**FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **PLAINTIFFS UNDER SEAL** | : | **CIVIL ACTION NO.** |
|  | : | **HON.   16   0683** |
| **v.** | : |  |
|  | : | **FILED IN CAMERA & UNDER SEAL** |
| **DEFENDANTS UNDER SEAL** | : |  |
|  | : | **JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR FALSE CLAIMS ACT
## VIOLATIONS 31 U.S.C. § 3729 ET SEQ.

Thomas W. Sheridan, Esquire
SHERIDAN & MURRAY, LLC
424 South Bethlehem Pike, Third Floor
Fort Washington, PA 19102
Phone:        (215) 977-9500
Facsimile:    (215) 977-9800

*Of Counsel*:

Joseph Trautwein, Esquire
JOSEPH TRAUTWEIN & ASSOCIATES, LLC
1777 Sentry Parkway West
Abington Hall, Suite 100
Blue Bell, PA 19422
Phone:        (215) 764-2301
Facsimile:    (267) 464-0400

David T. Marks, Esquire
Jacques G. Balette, Esquire
Jason N. Young, Esquire
MARKS, BALETTE & GIESSEL, P.C.
10000 Memorial Drive, Suite 760
Houston, TX 77024
Phone:        (713) 681-3070
Facsimile:    (713) 681-2811

Mark DiCello, Esquire
THE DICELLO LAW FIRM
7556 Mentor Ave
Mentor, OH 44060
Phone:        (440) 953-8888
Facsimile:    (440) 953-9138
*Counsel for Plaintiffs / Relator*

1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, STATE OF
CALIFORNIA, STATE OF COLORADO, STATE
OF CONNECTICUT, STATE OF GEORGIA,
STATE OF INDIANA, STATE OF MONTANA,
STATE OF NEVADA, STATE OF NEW
HAMPSHIRE, STATE OF NORTH CAROLINA,
STATE OF TENNESSEE, STATE OF
WASHINGTON, STATE OF WISCONSIN,
COMMONWEALTH OF MASSACHUSETTS,
and COMMONWEATH OF VIRGINIA,

                     Plaintiffs,
                     *Ex rel.*

JOHN DOES

                     Plaintiffs-Relators,

      v.

KINDRED HEALTHCARE, INC.; KINDRED
HEALTHCARE OPERATING, INC.; KINDRED
HEALTHCARE SERVICES, INC.; KINDRED
NURSING CENTERS, EAST, LLC; KINDRED
NURSING CENTERS WEST, LLC; KINDRED
NURSING CENTERS SOUTH, LLC; AND
KINDRED NURSING CENTERS NORTH, LLC,

                     Defendants.

## ORIGINAL COMPLAINT FOR
## FALSE CLAIMS ACT VIOLATIONS-31 USC § 3729, ET SEQ.

This action is brought by John Doe Relators by and through the undersigned attorneys on behalf of the United States of America and the States of California, Colorado, Connecticut, Georgia, Indiana, Montana, Nevada, New Hampshire, North Carolina, Tennessee, Washington, and Wisconsin, and the Commonwealths of Virginia and Massachusetts against Kindred Healthcare, Inc.; Kindred Healthcare Operating, Inc.; Kindred Healthcare Services, Inc.; Kindred Nursing Centers, East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers South, LLC; And Kindred Nursing Centers North, LLC, who owned and operated 174 nursing homes identified in *Exhibits 1 and 2*[1] attached hereto (collectively, "Kindred" or "Defendants") to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and various state false claims acts[2] for tens of thousands of false claims presented or caused to be presented for payment or approval to Medicare and Medicaid by Defendants.

---

[1] *Exhibit 1* identifies 95 nursing homes, listing the name, provider number, address, and dates of ownership/operation by Kindred, and the wholly-owned corporate subsidiary through which Kindred operated each facility during all or or portion of the time frame of January 1, 2008 to December 15, 2015. Relators allege that each facility listed in Exhibit 1 engaged in a routine pattern and practice of presenting false claims or causing the same to be presented to federal and state governments during the aforementioned timeframe.   Additionally, key financial data for the facilities identified in Exhibit 1 will be provided to the United States of America and the States of California, Colorado, Connecticut, Georgia, Indiana, Montana, Nevada, New Hampshire, North Carolina, Tennessee, Washington, and Wisconsin, and the Commonwealths of Virginia and Massachusetts with Relators' Disclosure Statement in Exhibit 1A.

*Exhibit 2* lists 79 additional Kindred nursing homes.  As to the facilities listed in Exhibit 2, these nursing homes presented or caused to be presented false claims to federal and state governments.  Furthermore, key financial data for the facilities identified in Exhibit 2 will be provided to the United States and the above listed states with Relators' Disclosure Statement in Exhibit 2A.

[2] The state False Claims Acts invoked for purpose of this case include: California (CALIFORNIA FALSE CLAIMS ACT, Government Code §§12650-12656), Colorado (COLORADO MEDICAID FALSE CLAIMS ACT, § 25.5-4-303.5, *et seq.*), Connecticut (CONNECTICUT FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS, §17b-301, *et seq.*), Georgia (GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT, codified at §§ 23-3-120 to 23-3-127 and STATE FALSE MEDICAID CLAIMS ACT, §§ 49-4-168 to 49-4-168.6), Indiana (INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IC § 5-11-5.5, *et seq.*), Massachusetts (MASSACHUSETTS FALSE CLAIMS ACT, Chapter 12, Part 1, Title II, § 5, *et seq.*), Montana (MONTANA FALSE CLAIMS ACT, MCA § 17-8-401, *et seq.*), Nevada (NEVADA - SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT, NRS § 357.010, *et seq.*), New Hampshire (NEW HAMPSHIRE FALSE CLAIMS ACT, § 167:61-B, *et seq.*), North Carolina (NORTH CAROLINA FALSE CLAIMS ACT, § 1-605, *et seq.*), Tennessee (TENNESSEE FALSE CLAIMS ACT, § 4-18-101, *et seq.* and TENNESSEE MEDICAID FALSE CLAIMS ACT, § 71-5-181, *et seq.*), Virginia (VIRGINIA FRAUD AGAINST

## I.    INTRODUCTION

1.    This case involves a nationwide false claim scheme by Kindred which is one of the largest and most profitable nursing home conglomerates in the country to obtain payment from Medicare and Medicaid for necessary resident care that it claimed to have provided, but in fact, did not provide.

2.    Kindred implemented and deliberately pursued a strategy to recruit residents[3] with high acuity levels (*i.e.*, residents who were extremely dependent upon staff for their most basic care needs) in order to allow it to reap higher Medicare and Medicaid reimbursements. While pressuring its nursing homes to target and recruit physically-dependent, seriously impaired residents, Kindred intentionally understaffed its facilities in order to skim more money from federal and state healthcare payors.  These continuing practices not only violated the law but made it humanly and mathematically impossible for the nursing homes made the subject of this case to deliver essential care services that they claimed to Medicare and Medicaid were required and provided.  In short, Kindred was paid for services it claimed to provide, but did not.

3.    Medicare, a federal program, covers care in "skilled nursing facilities" ("SNFs") for a fixed period for those who need skilled nursing services following discharge from a qualifying hospital stay.  42 U.S.C. § 1395i–3.  Medicaid, a joint federal and state program, covers long term care in a "nursing facility" ("NF") for those who are medically qualified and dependent on staff for nursing care services. 42 U.S.C. § 1396a. (Since a single Kindred facility may and typically does serve residents in each program, the term "nursing home" will refer to a

---

TAXPAYERS ACT, § 8.01-216.1, *et seq.*), Washington (WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT, RCW §74.66.005, *et seq.*), and Wisconsin (WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW, § 20.931, *et seq.*).

[3] The Social Security Act §§ 1810 and 1919, and 42 CFR § 483, *et seq.*, refer to a nursing home *patient* as a *resident*.  The terms are used interchangeably herein.

facility with both Medicare and Medicaid residents.)  By reason of their loss of physical function and cognitive decline, both Medicare and Medicaid residents may need essential bedside care, also known as assistance with activities of daily living (ADLs) including (a) toileting assistance, (b) incontinent care and changing of wet and soiled clothing and linen, (c) assistance transferring to chair and back, (d) assistance with dressing, (e) assistance with bathing and personal hygiene, (f) assistance with turning and repositioning immobile residents, (g) feeding assistance, (h) a.m. and p.m. care, and (i) exercise or range of motion for debilitated residents.

4.      When Kindred knowingly admitted Medicare and Medicaid residents, it knew that it was required by law to provide these essential care services to every resident needing the same.

5.      Despite its aggressive recruitment of residents who were dependent upon nursing home staff for all or many of the labor-intensive ADLs listed above, Kindred deliberately limited the number of staff allowed to be on duty in its nursing homes.  This practice made it impossible for Kindred to deliver the ADL services that it claimed to Medicare and Medicaid were provided to residents in an individualized resident document known as a Minimum Data Set ("MDS"),[4] as well as the Comprehensive Care Plan[5] and daily ADL staff support and performance records[6] for

---

[4] The MDS is a document that is required to be completed for every nursing home resident and submitted to Medicare/Medicaid as a condition of payment. The MDS contains a list of specific ADLs required by each resident, as well as a list of the ADL services the nursing home claimed to have provided (including whether any of those services required the assistance of 2 staff members.  A nursing home must complete an MDS for each resident upon admission to the facility and then periodically update it at specified times (5-day, 14-day, 30 day, quarterly, annually) and upon significant changes in the resident's condition.  The MDS information is collected electronically by the facility and transmitted to states and/or to the national MDS database at CMS.  As the Seventh Circuit has stated, the MDS "form is both a billing document and a care assessment certification for Medicare and Medicaid ..." *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).

[5] The facility must develop a Comprehensive Care Plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment.  42 CFR S 483.20(k).  This document is part of each resident's medical record.

The Comprehensive Care Plan must be—

(i) Developed within 7 days after completion of the comprehensive assessment;

each resident.  As a consequence, Kindred residents were routinely deprived of essential bedside care.  Kindred employed "staffing ladders" and other mandatory controls designed to limit labor hours and costs and deliberately forced its nursing homes to be staffed at levels that were (a) incompatible with the amount of ADL services required by residents, (b) insufficient to deliver the ADL services for which Kindred submitted claims for payment from Medicare and Medicaid, (c) which resulted in Kindred violating both federal and state false claims acts and (d) neglected and harmed its most vulnerable residents.

6.      The profound difference between the amount of ADL services that Kindred claimed to have provided and the amount of those services that were humanly possible given Kindred's staffing is at the heart of this case.

7.      John Doe Relators have direct and independent knowledge that:

a.      Kindred continually exerted pressure from the top down on its subject nursing homes to recruit highly-dependent residents who required assistance with labor-intensive ADL care.

b.      Despite its aggressive recruitment of highly-dependent residents, Kindred deliberately employed a non-acuity-based staffing scheme that ignored the essential ADL care needs of its residents and caused the staffing

---

(ii) Prepared by an interdisciplinary team, that includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff in disciplines as determined by the resident's needs, and, to the extent practicable, the participation of the resident, the resident's family or the resident's legal representative; and

(iii) Periodically reviewed and revised by a team of qualified persons after each assessment.

The services provided or arranged by the facility must—

(i) Meet professional standards of quality; and

(ii) Be provided by qualified persons in accordance with each resident's written plan of care.  42 CFR S 483.20(k)(2)-(3)

[6] Additionally, facilities must have sufficient medical record documentation to justify the ADL coding in each resident's MDS for ADL care claimed to be required and provided to residents.

levels/labor hours to be insufficient to meet the needs of its residents as defined by their MDSs and Comprehensive Care Plans.

c.     Kindred's systemic non-acuity-based staffing practices resulted in dependent residents routinely not receiving the essential ADL care that Defendants certified such residents required and were provided and which directly resulted in resident neglect and harm.

d.     Despite Kindred's awareness of the care deprivations its staffing and resident recruitment practices caused, it refused to increase staffing levels or decrease the number of heavy care residents in the subject facilities to make it possible for the limited number of staff to deliver the essential ADL care required by dependent residents.

e.     The staffing targets and resident recruitment targets that Kindred imposed and relentlessly enforced at its facilities made it humanly impossible for the limited numbers of staff to deliver the essential bedside care that Kindred claimed in its MDSs, (resident Comprehensive Care Plans) and resident medical records was necessary for and actually provided to its highly-dependent nursing home residents.

8.     Relators have direct knowledge that Kindred understaffed each of the subject nursing homes and quantified the extent to which it deprived residents the basic ADL care that was required and that Kindred claimed was provided. Kindred nonetheless submitted claims for payment to the federal and state governments for ADL services that were mathematically and humanly impossible for it to have provided.

7

9.     While the gravamen of Relators' claim, brought pursuant to federal and state False Claims Acts, is that government payors were being billed for services that were not provided, it is also the case here that Defendants have shortchanged care to their most vulnerable resident population – many of whom lack the capacity to complain on their own – in order to increase Kindred's profits and raise the cash necessary to finance debt, support excessive spending and a zealous acquisition strategy.

10.    The false claims and statements in this case include tens of thousands of false MDSs submitted to Medicare and Medicaid.  Kindred knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in these MDSs and that the submission of false resident ADL information in these MDSs may subject it to substantial criminal, civil and administrative penalties. The false claims in this case also include the various claims for payment that Kindred submitted to Medicare and Medicaid, certifying as a condition of payment that the care it claimed to have delivered complied with federal and state laws.

## II.    JURISDICTION AND VENUE

11.    John Doe Relators bring this action on behalf of themselves and on behalf of the United States for Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the the States of California, Colorado, Connecticut, Georgia, Indiana, Montana, Nevada, New Hampshire, North Carolina, Tennessee, Washington, and Wisconsin, and the Commonwealths of Virginia and Massachusetts, for violations of their respective State False Claims Acts (collectively referred to as the "Qui Tam States").

12.    This Court has both subject matter and personal jurisdiction under 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law

8

causes of action as well as claims brought under State False Claims Acts under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

13.     Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because one or more of Defendants can (1) be found in, (2) resides in, and (3) transacts business in this District, and because acts proscribed by 31 U.S.C § 3729 occurred in this District.  For example, the Kindred Defendants owned, operated, and managed the Kindred Transitional Care and Rehabilitation Center--Wyomissing in Reading, Berks County (provider number #395237).  Further, the acts proscribed by 31 U.S.C § 3729 occurred at this facility.

14.     There has been no public disclosure of the allegations herein.  To the extent that there has been a public disclosure unknown to the John Doe Relators, they are the "original source" under 31 U.S.C. § 3730(e)(4) and similar state laws.  John Doe Relators have direct and independent knowledge of the information on which the allegations are based.

## III.   THE PARTIES

### A.   THE RELATORS

15.     John Doe Relators are citizens of the United States and have standing to bring this action under the False Claims Act, 31 U.S.C. § 3730(b)(1) and the various state False Claims Acts.

16.     John Doe Relators have direct and independent knowledge of the facts and circumstances giving rise to this claim.

17.     Recognizing that fraud on the government can be diffuse and institutional, the Relators have each contributed a piece of the mosaic to establish the systemic nature of Defendants' fraudulent practices.

**B.  DEFENDANTS**

18.      Defendant Kindred Healthcare Inc. ("Kindred" or the "Company") is a Fortune 500 healthcare services conglomerate incorporated in Delaware and headquartered in Louisville, Kentucky.[7]   Excluding its insurance company in the Cayman Islands, Kindred operates through 327 subsidiary companies in 46 states and Puerto Rico.[8]  As of June 30, 2015, Kindred reported that it provided healthcare services through its subsidiaries at 2,730 locations in 47 states, including 96 transitional care hospitals, 16 inpatient rehabilitation hospitals, 90 nursing centers, 21 sub-acute units, 656 home health, hospice and non-medical home care sites, 99 inpatient rehabilitation units (hospital-based), and contract rehabilitation services at 1,752 sites.[9]

19.      Kindred is one of the largest diversified providers of post-acute services, in the United States, pumping out revenues totaling over $31 billion from 2008 through 2014 (including approximately $5 billion in 2013 and $3.6 Billion in 2014), a substantial portion of which are derived through Medicare and Medicaid funding paid to Kindred's nursing home operations (skilled nursing facilities and nursing facilities).  In its annual SEC report for the period ending December 31, 2012, Kindred boasted that it was the fourth largest skilled nursing facility provider in the nation, operating a national network of 223 nursing homes with 27,142 licensed beds in 27 states.[10]

20.      Since 2008, Kindred's nursing home operations have generated revenues in excess of $12.9 billion, based on a volume of over 50 million resident days.  By far, the largest

---

[7] Kindred Healthcare, Inc.'s principal place of business is 680 South Fourth Street, Louisville, Kentucky 40202.

[8] *See* Kindred's SEC 10-K Annual Report for fiscal year ending December 31, 2014.

[9] *See* Kindred's Investor Overview website at http://phx.corporate-ir.net/phoenix.zhtml?c=129959&p=irol-IRHome.

[10] *See* Kindred's SEC 10-K Annual Report for fiscal year ending December 31, 2012.  In 2013, to support its expansion into long term care hospitals and therapy providers, Kindred sold a number of its nursing home facilities and, as of December 31, 2013, it operated 12,638 licensed beds in 23 states.  By 2014, the number of nursing homes had been reduced further to 90, with 11,910 beds in 18 states.

purchaser of this nursing home care was the government, with over 82% of these revenues since 2008 being derived from the Medicare, Medicare Advantage, and Medicaid.[11]

21.     Kindred's growth and diversification was financed by the nursing home[12] Medicare/Medicaid reimbursement system.  The guaranteed chunk of taxpayer cash derived from Kindred's nursing home operations provided the revenue stream necessary to service Kindred's debt.

22.     Kindred Healthcare, Inc. is a Delaware corporation with its principal place of business located at 680 South Fourth Street, Louisville, KY 40202-2412.

23.     Kindred Healthcare, Inc., owns as a subsidiary, Kindred Healthcare Operating, Inc., which in turns owns Kindred Nursing Centers East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers North, LLC; and Kindred Nursing Centers South, LLC. Additionally, Kindred Healthcare, Inc., owns as a subsidiary Kindred Healthcare Services, Inc.

24.     Kindred Healthcare Operating, Inc. is also a Delaware corporation with its principal place of business located at 680 South Fourth Street, Louisville, KY 40202-2412.

25.     Kindred Healthcare Services, Inc. is also a Delaware corporation with its principal place of business located at 680 South Fourth Street, Louisville, KY 40202-2412.

26.     Kindred Nursing Centers, East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers South, LLC; and Kindred Nursing Centers North, LLC., hold the licenses for approximately 90% of the nursing homes included in the attached Exhibits 1 and 2. As such, the overwhelming majority of Kindred's nursing homes were directly controlled and operated by the named Defendants.  The principal place of business for each the "Nursing

---

[11] *See* Kindred's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2014.

[12] For purposes of this pleading, the term "nursing home" means a dually certified skilled nursing facility and nursing facility as such are defined in Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r.  Further, such term includes all state-licensed nursing homes/nursing facilities.

11

Centers" Defendants listed in this paragraph is 680 South Fourth Street, Louisville, Kentucky 40202.   Each is a Delaware entity that at all times material to this case was a wholly owned subsidiary of Kindred Healthcare, Inc.  These Defendants were regularly designated by Kindred Healthcare, Inc. as the legal entities owning and operating those facilities in Exhibits 1 and 2.  As described in more detail below, each of the aforementioned legal entities and nursing homes was merely an instrumentality or conduit through which Kindred Healthcare, Inc. did business and operated the facilities listed in Exhibits 1 and 2.

27.     Of particular relevance to this case are the 174 Kindred owned, operated, managed, and/or maintained nursing homes listed in Exhibits 1 and 2 by name, address, and provider number, including the facility in the Eastern District of Pennsylvania.  These nursing homes are both "skilled nursing facilities" and "nursing facilities" as such are defined by Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r, as well as by state laws and regulations governing the operation of nursing facilities.  With respect to each of the nursing homes listed in Exhibits 1 and 2, Kindred entered into provider agreements with Medicare and Medicaid and systematically presented false claims for government payment under each facility's unique provider number in violation of 31 U.S. § 3729, as described in more detail below.

28.     Also, as described in more detail below, the facilities listed in Exhibits 1 and 2 were not only owned, operated, controlled, managed, and dominated by Defendants but were also mere agents, instrumentalities, or conduits through which the Kindred Defendants did business.  Defendants managed, operated, obtained licenses, and distributed the revenues, profits and assets for a national network of nursing homes, including the facilities listed in Exhibits 1 and 2.  By reason of the conduct described herein, Defendants and the subject nursing homes

12

directly participated in the false claim violations described herein and were the alter egos of one another, there being a sufficient unity of interest and ownership among and between them that the acts of one were for the mutual benefit of and can be imputed to the others.

## IV. MEDICARE, MEDICAID, AND KINDRED'S CERTIFIED CLAIMS OF STAFF AND CARE PROVIDED

29.     The federal and state governments are the principal purchasers of nursing home services, primarily through their Medicare and Medicaid programs.   Medicare is a federal government health program primarily benefiting the elderly and disabled that is administered by CMS.  Medicare pays for short-term post-acute nursing home care that includes skilled nursing and rehabilitation services (in what it calls "skilled nursing facilities" or "SNFs").   It covers up to 100 days of nursing home services per episode of illness after a qualifying inpatient hospital stay.  Medicare's payments to SNFs are for the provision of both skilled nursing services and the ADLs needed by the Medicare beneficiary.

30.     Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that pays for medical expenses of primarily low-income residents.   Funding for Medicaid is shared between the federal government and state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  Medicaid pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS.  42 U.S.C. §§ 1396a(a)-(b).  Medicaid pays for long term care in a "nursing facility" (NF), including ADLs, for those who are medically qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.

31.     Federal law requires operators of both SNFs and NFs to conduct a comprehensive assessment of each residents' specific needs, and to submit the list of these needs to CMS.  42

U.S.C. § 1395i–3 (Medicare); 42 U.S.C. § 1396 (Medicaid).   The nursing homes report this list in a document known as the "Minimum Data Set" ("MDS") for every resident in the nursing home regardless of the resident's age, diagnosis, length of stay, or payment category (*i.e.*, Medicare, Medicaid, or private insurance).   42 CFR § 483.20.   In *Section G* of the MDS, the nursing home provides a specific list of the ADL care each resident needs and a list of the ADL services the nursing home claimed to have provided to the resident.   An example of *Section G* of the MDS is set forth below:

| Section G | Functional Status |
|---|---|

**Coding:**

**Activity Occurred 3 or More Times**
0. **Independent** - no help or staff oversight at any time
1. **Supervision** - oversight, encouragement or cueing
2. **Limited assistance** - resident highly involved in activity; staff provide guided maneuvering of limbs or other non-weight-bearing assistance
3. **Extensive assistance** - resident involved in activity, staff provide weight-bearing support
4. **Total dependence** - full staff performance every time during entire 7-day period

**Activity Occurred 2 or Fewer Times**
7. **Activity occurred only once or twice** - activity did occur but only once or twice
8. **Activity did not occur** - activity (or any part of the ADL) was not performed by resident or staff at all over the entire 7-day period

**Coding:**
0. **No setup or physical help from staff**
1. **Setup help only**
2. **One person physical assist**
3. **Two+ persons physical assist**
8. **ADL activity itself did not occur during entire period**

| | 1. Self-Performance | 2. Support |
|---|---|---|
| | ↓ Enter Codes in Boxes ↓ | |
| A. **Bed mobility** - how resident moves to and from lying position, turns side to side, and positions body while in bed or alternate sleep furniture | 3 | 3 |
| B. **Transfer** - how resident moves between surfaces including to or from: bed, chair, wheelchair, standing position (excludes to/from bath/toilet) | 3 | 3 |
| C. **Walk in room** - how resident walks between locations in his/her room | 8 | 8 |
| D. **Walk in corridor** - how resident walks in corridor on unit | 8 | 8 |
| E. **Locomotion on unit** - how resident moves between locations in his/her room and adjacent corridor on same floor. If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| F. **Locomotion off unit** - how resident moves to and returns from off-unit locations (e.g., areas set aside for dining, activities or treatments. If facility has only one floor, how resident moves to and from distant areas on the floor. If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| G. **Dressing** - how resident puts on, fastens and takes off all items of clothing, including donning/removing a prosthesis or TED hose. Dressing includes putting on and changing pajamas and housedresses | 3 | 2 |
| H. **Eating** - how resident eats and drinks, regardless of skill. Do not include eating/drinking during medication pass. Includes intake of nourishment by other means (e.g., tube feeding, total parenteral nutrition, IV fluids administered for nutrition or hydration) | 1 | 2 |
| I. **Toilet use** - how resident uses the toilet room, commode, bedpan, or urinal; transfers on/off toilet; cleanses self after elimination; changes pad; manages ostomy or catheter; and adjusts clothes. Do not include emptying of bedpan, urinal, bedside commode, catheter bag or ostomy bag | 3 | 3 |
| J. **Personal hygiene** - how resident maintains personal hygiene, including combing hair, brushing teeth, shaving, applying makeup, washing/drying face and hands (excludes baths and showers) | 2 | 2 |

| G0120. Bathing |
|---|

How resident takes full-body bath/shower, sponge bath, and transfers in/out of tub/shower (excludes washing of back and hair). Code for most dependent in self-performance and support

**Enter Code** [ 3 ]   **A. Self-performance**
  0. **Independent** - no help provided
  1. **Supervision** - oversight help only
  2. **Physical help limited to transfer only**
  3. **Physical help in part of bathing activity**
  4. **Total dependence**
  8. **Activity itself did not occur during the entire period**

**Enter Code** [ 3 ]   **B. Support provided**
  (Bathing support codes are as defined in item G0110 column 2, ADL Support Provided, above)

*Example:  MDS 3.0 Section G*

32.      On each MDS Kindred submitted to CMS and state governments, it made specific

claims in *Section G* of the MDS regarding both the functional status of each of its residents ***and***

the number of staff provided to help residents with each ADL: (a) bed mobility, (b) transfer, (c)

walk in room, (d) walk in corridor, (e) locomotion on unit, (f) locomotion off unit, (g) dressing, (h) eating, (i) toilet use, (j) personal hygiene, and (k) bathing.[13]

33.     Every nursing home operated by Kindred is required to accurately assess and code in Column 1 ("Self-Performance") each resident's ability to perform each ADL, and in Column 2 ("Support") the level of assistance and support required by and provided to each resident by nursing home staff for each ADL.  In the example above, the use of code "3" in Column 1 to describe the resident's ability to perform basic ADL functions indicates the resident has minimal ability to perform these basic functions and is highly dependent on nursing home staff for the same.  Further, by coding a "3" in various "staff support" boxes under Column 2, the nursing home in this example claims that the resident required and was provided *2-person physical assistance* by nursing home staff for those specific *ADL* functions.  Thus, the example above indicates the resident required (and was provided) the assistance of two nursing home staff members in connection with moving in her bed (Bed Mobility), transfers to and from her bed (Transfer), and the use of toilet (Toileting).

34.     Every time Kindred submitted an MDS to the federal and state government for a resident, Kindred made the following certification or one substantially similar to it (emphasis added):

> I certify that the accompanying information **accurately reflects resident assessment information** for this resident and that I collected or coordinated collection of this information on the dates specified.  To the best of my knowledge, this information was collected in accordance with applicable **Medicare and Medicaid** requirements.  I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and **as a basis for payment from federal funds**.  I further **understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this**

---

[13] A true and complete copy of MDS 2.0 and 3.0 will be produced to the United States and the above listed states with Relators' Disclosure Statement.

**information**, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for **submitting false information**.  I also certify that I am authorized to submit this information by this facility on its behalf.  (emphasis added).

35.    Each Kindred nursing home was also required to submit staffing data to CMS, including specific information as to the time available to certified nurse aides and licensed nurses in a CMS-671 form[14] as part of the annual survey process.  As stated in CMS's State Operations Manual, completion of the Form CMS-671 is a condition of payment by Medicare and Medicaid:

> Skilled nursing facilities and nursing facilities **must be in compliance** with the requirements in 42 CFR Part 483, Subpart B **to receive payment under Medicare or Medicaid**.  To certify a skilled nursing facility or nursing facility, complete at least:
>
> •    A life safety code survey; and
>
> •    A standard survey (Forms **CMS**-670, **671**, 672, 677, 801 through 807, and Exhibits 85, 86, 88 to 95).

*(emphasis added)*.[15]

36.    Kindred also repeatedly submitted claims to Medicare and Medicaid for payment for resident care.  If the resident was covered by Medicare, then the Kindred facility - which was proving SNF services and seeking reimbursement for the same – submitted a claim to a Medicare Administrative Contractor ("MAC") on either the 837I electronic form or the CMS-1450 paper form.  Medicare pays SNFs a pre-determined daily rate for each day of care under a prospective payment system ("PPS").    *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).   The PPS payment is expected to cover all operating and capital costs that efficient facilities would be expected to incur in furnishing SNF services (Medicare will pay more for certain high-cost, low-

---

[14] A copy of the CMS-671 form will be produced to the United States and the above listed states with Relators' Disclosure Statement.

[15] State Operations Manual, Chapter 7 - Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, pp. 23-24, (Rev. 12/13/13).  *Also see* §§1819 and 1919 of the Social Security Act which require the survey process.

probability ancillary services not relevant here).   This PPS payment consists of a nursing

component and a therapy component.  Both of these are adjusted for (1) geographic differences

and (2) the facilities "case mix index" ("CMI").   As described below, the CMI is unique to each

facility and incorporates information from *Section G* of the MDS.

37.     Kindred also repeatedly submitted-claims for payment to state Medicaid programs

to receive payments for residents covered by Medicaid, using an electronic form that contains

similar information as to that found in the CMS 1450.  While state Medicaid program payments

to NFs vary from state to state, every state (except Maryland and Wyoming) uses a prospective

payment system similar in nature to the Medicare PPS system.   The Medicaid programs in

Arizona, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Montana,

Nebraska, Nevada, New Hampshire, North Carolina, Ohio, Pennsylvania, Utah, Vermont,

Virginia, Washington, and Wisconsin, like Medicare, adjust the daily payment amount (a per

diem payment) based on the facility's CMI which includes the information Kindred reported in

*Section G* of each resident's MDS. [16] The Alabama, California, Connecticut, Missouri, Oregon,

and Tennessee Medicaid programs also pay NFs a per diem rate but do not use a case mix index

in making adjustments to the per diem rate.

38.     As a provider of health care to frail and elderly nursing home residents covered by

Medicare and Medicaid, Kindred repeatedly affirmed and certified to federal and state

---

[16] *See generally*, Ariz. Rev. Stat. § 36-2959 (Arizona); Colo. Rev. Stat. § 25.5-6-202 (Colorado); Ga. Laws 111-4-1-.10 (Georgia); 405 Ind. Admin. Code 5-13-3 (Indiana); Idaho Admin. Code r. 16-03.10 *et seq.* (Idaho); 901 Ky. Admin. Regs. 1:022 (Kentucky); 10-144 Me. Code. R. § 115 (Maine); 130 Mass. Code. Reds. 456.401 *et. seq.* (Massachusetts); Mont. Admin. R. 37.40.307 (Montana); 471 Neb. Admin Code § 12-011 *et. seq.* (Nebraska); Nevada Medicaid Services Manual Chapter 500, publically available at https://dhcfp.nv.gov/MSM/CH0500/MSM%20Ch%20500%20Packet%20(03-22-13).pdf (Nevada); N.H. Rev. Stat. 151-E *et seq.*, (New Hampshire); North Carolina Clinical Coverage Policy 2B-1, publically available at http://www.ncdhhs.gov/dma/mp/2B1.pdf (North Carolina); Ohio Admin. Code § 5160-3-10 *et. seq.*, (Ohio); 55 PA Code Chapter 1187 (Pennsylvania); Utah Admin. Code § r.414-504 *et seq.*, (Utah); Vt. Stat Ann. Tit. 33, § 905 (Vermont); 12 Va. Admin. Code § 30-90-10 (Virginia); Wash. Admin. Code 388-96-010 *et seq.*, (Washington); and Wis. Stat. § 49.45(6m) (Wisconsin).

governments for each of the subject nursing homes that the services it was paid by taxpayers to

provide complied in all respects with applicable law and conditions of payment.  In addition to

its certifications regarding the MDS and CMS-671 forms described above, Kindred also certified

that it would abide by Medicare and Medicare regulations as a condition of payment.

39.    The Social Security Act and federal regulations require all nursing homes to have

sufficient numbers of nursing staff, including certified nurse aides (CNAs), to provide "nursing

and related services to attain or maintain the highest practical physical, mental, and psychosocial

well-being of each resident, as determined by resident assessments and individual plans of

care."[17]  42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); and 42 C.F.R. § 483.30.

Further, every nursing home:

> [M]ust provide services by sufficient numbers of each of the following types of
> personnel on a 24-hour basis to provide nursing care to all residents in accordance
> with resident care plans: (i) Except when waived under paragraph (c) of this
> section, licensed nurses; and (ii) Other nursing personnel [including certified
> nurse aides (CNAs)].[18]

42 C.F.R. § 483.30(a)(1).  These staffing laws and regulations require, as a condition to

Medicare/Medicaid reimbursement, that each nursing home must have sufficient numbers

of staff on a 24-hour basis to provide the basic bedside care services needed by residents,

as defined by each resident's MDS assessment and individual plan of care.

---

[17] The definition and specific requirements for a "resident assessment" (also known as a Minimum Data Set or
MDS) and "individual plan of care" are also set forth in 42 U.S.C. § 1395i-3(b)(4)(A)(i), 42 U.S.C. §
1396r(b)(4)(A)(i), and 42 C.F.R. § 483.30.

[18] "Other nursing personnel" includes certified nurse aides (CNAs), which are specifically defined in 42 C.F.R. §
483.75 as:

> [A]ny individual providing nursing or nursing-related services to residents in a facility who is not
> a licensed health professional, a registered dietitian, or someone who volunteers to provide such
> services without pay.  Nurse aides do not include those individuals who furnish services to
> residents only as paid feeding assistants as defined in § 488.301 of this chapter.

40.    Further, Medicare and Medicaid payments to nursing homes are explicitly premised upon compliance with § 1819(d)(1) (Medicare) and § 1919(d)(1) (Medicaid) of the Social Security Act (42 U.S.C. § 1395i-3(d)(1)(A) and 42 U.S.C. § 1396r(d)(1)(A)) that provide:

> A skilled nursing facility (and "non-skilled" nursing facility) must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.

41.    Kindred's repeated assurances that it would comply with these laws began when it filed applications for each of its nursing homes to participate in the Medicare program.  Each Kindred facility subject to this case completed a *Medicare Enrollment Application for Institutional Providers* (CMS-855A), certifying and affirming on an ongoing basis that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor.
>
> I understand that **payment of a claim** *by Medicare is* **conditioned** *upon* the claim and the *underlying transaction complying with such laws, regulations, and program instructions* (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the *provider's compliance* with all applicable conditions of participation in Medicare.
>
> My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program. (*emphasis added*).

42.    Further, in order to qualify for Medicare payments, Kindred's nursing homes were required to sign and did, in fact, execute *Health Insurance Benefit Agreements* (CMS-1561) under 42 U.S.C. § 1395cc, conditioning payment on compliance with federal regulations, including those referenced above.  Specifically, these Agreements state, "In order to *receive*

*payment* under [Medicare]," the nursing home, "as the provider of services, agrees to conform to the ... applicable provisions in 42 CFR."[19]

43.     Kindred's certifications as compliance for payment from Medicare are described in the *Medicare Benefit Policy Manual*.  This *Manual* provides that payment for care in a SNF is covered only if all of the following conditions were met:

- The patient requires skilled nursing services or skilled rehabilitation services, i.e., services that must be performed by or under the supervision of professional or technical personnel (*see* §§30.2 -30.4); are ordered by a physician and the services are rendered for a condition for which the resident received inpatient hospital services or for a condition that arose while receiving care in a SNF for a condition for which he received inpatient hospital services; [and]

- The patient requires these skilled services on a daily basis (*see* §30.6); [and]

- As a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a SNF (*see* §30.7.); and

- The services delivered are reasonable and necessary for the treatment of a patient's illness or injury, i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. ***The services must also be reasonable in terms of duration and quantity.***

**If any one of these four factors is not met, a stay in a SNF, even though it might include the delivery of some skilled services, is not covered.**  For example, payment for a SNF level of care could not be made if a resident needs an intermittent rather than daily skilled service.

*Medicare Benefit Policy Manual*, Ch. 8, § 30 *(emphasis added)*.

44.     Accordingly, throughout the applicable timeframe in this case, Kindred knew that Medicare would not pay it for services that were:  (1) not reasonable, (2) not consistent with the

---

[19] *Id.* CMS Form 1561 is available at
http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1561.pdf

nature and severity of the resident's individual needs, (3) not consistent with accepted standards of medical practice, and (4) not reasonable both in terms of **duration and quantity**.

45. Another condition of Medicare payment is found in the Patient's Assessment Requirements of the Social Security Act:

> A skilled nursing facility **must conduct** a comprehensive, accurate, standardized, reproducible **assessment of each resident's functional capacity**, which assessment—
>
> (i) describes the resident's **capability to perform daily life functions and significant impairments** in functional capacity;
>
> (ii) is based on a uniform minimum data set [MDS] specified by the Secretary . . .;
>
> (iii) uses an instrument which is specified by the State under subsection (e)(5); and
>
> (iv) includes the identification of medical problems.
>
> Each such [MDS] assessment must be conducted or coordinated (with the appropriate participation of health professionals) by a registered professional nurse who signs and **certifies** the completion of the assessment. Each individual who completes a portion of such an assessment shall sign and **certify as to the accuracy** of that portion of the assessment.

42 U.S.C. 1395i–3 and 42 U.S.C. 1396r (*emphasis added*). Put simply, to be paid by Medicare and Medicaid, nursing homes must accurately complete MDS assessments for each and every resident.

46. Each Kindred nursing home also signed a Medicaid Provider Agreement agreeing that the provider is only entitled to be reimbursed for furnishing covered services when all federal and state laws, regulations and program rules have been followed by the provider. Each state's Provider Agreement is slightly different, but this over-riding similarity that compliance with law is a required condition of payment is present throughout the country and in every state involved in this litigation.

22

47.     For example, the Kentucky Medicaid Provider Agreement (p. 6) states that:

All participating providers **agree to meet the requirements of all applicable state and federal laws and regulations** including Title VI of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, the Americans with Disabilities Act, and the Rehabilitation Act of 1973.[20]

48.     Similarly, the various state regulations under Medicaid establish the same requirements that are present under federal law concerning using nursing home resources to meet resident needs and having sufficient staff to meet those needs.[21]  For example, in Kentucky, 902 KAR § 20:300 states:

The facility **shall** provide services by **sufficient numbers of Certified Nursing Assistants** on a twenty-four (24) hour basis **to provide nursing care to all residents in accordance with resident assessments and individual care plans.**

49.     The Kentucky Medicaid Provider Manual, page 17, states:

Provider acknowledges and agrees that no reimbursement is due for a covered service and/or no claim is complete for a covered service unless performance of that covered service is fully and accurately documented in the member's medical record prior to the initial submission of any claim.

50.     The Kentucky Medicaid Nursing Facility Services Manual, Section II, page 2.2 states:

Providers of medical service or authorized representatives attest by their signatures, that the presented claims are valid and in good faith.  Fraudulent claims shall be punishable by fine, imprisonment or both.

51.     The Kentucky Medicaid Electronic Media Agreement, which Kindred nursing homes have signed, states:

This is to certify that the transmitted information is true, accurate, and complete and that any subsequent transactions which alter the information contained therein will be reported to the KMP. I understand **_that payment and satisfaction of these_**

---

[20] This language is also present in the *Kentucky Medicaid Nursing Facility Services Manual, Section II* (p. 2.1).

[21] Each of the states in which Kindred operated have adopted specific regulations applicable to nursing home operations that correspond to the federal regulations at 42 CFR § 483.10, *et seq.*

*claims will be from Federal and State funds* and that any false claims, statements, or documents or concealment of a material fact, may be prosecuted under applicable Federal and State Law.

52.     Finally, submission of accurate and true MDS information is also a condition of payment under Medicaid just as it is for Medicare.  Accordingly, Kindred certified in every one of its Medicaid and Medicare residents' MDSs that:

> I certify that the accompanying information accurately reflects resident assessment information for this patient and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. **I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds.** I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf.  [*emphasis added.*]

## V.     KINDRED PACKED ITS NURSING HOMES WITH HEAVY CARE RESIDENTS WHILE UNDERSTAFFING ITS NURSING HOMES

53.     John Doe Relators have direct and independent knowledge that the resident-to-staff ratios established and enforced by the company made it humanly impossible to deliver the essential ADL care required by dependent residents due to the sheer number of residents they were assigned and the residents' overwhelming needs.[22]  As a result, Kindred nursing home residents frequently were (a) forced to use their beds as toilets; (b) left in their own urine and feces for extended periods ("until the urine had dried and formed brown rings on the bed linens" or "until the feces had dried and stuck hard to the resident's body"); (c) left in pajamas/gowns and not gotten out of bed; (d) left in bed in the same position for hours on end; (e) left with a

---

[22] CNAs were pressured to falsify medical records to make it appear that they had provided care that they did not provide; for example, it was a practice to falsify records to show that residents received care on days when , according to employee time cards, the CNA was not in the building to deliver such care and/or on dates when the resident was not in the facility to receive it.

food tray next to the bed without any feeding assistance; (f) left smelly and unclean, unshaven, and unbathed; (g) left yelling/crying for help after call lights were pushed but not answered; (h) not provided oral care; (i) not encouraged or even given liquids to drink; and (j) found on the floor due to a lack of assistance.[23]

54.    Predictably, the residents who experienced the most care deprivation were those who were most vulnerable and unable to move or transfer from bed to chair, who did not have control of bowel and bladder function, whose wet and soiled clothing frequently had to be changed, and who were incapable of feeding themselves, bathing themselves, dressing themselves, and getting out of bed by themselves.  Based on Relators' direct and independent knowledge, these are the very type of residents who Kindred targeted for recruitment.

55.    In its quest to increase revenues and cash flows,[24] Kindred directed and required every nursing home in its chain to target and recruit high acuity residents including those requiring 2-person assist.  These targeted residents shared a common dependence upon nursing home staff for basic bedside care including: (a) toileting assistance, (b) incontinent care and changing wet/soiled clothing/linen, (c) assistance transferring in and out of bed/wheelchair, (d) repositioning in bed or wheelchair, (e) assistance with feeding and hydration, and (f) bathing and personal hygiene.

---

[23] Furthermore, Kindred had a practice of bringing in additional staff during surveys in order to make it appear that residents were getting proper care.  After the surveyors left, staffing levels and ADL care would go back to "normal" understaffed levels.  The limitations of the survey process and the likelihood that surveys significantly understate care issues at nursing homes are well known and well documented.  A study done by the United States Government Accountability Office ("GAO") in 2008 described widespread, nationwide patterns of state surveys failing to identify deficiencies;  70% of state surveys missed one or more deficiencies.  The most frequently missed type of deficiency identified in these resurveys was poor quality of care, including things like failing to ensure proper nutrition and hydration and failing to prevent pressure sores.  A 2009 study by the GAO identified several causes for this high level of deficiency understatement including the high number of survey tasks that surveyors were expected to complete, surveyors' inexperience with the survey methodology, and surveyor workforce shortages.

[24] Kindred Healthcare Inc.'s corporate strategy of increasing occupancy levels, numbers of high acuity residents, and revenues and cash flows came from the top down.  This strategy was memorialized in multiple SEC filings and emails.

### A.   KINDRED'S NURSING HOMES INCREASED OCCUPANCY RATES AND RECRUITED HEAVY CARE RESIDENTS

56.    Kindred's financial goal is to fill all its beds in each of its nursing homes.  More residents translate to more revenue.  While there is nothing wrong with maximizing resident census[25] and revenue, it is wrong to do so when facility staffing levels have been deliberately limited to the point that necessary care cannot be provided to residents.   This ongoing practice by Kindred is evident from the July 21, 2015 Affidavit of Tim Sirls, Kindred Director of Nurses, Heritage Manor, Kentucky:

> I was the Director of Nursing Services (DNS) also known as the Director of Nursing (DON) at Heritage Manor Healthcare Center (hereinafter "Heritage Manor") between April 2014 and June 2014.
>
> The DON should have a pivotal role in deciding what types of patients should be admitted into a nursing facility. This is because the DON is in the best position to know the staff s competency levels, time constraints, and ability to meet the new patient's needs. However, I had virtually no input or control over the census levels and patient recruiting efforts at Heritage Manor. Instead, Kindred implemented policies to ensure that the nursing home's beds were constantly filled with the highest paying residents possible. I could always admit a new resident but I had no authority to deny a new resident admission.
>
> Kindred made it clear Heritage Manor had to recruit and retain as many complex care residents as possible. These residents generated the highest reimbursement levels and revenue and allowed Kindred the opportunity to make more money for the services they could charge related to those residents. Importantly, these residents typically required the highest levels of care and demanded the most attention and time from my staff in order to properly care for their needs.
>
> Kindred's business strategy kept the acuity level at Heritage Manor above the average nursing home. Almost all of the residents at Heritage Manor (90% or more) were extensively or totally dependent on the staff for their activities of daily living (AOLs).  Almost every one of the residents required assistance with time-consuming ADLs, including: 1) toileting or incontinent care; 2) transfer from bed to wheelchair or back; 3) bathing; 4) dressing; 5) personal hygiene; 6) bed mobility; 7) eating; and, 8) AM/PM care. A high percentage of these patients (40% or so) required 2-person assistance with one or more ADL. Over half of the

---

[25]"Census" is the count of residents in a nursing home.

residents had dementia or Alzheimer's, further increasing the workload of the facility. Heritage Manor therefore needed to have higher staffing in the facility to meet the needs of the high resident acuity levels/workload at the facility.

Having sufficient, competent staff is vital to providing adequate care. It is critical to meeting resident needs and preventing neglect.

Kindred, however, did not staff Heritage Manor based on acuity levels/ADL needs of the residents. There was no tool, or method for determining staffing levels based upon the acuity/need levels of residents. Instead, staffing was based solely upon pre-determined budgetary targets based upon the number of residents in the facility (census). This practice was dangerous. Heavy care residents who required extensive assistance with time consuming ADL care such as eating assistance, toileting assistance, incontinent care, transfers, dressing, hygiene care, turning and repositioning, and bathing, require significantly more staff time than light care residents who are independent in these functions. However, based on Corporate Kindred's staffing method, there was no distinction made as to workload or labor time required to meet resident needs. All residents were staffed the same regardless of their ADL needs and the fact a significant number of residents required 2-person assist for these ADLs, effectively doubling the amount of time required to provide this important care.

57.    Kindred made resident recruitment a top company-wide priority.  Drops in a nursing home's resident census (also known as "negative budget variances") were regarded as a crisis by the Company, which strictly monitored the number of filled and empty beds each day in every one of its facilities.  Kindred's Corporate District Director of Operations, Katherine Joy has testified that:

> Q.  Now, you told me that you reported directly to David Stordy [Kindred Senior Vice President] and Mr. Jim Scadlock [Kindred Senior Vice President for Marketing and Development], correct?
> A.  Yes.
> Q.  Do you know who they reported to?
> A.  The president of the nursing home division for Kindred Healthcare.
> Q.  Lane Bowen?
> A.  Lane Bowen.
>
> …
>
> Q.  Is it true that you were being told by your corporate supervisors that you were expected to get the census changes that they wanted?
> A.  Yes.
> …

A   Is it true that you and your district team were being told by your corporate supervisors that you needed to micromanage and have a plan for increasing Medicare census at your nursing homes?
Q  Yes.
…
Q.  Is it true that you were being told by your corporate supervisors that you needed to make meeting your, or exceeding your census budget a top priority?
A.  That's what it said in this email.

58.   Kindred's Senior Vice President David Stordy wrote in an email to Katherine Joy that:

You each need to **make census the priority**, and most importantly, your EDs [facility Executive Directors] have to take responsibility for this.  I have spent most of this afternoon meeting with Rosemary and **she will be turning up the heat**.  Your support and **shared ownership of the message that she delivers is the expectation**. (*emphasis added*)

59.   Further, in an email dated March 17, 2006 Jim Scadlock, Kindred's Senior Vice President for Marketing and Development, echoed Kindred's mandate that each of its nursing homes increase census going forward in order to generate increased revenue for Kindred:

"… we as a company are confronted with significant challenges.  That's why HSD [Kindred's Health Services Division] has a **mandate to significantly improve census this year**.  …  A jump of **just one percentage point** [in company's nursing home census] equals more than 300 ADC [average daily census] and that alone would be over **$22 million in added revenue annually**." (*emphasis added*).

60.   Kindred also sought to increase its admission of high acuity residents who required more care because federal and state health care programs pay more for such residents. Indeed, some heavy care residents are so dependent that two CNAs are required to provide certain services; these are known as 2-person assists.  Compared to a resident that does not require a 2-person assist, Kindred could collect over $115 dollars more per resident, per day in Medicare reimbursement for a resident requiring 2-person assist for ADL services, such as assistance for toileting/incontinent care, repositioning in bed, and transferring bed to chair and

back.  For this reason, Kindred required every nursing home to target high rate-of-pay residents, including those requiring 2-person assists.

61.     With a finite number of beds, Kindred wanted them filled with heavy care, high rate-of-pay residents.  Due to the fierce competition that existed in the marketplace for such residents, Kindred had a coordinated strategy to ensure that its nursing homes were aggressively recruiting heavy care residents.  Kindred hired admission coordinators and sales directors who were required to follow Kindred's corporate wide marketing action plans designed to increase admissions of heavy care residents.  In Kindred's marketing procedures, resident admissions were regarded as "sales."  Employing terminology like "sales blitz," "cluster marketing," "sales call," "sales volume," "targeted sales," Kindred required each nursing home admission coordinator/sales director to document every "sales call" made to a hospital or physician to recruit a resident and to report to management all results and variances from targeted numbers.  Kindred also incentivized its admission coordinators/sales directors through bonuses paid for hitting the specified census and payor-mix targets.  ("Payor-mix" refers to the resident's source of payment or insurance, such as Medicare or Medicaid).  Kindred management also routinely chastised, reprimanded, and/or terminated admission coordinators/sales directors who failed to achieve Kindred's payor-mix objectives.

62.     Kindred's payor and patient acuity targets emanated from the top of Kindred's corporate structure and were implemented throughout the company by Kindred's Senior Vice President of Sales and Marketing and by its Regional and District Sales and Marketing teams.

63.     Kindred's census and staffing targets were implemented in each of its geographic regions (North, Central/South, East, and West).  For example, in the Central/South Region,

Kindred's District Director of Operations, Katherine Joy, testified in a deposition on June 22, 2011 that:

> Q.  And would it be fair to say that the executive director at Kindred Healthcare Mobile was also given specific budgeted census targets to meet?
> A  Yes.
> Q.  And specific quality mix targets to meet?
> A.  Yes.
> Q.  And specific labor cost targets to meet?
> A.  Yes.
> …
> Q.  And like you, the executive director was evaluated based in part on their ability to hit those targets?
> A.  Yes.
> …
> Q.  Is it true that you were being told by your corporate supervisors including Lane Bowen [Kindred's President] that it was unacceptable to be over budget in your census, labor cost and controllable targets?
> THE WITNESS:  Yes.
> …
> Q.  … All right, so is it true that in April of 2005, an admissions coordinator bonus program was implemented by Mr. Bowen to increase overall census or maintain budget and quality mix census?
> THE WITNESS:  Yes.
> Q.  And then he also sends this e-mail directly to the administrators letting them know that it was imperative that they administer the program?
> A.  Yes.
> Q.  And under the program, the admissions coordinators got a cash bonus every month if the census targets were met?
> THE WITNESS:  Yes.
> …
> Q.  Or if they met or exceeded their quality mix which was the census minus Medicaid?
> A.  Yes.

64.     Similarly, in the West Region, a Kindred District Director of Operations, Gwyn Rucker, testified in a deposition on November 10, 2011 that Kindred targeted "clinically complex" residents to increase revenue:

> Q.     And there was even instruction from Corporate to allow the admissions of more clinically complex residents, right?
> A.     Correct.

Q. Which means you would want to target residents who have an increased acuity, right?

A. That's what clinically complex means.

Q. For example, Medicaid is on the low end of reimbursement, right?

A. Correct.

Q. And Medicare is on the high end, right?

A. Correct.

Q. That's why Corporate was targeting the high-end residents, the Medicare residents, because it increases the revenue, true?

A. Correct.

65.     Likewise, Richard Kackmeister, an Administrator in Kindred's West Region,

testified in a sworn declaration dated October 17, 2011, as follows:

Despite my title, I had virtually no input or control over the census levels and resident recruiting efforts at Edmonds.  Instead, Kindred implemented policies to ensure that the nursing home's beds were constantly filled with the highest paying residents possible.  Kindred gave me and enforced specific census targets, payor mix targets, and discharge targets – all of which were meticulously monitored on a daily basis by Kindred.

Kindred made it clear that we should recruit and retain as many Medicare residents as possible.  Medicare residents generated the highest reimbursement levels for the facility and allowed Kindred' various subsidiaries that provided therapy the opportunity to make more money for the services they could charge related to those residents.  However, Medicare residents typically require the highest levels of care.

**Kindred stripped both me and my Director of Nursing of the discretion and professional judgment to refuse new admissions based on the limited number of staff in the facility**.  Rather, if the salesmen recruited a new residents, the home was expected to admit the residents.

As administrator, **I was unable to place a moratorium on new admissions or to increase staffing levels** when in my professional judgment an increase was necessary to properly care for the acuity level of the residents in the building.

Had I been allowed to exercise my professional judgment at Edmonds, we would have significant increased staff, changed staff positions, and raised wages immediately.  This would have cost more money, which Kindred controlled and limited.

However, none of my recommendations were implemented by Kindred and Edmonds continued to experience consequences.  Despite the efforts of staff present, the care provided was insufficient, and residents suffered.  Consequently,

the facility continued to have residents with pressure sore related problems; many were left unsupervised and were not provided enough assistance with activities of daily living. (*emphasis added*).

66.     In the East Region, a Kindred Administrator, Byron Eshelman, testified in a sworn affidavit dated April 22, 2011, that Kindred continuously demanded the admission of high acuity residents and compliance with staffing levels that did not take into account the needs of the residents:

> Kindred Healthcare, Inc. continuously demanded that new residents be recruited to the facility and that existing residents be retained.  The company made it clear that we should recruit and retain as many Medicare residents as possible. Medicare residents generated the highest reimbursement levels for the facility, but they also needed the highest levels of care.
>
> …
>
> Kindred further dictated the amount of money the home could spend on staff.  If the census went down, I was required to send aides home early.  If I did not meet the budget for staffing, I would be terminated.  These were Kindred's policies.

### B.     KINDRED STAFFED ITS NURSING HOMES WITHOUT REGARD TO RESIDENT NEEDS

67.     As noted above, federal law requires that every nursing home must have sufficient numbers of nursing staff, including CNAs, to provide all nursing and related care services to each resident as defined by and in accordance with his/her MDS and individualized care plan. 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); 42 C.F.R. § 483.30 and § 483.30(a)(1).  These federal laws mandate that Kindred staff its nursing homes based on the resident acuity, including the ADL services defined in MDS *Section G* that are required by each home's unique resident population.

68.     Kindred deliberately ignored these regulations.  Rather than basing staffing on resident acuity, Kindred implemented a company-wide policy on or about April 28, 2006 mandating the following CNA staffing ratios: 1 aide to 8 residents on the day shift, 1 aide to 12

residents on evening shift, and 1 aide to 20 residents on the night shift.  Kindred's policy resulted

in understaffed nursing homes in violation of federal and state regulations.

69.     Kindred Director of Nursing, Tim Sirls (Heritage Manor, Kentucky), has first-

hand knowledge of the impact Kindred's staffing practices had on care delivery:

> During my employment at Heritage Manor, the biggest obstacle I faced was that
> Corporate Kindred constantly interfered with my professional duties and
> responsibilities.  As the DON, I was responsible by law to ensure the residents
> were provided appropriate care, However, I was not given professional discretion
> to determine or control: (a) the budgeted or actual staffing levels at Heritage
> Manor; (b) the budgets for care related supplies at Heritage Manor; (c) the hiring
> and firing of nursing staff; (d) the discipline of nursing staff when they violated
> protocols and basic care standards; (e) the admissions into Heritage Manor and
> types of patients admitted to Heritage Manor, (f) the census at Heritage Manor
> and marketing targets; and, (g) the patient recruitment programs and discharge
> practices. These things were not determined by me but rather by Corporate
> Kindred. All cash management functions, revenues and' expenditure decisions at
> the nursing home level were tightly controlled by Corporate Kindred. As a result,
> Kindred significantly hampered me in doing my job as the DON. More
> importantly, Kindred made it impossible to fix the problems at Heritage Manor
> and knowingly perpetuated the problems at Heritage Manor.

> Kindred dictated the maximum number of staff allowed to work as well as the
> maximum amount of money that could be spent for staffing at Heritage Manor.
> These maximum staffing levels were mandated by Kindred through the budget
> and were determined by the number of residents in the building, without regard to
> the needs of the residents. The nursing staff and I had no authority to adjust the
> staffing levels to the acuity needs of our residents. Whenever I tried to do this,
> Donna Brown, the District Director of Operations (DDO) for Kindred became
> angry.

> Labor costs are the largest expense in a nursing home and DDO Brown
> specifically instructed us to control these expenses at or below the budgeted
> levels. DDO Brown made it a point to tell me that controlling labor cost at or
> below budget was vital to meeting Kindred's profit targets and my continued
> employment with the company.  Kindred required daily reporting on the number
> of staff working to make sure we stayed at or below the staffing budget. I had no
> ability to exercise my professional judgment in determining the number and
> nature of staff that were necessary to meet the needs of our residents. It was very
> frustrating not having the authority to determine the staffing levels at Heritage
> Manor.

During my tenure, the budgeted staffing levels at Heritage Manor were 2.13 hours per patient day for nurse aides, 0.76 hours per patient day for licensed practical nurses and 0.38 hours per patient day for registered nurses. These were the maximum staffing levels we could run on any given day. The maximum staffing level for total direct care staff was therefore 3.27 hours per patient day. The management nurses rarely provided direct care to residents, unless the OIG was in the facility. These staffing levels were dangerous for the residents. On day shift there should have been no more than 6 residents per nurse aide. On the evening shift, there should have been no more than 6 residents per nurse aide from 3p to 7p and no more than 8 residents per nurse aide [sic] from 7p to 11p. On the night shift, there should have been no more than 10 residents per nurse aide. Heritage Manor was never close to these ratios while I was the DON because DDO Brown wouldn't allow it. This made it impossible for the CNAs to provide the residents appropriate hygiene, repositioning) feedings, supervision, etc.

I quickly recognized Kindred's budgeted staffing levels at Heritage Manor were too low to be able to fix the problems at Heritage Manor and provide basic care to the heavy care residents in the building. I never requested that Kindred increase the budgeted staffing levels because DDO Brown made it clear my request would be denied. I never requested authority to increase the actual number of staff to match the high acuity needs of the residents at Heritage Manor because DDO Brown became upset anytime we exceeded our budget. I requested authority to deny the admission of several high acuity patients that I felt we could not handle. This request was denied by Corporate Kindred and Heritage Manor never stopped admitting high acuity residents while I was the DON. I discussed the poor care and unnecessary injuries which I witnessed during my resident rounds with Administrator Porter. We discussed the complaints from staff. We discussed the complaints from residents and family members. We discussed the survey
findings and how the underlying cause of the poor care practices was the lack of sufficient and competent staff and noncompetitive wage rates. Administrator Porter shared my frustrations but we both lacked authority to change any of it. DDO Brown stated her primary focus was to maintain the census, hit the profit targets and clear the survey deficiencies. The mentality of doing just enough to get out of existing problems instead of implementing the steps to prevent them in the first place was frustrating because they are not permanent fixes. And as soon as the existing problems were "cleared" with the OIG, more problems arose and the old problems resurfaced. DDO Brown stated that from her point of view, Heritage Manor mostly had "paper compliance issues." I told her this was not true and that Heritage Manor had fundamental systemic breakdowns. In truth, Donna Brown was the DON at Heritage Manor and had all the authority, even though she had no nursing background. I felt like a DON on paper only.

However, I knew better than to ask for these things and tried hard to correct the problems within the constraints given to me by Kindred. We had a lot caring aides and nurses who tried hard. But we all had an impossible task. The care provided was insufficient, and residents were hurt. Many residents developed pressure

sores, became malnourished and dehydrated, lost weight, suffered falls and fractures and on and on. The degree of neglect depended to some extent on how dependent the resident was on the staff for their needs. The more dependent a resident was for simple things such as eating, drinking and hygiene, the more that resident suffered.

Not a day passed that I didn't receive a complaint from the staff, resident and/or family member regarding the needs of residents not being met because of short staffing. I verified those complaints with first-hand observations, I almost always conveyed them to Administrator Porter and I often conveyed them DDCO Newton. Despite my reports, Kindred refused to adjust the staffing restrictions to the needs of the patients and continued to demand recruitment of residents with high care needs.

70.     The disconnect between the highly-dependent nature of residents and staffing is

confirmed by the Affidavit of nurse Johnna Dobson dated August 22, 2014:

I am a Licensed Practical Nurse (LPN) in Kentucky. I became a Licensed Practical Nurse in 2007 and my license is current.  Prior to becoming a nurse in 2007, I worked as a patient tech in an emergency room. I was also a police officer and detention officer for approximately 6 years prior to this as well.  I was employed at the Heritage Manor nursing home for approximately 4 months (February - June of 2014) . . . .

I worked both the day shift and evening shift at Heritage Manor. On both shifts we were understaffed of nurses and nurse aides. Rozella [Young]'s hall was considered the heaviest and the hardest in the facility containing approximately 25 residents. All of them required staff assistance for their ADLs. Although this was the heaviest and most difficult hall, Heritage Manor only staffed the hall with one nurse and two CNAs. Then, there were several occasions when only one CNA would show up for work.

71.     The impact of Kindred's staffing policies on the care residents received at

Heritage Manor, Kentucky, is further corroborated by the June 10, 2015 Affidavit of Angela

Austin, LPN:

I worked for the Heritage Manor Nursing Home from about April 2014 to July of 2014.  I could not risk my license and livelihood by continuing my employment there so I decided to leave.  The staffing situation at Heritage Manor was bad when I started and got much worse by the time I left.  My career ended with them when I worked a night shift and found out that me and one other nurse were required to cover the entire building.  That was insane.  I gave my notice the following morning after that shift.  There was no way possible to provide my

residents the care they needed or deserved. Being constantly shorthanded and understaffed put the residents at serious risk and placed the nurses and CNAs working at risk of losing their license. I have worked in 5 different nursing homes in the area and Heritage Manor was by far the worst staffed facility and provided the worst care to their residents.

The chronic understaffing at Heritage Manor made it impossible for nurses and CNAs to do their job and provide the residents the care they so critically needed. Complaints to nurse managers, DONs and Administrators went nowhere. My CNAs complained to me but I was powerless to change anything. State was in the home many times investigating complaints. But nothing changed and if anything, it got worse when the state left. While state was in the building it was all hands on deck. Ever person in that building was on the floor helping out including office or administrative persons. They tried to put on a show for state, however, if state had been in the home in the late evening or night shift hours, they would have seen a different picture. Often times the schedule reflected that enough people would show up but that was not the case in reality. The most CNAs scheduled for a day shift was two for the 100 Hall and possibly a floater that would be floating the entire building. That's if they showed up. On the evening it was never more than two scheduled and again, if they showed up. On nights it only allowed for one CNA and ........often times that did not happen. It was not unusual for CNAs to have cover more than one hall or leave their hall to go help another aide on another hall. I would say that 75% of the time we were understaffed and even when "full" staffed not all care could be provided. On the day shift alone, 50% of the available CNA time could be taken away with breakfast and lunch duties.

72.     These staffing complaints are echoed by CNA Jessica Sasseen in her Affidavit of

June 2015:

I am a certified nurse's aide (CNA) in Kentucky. I have been a CNA for approximately 11 years and my license is still active and in good standing. I was employed with Heritage Manor Nursing home from approximately July 2011 to April of 2015. I had some breaks in my employment but was full time for several years. In 2014, I was working a fulltime schedule of 4 days on then 2 days off.

Although it fluctuated a little, the 100 hall had about 25 residents. On the night shift I was required to work this hall by myself. Once or twice a week I also had to cover another hall because of staff shortages. At best, I was one CNA with 25 residents and at worst it was just me to 50 residents. It was not physically possible for me to deliver all the care the residents required when I was the only person there for 25 residents. You can only image how much worse it got when I was the only person for 50 residents. Of the 4 different nursing homes that I've worked in the area , Heritage Manor was by far the worst staffed home and patient care suffered. On those nights where I had to cover two halls, it was all I could do to

provide some basic care and at least make sure they were alive by shifts end. This situation always scared me.

There were many problems at Heritage Manor that were caused by understaffing of CNAs and nurses. Aside from not being able to perform the turning and repositioning that many residents of the 100 hall required, incontinent care suffered for all of them as well. There were many fall risks including Regina and Rozella that were not monitored "'properly or not monitored at all. There were several other residents on the 100 hall who had developed problems with skin breakdown. Record keeping and documentation also suffered. The records maintained by the CNAs were mostly pure guesswork at best. At worst they were being filled in falsely as there was no way to know if care had been given to a resident. Management did not care if the records were right or wrong but only that they were filled in. I do not know how they could even expect a CNA with 50 residents to be able to provide all the care those 50 human beings needed, perform the other duties they required of night shift aides, like cleaning wheelchairs, and still be able to chart on all 50 that all care was in fact given. Management wanted blanks to be filled in no matter what so they pressured the nurses who in turned pressured us to fill them in.

We all complained about the working conditions at Heritage Manor. We complained many times and so did the residents. I personally complained to my nurses and the staffing coordinator and I know those complaints were carried up the chain of command. I also complained to the DON and administrator about the poor working conditions that residents were suffering. There was no way that management could possibly be unaware of the staffing problems and the negative effect it was having on our residents.

73.    Further, Richard Kackmeister, Administrator, **Edmonds Healthcare Center** testified in a December 15, 2011 deposition in *Sande v. Kindred*, Superior Court of State of Washington for King County, No. 10-2-06726-4-SEA, that staffing numbers were set by Kindred's corporate headquarters and were based on census (number of residents) and not on acuity (resident needs):

> A. But my complaint is that it says in one of the documents when they [Kindred corporate] are setting the budgets they are supposed to take in to account the acuity levels of the residents. And we had one of the highest acuity levels in the area and we had one of the lowest CNA budgets to work with.
> ...
> Q: So your issue was the staff levels?
> A: **We were way understaffed for the acuity level.**
> ...

37

A. And I can't help but believe that they **[Kindred corporate] should have known**. If they are looking at data that shows that **we have the highest acuity in the state and we have got the third lowest CNA ratio** when they've got two other buildings right beside us who have basically the same staffing but one of them is 77th in acuity and the other one is 118th in acuity. I don't understand … (*emphasis added*).

74.     Similarly, Byron Eshelman, the Kindred Administrator for Silas Creek Rehabilitation and Healthcare Center in North Carolina, testified in a sworn affidavit dated April 22, 2011, that Kindred's staffing levels that did not take into account the needs of the residents:

Kindred Healthcare, Inc. **dictated that staffing levels** in the facility be based solely on the number of residents in the home, **without regard to the residents' care needs** or acuity. (*emphasis added*).

75.     To ensure compliance with its prescribed staffing targets, Kindred required its nursing homes to use its "staffing ladders" that memorialized its mandatory ratios to determine the number of licensed nurses and CNAs on each work shift in each Kindred nursing home. Specifically, Kindred's staffing ladder was a computer spreadsheet into which nursing home managers entered the daily census (beds filled) and received an instant calculation of the number of nursing staff approved by Kindred for the day.   Significantly, the "staffing ladder" that Kindred mandated did not take into account the acuity of the residents at a particular nursing home.   Consequently, on a daily basis, the number of CNAs, LPNs, and RNs on duty at each Kindred facility was determined by the number of residents in the nursing home, regardless of those resident's actual needs.[26]

---

[26] Despite repeated *Requests for Production* (to Kindred for any kind of acuity-based staffing tool) made between 2003 and 2013 in the following cases, Kindred has never produced or claimed the existence of any such tool or instrument that adjusts staffing (numbers of nurse assistants and nurses) to the acuity of residents in their facilities: Case No. 09 CVS 1813; *Hiepler v. Kindred Nursing Centers East, LLC, et al.;* In the General Court of Justice, Superior Court Division; Forsyth County, North Carolina; Case No. 09 CVS 1103; *Reid v. Kindred Nursing Centers East, LLC, et al*; In the General Court of Justice, Superior Court Division, Orange County, North Carolina; Case No. 10 CVS 00069; *Thompson v. Kindred Nursing Centers East, LLC, et al.*; In the General Court of Justice, Superior Court Division, Orange County, North Carolina; Case No. 09 CVS 2137; *Muccino v. Kindred Nursing Centers East, LLC et al.;* In the General Court of Justice, Superior Court Division, Orange County, North Carolina; No. 09 CVS 025100; *Edwards v. Kindred Nursing Centers East, LLC, et al.*; In the General Court of Justice, Superior Court

76. An example of a Kindred staffing ladder for Certified Nurse Aides (CNAs) which prescribed specific CNA-to-resident ratios is set forth below:

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Staffing Ladder for Aides per Shift | | | | | |
| 2 | At  1:8, 1:12, 1:20 | | | | | |
| 3 | | | | | | |
| 4 | | | Number of aides per shift | | | |
| 5 | | | 8 | 12 | 20 | |
| 6 | Census | | 1st Shift | 2nd Shift | 3rd Shift | Total |
| 7 | 100 | | 12.5 | 8.3 | 5.0 | 25.8 |
| 8 | 101 | | 12.6 | 8.4 | 5.1 | 26.1 |
| 9 | 102 | | 12.8 | 8.5 | 5.1 | 26.4 |
| 10 | 103 | | 12.9 | 8.6 | 5.2 | 26.6 |
| 11 | 104 | | 13.0 | 8.7 | 5.2 | 26.9 |
| 12 | 105 | | 13.1 | 8.8 | 5.3 | 27.1 |
| 13 | 106 | | 13.3 | 8.8 | 5.3 | 27.4 |
| 14 | 107 | | 13.4 | 8.9 | 5.4 | 27.6 |
| 15 | 108 | | 13.5 | 9.0 | 5.4 | 27.9 |
| 16 | 109 | | 13.6 | 9.1 | 5.5 | 28.2 |
| 17 | 110 | | 13.8 | 9.2 | 5.5 | 28.4 |
| 18 | 111 | | 13.9 | 9.3 | 5.6 | 28.7 |
| 19 | 112 | | 14.0 | 9.3 | 5.6 | 28.9 |
| 20 | 113 | | 14.1 | 9.4 | 5.7 | 29.2 |
| 21 | 114 | | 14.3 | 9.5 | 5.7 | 29.5 |
| 22 | 115 | | 14.4 | 9.6 | 5.8 | 29.7 |
| 23 | 116 | | 14.5 | 9.7 | 5.8 | 30.0 |
| 24 | 117 | | 14.6 | 9.8 | 5.9 | 30.2 |
| 25 | 118 | | 14.8 | 9.8 | 5.9 | 30.5 |

*Example:  Kindred Staffing Ladder*

Division, Wake County, North Carolina; No. 10 CVS 313; *Page v. Kindred Nursing Centers East, LLC, et al*; In the General Court of Justice, Superior Court Division, Forsyth County, North Carolina; CV-2008-900492; *Perkins v. Kindred Healthcare, Inc., et al.*; In the Circuit Court of Mobile County, Alabama; No. CV-09-450; *Rocker v. Kindred Healthcare, Inc., et al.*; In the Circuit Court of Mobile County, Alabama; Case No. 07-CI-00271; *Gibson v. Kindred Healthcare, Inc., et al.*; In the Commonwealth of Kentucky, 25th Judicial Circuit, Clark Circuit Court, Division I; Civil Action No. 07-CI-00489; *Hawkins v. Kindred Healthcare, Inc., et al.*; In the Commonwealth of Kentucky, 25th Judicial Circuit, Clark Circuit Court, Division II; Case No. 07-CI-00479; *Fox v. Kindred Healthcare, Inc., et al.*; In the In the Commonwealth of Kentucky, 50the Judicial Circuit, Boyle Circuit Court; Case No. CT-004204-07; *Cotton v. Kindred Healthcare, Inc.; et al.*; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CI-002155-07; *Wellington v. Cordova Rehabilitation and Nursing Home, et al.*; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CT-003029-07; *Matthews v. Cordova Rehabilitation and Nursing Home, et al.*; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. 005927-06, *Monroe v. Primacy Rehabilitation and Healthcare Center et al.;* In the Circuit Court of Tennessee for the 30th Judicial District at Memphis, Shelby County; Cause No. CT 005059-05; *Porter v. Spring Gate Rehabilitation and Healthcare Center, et al.*; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CT-006540-06, *Johnson v. Spring Gate Rehabilitation and Healthcare Center, et al.*; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No.: CT-005061-05: *Brown v. Spring Gate Rehabilitation and Healthcare Center, in its Assumed or Common Name;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CT-004669-07; *Lewis v. Kindred Healthcare, Inc.; et al.*; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County, Div. II; Case No. No. 10-2-06726-4 SEA; *Sande v. Kindred Healthcare Operating, Inc., et al.;* In the Superior Court of the State of Washington for King County.

77.     According to this staffing ladder, if the Kindred nursing home had 100 residents, the facility should then have 12.5 nurse aides on the first shift, 8.3 nurse aides on the second shift, and 5.0 nurse aides on the third shift.[27]   The number of nurse aides per shift identified in columns C, D and E of Kindred's staffing ladder were derived by dividing the staffing ratios Kindred prescribed for each shift which are set forth in the upper left hand column of the staffing ladder by the census found in Column A.   The number of nurse aides allowed by Kindred was a function of its prescribed ratios – first shift 1:8, second shift 1:12, third shift 1:20.

78.     A similar staffing ladder used by Kindred was based on the number of CNA hours per resident per day.  Rather than prescribing a ratio of residents to CNAs, Kindred specified the number of CNA hours and minutes per resident in a 24 hour period.[28]   Though the staffing ladders changed minutely over the years, none of them took into account the acuity of the particular residents at each nursing home.

79.     These staffing targets prescribed for each facility were closely monitored and enforced by Kindred.   Kindred used payroll software programs to meticulously track all staffing levels and identify staffing or budget variances at each of its facilities on a daily basis.   The results of this monitoring were regularly reported in Kindred's *Payroll Analysis and Trend Report* that Kindred used at every nursing home on an ongoing basis from at least 2008 through 2015.   These *Payroll Analysis and Trend Reports* show that Kindred set, knew, and controlled the staffing levels at each of its nursing homes.

---

[27] In order to staff at a fraction such as 12.5 or 8.3 CNAs during a shift, a nursing home can reduce the number of hours that one or more staff members work.

[28] For example, in a nursing home with a census of 100 residents on December 1, and with 12.5 CNAs working the 6-2 shift, 8.3 CNAs on the 2-10 shift, and 5.0 CNAs on the 10-6 shift, the CNA hours per resident day (for this 24 hour period) would be calculated by multiplying the 24-hour total of CNAs (25.8) by 8 hours (25.8 x 8 = 206.4) and then dividing the product (206.4 hours) by the resident census (100).   In this example, 206.4 hours of CNA time must be divided between 100 residents resulting in 2.06 CNA hours per patient day (PPD).

80.     During the relevant time frame, Kindred made it clear to the employees of each nursing home that the inability to comply with Kindred's staffing targets and budgets was unacceptable.  Nursing home administrators unable to comply with Kindred's set staffing targets were admonished and/or fired.  An example of the mandatory nature of Kindred staffing and budget directives can be found in the email dated July 27, 2007, from Charlotte Nelson, a Kindred District Director of Operations, to a nursing home administrator:

> Attached you will find a staffing ladder shell to assist you (and your scheduler) to **control labor to in-house census daily**.  We have several facilities running over and I trust this tool will assist you to manage this **critical area of the business**. Enter in your census numbers, and your budgeted RN, LPN and CNA ppd- this excludes Nursing Administration (DNS, ADNS, MDS, CM).  **Variance to the budget will require Rick's [Regional Vice President] approval. Otherwise, you are expected to run the budgeted numbers.** (*emphasis added*).

81.     Verbal and written communications, including emails, were routinely sent from Regional Senior Vice President and District Directors of Operations making it clear that facilities had to run their labor hours according to the prescribed budget.  For example, District Northeast Director of Operations Gwyn Rucker testified in a deposition dated November 10, 2011 that the West/Pacific Regional Vice President Donna Kelsey instructed all of the West/Pacific Directors of Operations via email to run labor hours at or below budget – "**no excuses**."

Q.     Don't go over budget is what she's telling you?

A.     Correct.

Q.     And she's instructing the direct – Directors of Operations, you, that you need to inform both your Administrators and your Directors of Nursing that running the labor hours is an expectation of working for Kindred, right?

A.     Yes.

Q.     And she says enough is enough, get this fixed now, right?

A.     That's what it says.

Q. And this is instructions from your boss to you, and instructing you to inform the DONs, and the Administrators <u>never to exceed the budget for labor hours</u> in the nursing homes, true?

A. That's what it says. (*emphasis added.*)

## C. KINDRED KNEW ITS ADMISSION AND STAFFING POLICIES RESULTED IN POOR CARE THAT HARMED ITS RESIDENTS

82. Kindred's policies of admitting as many residents as possible and recruiting high acuity residents (which maximized workload) while understaffing its nursing homes resulted in residents not receiving necessary care. The fallout from such policies has not only inundated Kindred with an avalanche of lawsuits by families of residents, but also generated countless complaints from Kindred's own employees, as discussed below.

83. Kindred knew that the levels of staff it mandated and enforced in its facilities made it impossible to provide for the *Section G* needs of residents. At all pertinent times, Kindred was aware that core care services required by the heavy care residents it recruited vastly exceeded the physical work capacity of the limited number of CNAs approved to work in its facilities.

84. As previously described, Kindred implemented a company-wide staffing policy. In prescribing and enforcing these staffing levels, Kindred either knew of or acted with reckless disregard to widely disseminated and scientifically uncontroverted findings that:

    a. CNA staffing levels of 1:8 day shift, 1:10 evening shift, and 1:20 night shift had been determined to cause very long waits for services and no assistance during meals for many residents, even when staff worked hard.[29]

---

[29] Phase II Final Report to Congress: *The Appropriateness of Minimum Nursing Staff Ratios in Nursing Homes*, 3-28.

      b.    Staffing at 2.2 CNA hours per patient day was predicted to result in long waits for service and inconsistent implementation of care even when staff worked at unrealistically high productivity levels.[30]

      c.    Staffing at the CNA levels Kindred dictated, in its staffing ladders, and enforced, had been determined to cause 2-3 hour waits for changes of diapers and wet linens, as well as high rates of omitted care and missed or late food service.[31]

      d.    In even low workload nursing homes, 2.8 CNA hours per patient day were minimally required to meet the core care needs of residents as defined by their MDS assessments.[32]

85.    Such findings were published by CMS in 2001 in its Report to Congress. Accordingly, five years after CMS tested the effects of CNA staffing levels on care and reported its findings, Kindred implemented mandatory policies and staffing ladders requiring its nursing homes to staff at the very same CNA PPDs and ratios known to cause widespread and significant care deprivation.

86.    Furthermore, Kindred knew the CNA staffing levels it imposed upon its facilities were also woefully below the minimum nursing home staffing levels recommended by the Institute of Medicine in 2004.[33]

87.    By reason thereof, in continuing to pressure its nursing homes to hit CNA staffing targets, Kindred knew it was humanly impossible for the limited workforce in its facilities to provide: (a) the essential bedside care required by the high acuity residents it purposely recruited;

---

[30] *Id.* at 1-7.

[31] *Id.* at 3-25, 26.

[32] *Id.* at 3-31.

[33] The Institute of Medicine in its 2004 report entitled, *Keeping Patients Safe,* recommended a minimum of "one RN for every 32 patients (0.75 hours per resident day), one licensed nurse for every 18 patients (1.3 hours per resident day), and one nurse assistant for every 8.5 patients (2.8 hours per resident day)." The IOM's recommendations were based on the findings contained in CMS's Phase II Report to Congress, *Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes.*

and (b) essential bedside care and staff support it claimed to have actually provided in *Section G* of each resident's MDS.

> **1. Kindred Knew Its Understaffing Policies Resulted in Poor Care That Was Harming Vulnerable Patients Based on an Avalanche of Complaints from 2008 to Present**

88.     Kindred's policies of maximizing workload levels while minimizing labor levels created a dangerous gap between the amount of time required by caregivers to provide the necessary *Section G* care versus the amount of time available to provide such care. The fallout from such policies has not only inundated Kindred with an avalanche of lawsuits by families of residents, but also generated countless complaints from Kindred's own employees (e.g., CNAs, nurses, and facility administrators). For example, Richard Kackmeister, an Administrator in the Kindred West/Pacific Region testified in a sworn declaration on October 17, 2011 that Kindred repeatedly ignored his employees' requests for increased staff to prevent neglect.

> The staff inundated me with complaints and concerns regarding the needs of residents not being met because of short staffing. These complaints came from the Director of Nursing, nurses, and nurse aides. I verified those complaints based with first-hand observations while working in the facility.
>
> When I received complaints, I conveyed them to Gwen Rucker [District Director of Operations]. Despite my reports, Kindred refused to modify the staffing restrictions and continued to demand recruitment of residents with high care needs.
>
> In addition to staff, the family of residents and the residents complained to us about the various negative impacts the low staffing levels had on the care being provided at the home.
>
> I expressed my own concerns, and I passed on the complaints of the staff, residents and their family members, and all of them were ignored by Ms. Rucker and Kindred. Despite the complaints that were communicated regarding resident care, Kindred failed to increase staffing levels or decrease resident numbers or acuity.
>
> Despite the staff's and my numerous requests for meaningful help, Kindred continued to operate the facility in the same manner.

89.     Kindred not only ignored the complaints of its administrators, it ignored complaints from its own medical directors.  In a written statement dated May 6, 2012 Dr. Joseph Palermo, a medical director of a Kindred nursing home in the West/Pacific Region, stated that he was forced to resign his position due to Kindred's unwillingness to increase staffing to prevent adverse consequences:

> I became aware of the facilities' dwindling census and its poor reputation in the community in the year before I left on 9/18/07.  I had determined that the limited staffing that became evident to me was placing residents at risk for adverse occurrences, which certainly included skin breakdown related to poor hygiene and general care of incontinent residents.  When I had questions about a given resident, it was often difficult to find a nurse, especially one who was familiar with a given resident.  I had no role in the Administration and could play no role in reversing the problems.  This left me no recourse but to tell the Administrator that I could not stay and jeopardize my reputation and license.

90.     Similarly, Kathleen Jarvis, RN, a Director of Nursing, Staff Development Coordinator and Wound Treatment Nurse in Kindred's West/Pacific region testified in a sworn declaration dated March 20, 2012 that she and her staff repeatedly made Kindred aware that her nursing home was understaffed and that residents were deprived of needed care.  Kindred, however, refused to increase staff:

> As part of my daily duties, I had to be present at meetings in the morning that were attended by all department heads including; the DNS Rita Eden and then Jeannie Russell, the Executive Director, Jane Davis and the Richard Kackmeister, and on many occasions Gwynn Rucker, the District Director of Operations.  The purpose of these meetings was to discuss issues regarding residents, staffing, budget and daily management, complaints and a host of other topics.  Staffing and complaints about staffing was always a hot topic.  Edmonds was constantly understaffed in terms of nurse aides and nurses. . .  The residents to nurse aide ratios were incredibly high and placed an impossible workload on the aides. . . As a result, turnover was high and continuity of care suffered greatly.  Management, including Gwynn Rucker, was aware of the constant problem and the fact that residents were not getting the care they desperately needed.  Though it was discussed in detail and in-house pressure sore development continued to rise, Kindred did nothing to increase the number of floor staff.

Complaints from family members and employees, which were frequent, were discussed in these meetings. I made complaints about staffing and poor resident care directly through my chain of command. I made these complaints to ED Jane Davis, ED Richard Kackmeister, DNS Rita Eden, DNS Jeannie Russell, DDO Gwynn Rucker and Diane Tiliano, the corporate SDC. Complaints from family members frequently concerned lack of care totally or substandard care. . . . Management was well aware that the home was understaffed constantly. Evidence of skin breakdown at Edmonds was rampant throughout the building. The fact that we could not offload pressure from these high-risk residents such as Ms. Sande was extremely harmful and counterproductive to preventing and healing skin breakdown. Management and corporate were made aware by floor staff via their complaints, informed by family members who could not get staff to respond to their loved ones needs, as well as the fact the daily ratios were impossibly high which made it impossible to meet the needs of the residents. Gwynn Rucker, when in attendance at these meetings, would always say she was aware of the problem and that she was working on it. Ms. Rucker would promise the staff hope and change, but ultimately nothing ever changed.

91.     Laurie Adams, RN, a Wound Treatment Nurse in Kindred's South Region,

testified in an affidavit dated October 19, 2011 that the underlying cause of the injuries in her

facility was Kindred's refusal to provide sufficient staff to meet the needs of the residents:

On the second floor, workload was extremely high because the vast majority of the residents required significant assistance with activities of daily living. During my tenure, understaffing was always a problem. It seemed like the staff was complaining to management on a daily basis that the residents were being neglected due to insufficient staff. And although the care was poor when I first started, it significantly deteriorated during the latter part of my tenure. I wholly agree with the email written by Scott Lindsey wherein he described the staffing levels at Kindred as both dangerous and critical.

*The dangerous and critical understaffing caused widespread neglect.*

92.     Georgia Jessie, a Licensed Nurse working with Ms. Adams agreed with her

assessment of Kindred's indifference in a sworn affidavit dated December 1, 2011:

I observed numerous care issues that resulted in neglect of the residents at Kindred. I, like many other nurses and CNAs, tried to keep up, but the number of residents, compounded with their high acuity levels, made it impossible for us to do our jobs. This was extremely frustrating to the staff and led to conflicts as work routinely did not get done. I, along with other staff, reported these problems to the management of Kindred, but I saw nothing change, unless state was in our building or management believed state was coming. Only during this

time did management call in additional staff to care for residents. It was evident to me that they could staff better when they wanted to present a false picture to state officials.

93.     The utter lack of any meaningful corporate response to address the problems in

Kindred's nursing homes is evident in the Affidavit of CNA Kayla Sanders dated June 9, 2015:

> It was apparent to me that management did not care about the residents or the staff at Heritage Manor. We were working 12 hour shifts, back to back in many cases, and it was physically and emotionally exhausting. I was completely drained when I left. If you cared about those residents, you were moving constantly. Going from high priority to high priority all day. I was never able to conduct anything that resembled a routine or rounds. It was chaos management most of the time, especially when I was on the 100 hall alone. On those days, which were many, I could only do the bare basics for the residents and even then it was late. I made complaints to management about the situation but nothing changed. Turnover of staff was constant as they could not handle the stress and workload at Heritage Manor. When Tim Sirls was hired, he tried to make some changes but management stopped him cold. Tim quit after only few months. I think I had three DONs in the 6 months I was there.
>
> Many residents had to wait long periods of time. Many times call lights stayed on for more than an hour because there was no one available to answer them. Turning and repositioning did not occur every two hours. Some nights they were lucky to be turned at all. Incontinent care suffered constantly. It is no wonder why residents such as Jerrelldeane and Rozella suffered skin breakdown and they could not heal properly. It is also no surprise that Regina fell and was on the floor for hours until she was finally found.

94.     The frustrations of staff were summed up by the Affidavit of Starr Foster dated

June 2015:

> I tried my best and I know other staff tried their best as well. It was simply impossible to keep up when Kindred forced you to work with such little help. I made complaints to my supervisors and I know state was investigating the home for the very problems I observed every day. But despite all of this, management never changed anything and the residents and staff suffered for it. I left the facility after I realized that this home had no intention of taking care of their residents or staff. It bothered be a great deal to leave because a part of me felt like I was abandoning these helpless residents, but I was powerless to change things, exhausted, and was in fear for my license. I have worked at several nursing homes in Kentucky and I would rate Heritage Manor as the worst one.

### 2. Kindred Knew Its Understaffing Policies Resulted In Poor Care That Harmed Its Vulnerable Patients—the Known Human Costs of its Staffing and Resident Recruitment Scheme

95.     The human costs of Kindred's staffing practices were often drastic and devastating: they caused widespread deprivations of human dignity, suffering, catastrophic injuries, and even death to residents across the country.  While the severity and nature of the injuries suffered by residents varied due to a number of factors,[34] the core care omission levels at Kindred's subject facilities remained intractably high due to the Kindred's willful blindness to the effects of its staffing based on headcount without consideration of acuity.

96.     The disparity between Kindred's staffing and acuity in the subject facilities had real world consequences.  Not only were residents of these facilities forced to suffer the indignities and health consequences from such routine care omissions, they further were subjected to long waits for the most basic human care, frequently exceeding 2 hours.

## VI. THE PRINCIPAL PURCHASER OF KINDRED'S NURSING HOME SERVICES: FEDERAL AND STATE GOVERNMENTS

97.     Federal and state Medicare and Medicaid programs are the primary purchasers of SNF and NF services, and the major source of income for Kindred's nursing homes.[35]

98.     Since 2008, Kindred's nursing home operations have generated revenues in excess of $12.9 Billion, based on a volume of over 50 million patient days.  By far, the largest

---

[34] Factors affecting the degree and nature of injury suffered by residents exposed to routine understaffing and core care omissions include: (a) the precise nature of the resident's dependency and length of exposure to care deprivation, (b) whether the resident received a proportionate or disproportionate share of the limited care, (c) how care omissions for an individual resident were distributed among the *Section G* core services, *i.e.*, which basic services were neglected the most, (d) the individual resident's physiological capacity to withstand care deprivation, and (e) the extent to which the resident's diagnosis and chronic disease process mask facility neglect.

[35] Most Kindred nursing homes are certified to provide both Medicare and Medicaid services.

purchaser of this nursing home care was the government, with over 82% of these revenues from 2008 to 2014 being derived from the Medicare and Medicaid reimbursement system.[36]

## VII.   KINDRED'S FALSE CLAIMS

99.    Kindred knowingly and methodically presented or caused to be presented false or fraudulent claims for payment by or approval of the United States government as well as state governments in violation of 31 U.S.C. § 3729(a)(1)(A) and similar state False Claim Acts.  From at least 2008 to the present, Kindred knowingly presented or caused to be presented false or fraudulent claims by submitting false MDS forms and by submitting false claims for PPS payments for thousands of nursing home residents.

100.    The MDS form "both a billing document and a care assessment certification for Medicare and Medicaid ..."  *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).  Each MDS Kindred submitted to CMS with false information is a false claim; each is also, as described below, a false statement that caused a false claim to be submitted.  In addition to the MDS forms, the claims Kindred submitted to Medicare and Medicaid for PPS payments for services that it did not provide are also false claims.

101.    Kindred knowingly made, used, or caused to be made or used false statements, claims, and certifications in its MDS assessments which it (a) knew were a material condition of payment; (b) knew were the basis of payment from federal and state funds; (c) knew that such claims were required to be accurate and truthful as expressly certified; and (d) knew were impossible.

---

[36] *See* Brown University data at ltcfocus.org.

102.   Further, from at least 2008 to the present, Kindred knowingly presented or caused to be presented false or fraudulent claims to Medicare and Medicaid for per diem payments, usually via the CMS 1450, 837I, 1450 and 1500 forms, for services that it did not provide. Additionally, these forms also contained false and inflated RUG and HIPPS billing codes.

103.   Government payment to Kindred for nursing home care, by statute, is conditioned on that care being "reasonable."   As set forth above, the care that Kindred delivered to its residents was so patently unreasonable in duration, quantity, and medical value that Kindred's submission of requests for payments for the same constituted false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B), as well as similar state False Claim Acts.

104.   Furthermore, throughout the timeframe of this case Kindred understood -- and certified -- in its Medicare Enrolment Application for Institutional Providers (CMS-855A) and Health Insurance Agreements (CMS-1561) that payment of claims by Medicare and Medicaid were conditioned upon the claim and underlying transaction complying with applicable laws.[37] Accordingly, Kindred knew that its payments from federal and state governments were conditioned on compliance with those previously discussed regulations which govern: (a) nursing home allocation and use of government funds, 42 C.F.R. § 483.75; and (b) essential staffing, 42 CFR § 483.30.  Moreover, by reason of the above enrollment certifications, Kindred certified, as to each Form CMS-1450 (UB-04) it submitted for payment, that it had complied with the above regulations.   Kindred's certifications of compliance stand in contrast to its knowing violations of these laws by its diversion of government payments intended for nursing home care and its decision to staff its facilities without regard for resident acuity.

---

[37] *See* below discussion of Kindred's *Medicare Enrolment Application for Institutional Providers* (CMS-855A) and Kindred's *Health Insurance Agreements* (CMS-1561).