# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF GEORGIA, STATE OF INDIANA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTH OF MASSACHUSETTS, and COMMONWEATH OF VIRGINIA ex rel. TIMOTHY SIRLS, <br><br>    Plaintiff-Relator, <br><br>    v. <br><br> KINDRED HEALTHCARE, INC.; KINDRED HEALTHCARE OPERATING, INC.; KINDRED HEALTHCARE SERVICES, INC.; KINDRED NURSING CENTERS EAST, LLC; KINDRED NURSING CENTERS WEST, LLC; KINDRED NURSING CENTERS SOUTH, LLC; AND KINDRED NURSING CENTERS NORTH, LLC, <br><br> Defendants. | **CIVIL ACTION NO.** <br> **2:16-cv-00683-JD** <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT FOR
## <u>FALSE CLAIMS ACT VIOLATIONS- 31 USC § 3729, *ET SEQ.*</u>

This action is brought by Plaintiff-Relator, Timothy Sirls ("Relator"), by and through his undersigned attorneys, and on behalf of the United States of America ("United States") and the States of California, Colorado, Connecticut, Georgia, Indiana, Montana, Nevada, North Carolina, Tennessee, Washington, and Wisconsin, and the Commonwealths of Virginia and Massachusetts (collectively, the "States" and, together with the United States, "the Government") against Kindred Healthcare, Inc.; Kindred Healthcare Operating, Inc.; Kindred Healthcare Services, Inc.; Kindred Nursing Centers, East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers South, LLC; and Kindred Nursing Centers North, LLC, who owned and operated 174 nursing homes identified in Exhibits "1" and "2"[1] attached hereto (collectively, "Kindred" or "Defendants") to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and various state false claims acts[2] for tens of thousands of false claims presented or caused

---

[1]Exhibit "1" identifies 95 nursing homes, listing the name, provider number, address, and dates of ownership/operation by Kindred, and the wholly-owned corporate subsidiary through which Kindred operated each facility during all or a portion of the time frame of January 1, 2008 to December 15, 2015. Relator alleges that each facility listed in Exhibit "1" engaged in a routine pattern and practice of presenting false claims or causing the same to be presented to federal and state governments during the aforementioned timeframe.  Exhibit "2" lists 79 additional Kindred nursing homes.  As to the facilities listed in Exhibit "2", these nursing homes presented or caused to be presented false claims to federal and state governments.

[2]The state false claims acts invoked for purpose of this case include: California (CALIFORNIA FALSE CLAIMS ACT, Government Code §§ 12650-12656), Colorado (COLORADO MEDICAID FALSE CLAIMS ACT, § 25.5-4-303.5, *et seq.*), Connecticut (CONNECTICUT FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS, §17b-301, *et seq.*), Georgia (GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT, codified at §§ 23-3-120 to 23-3-127 and STATE FALSE MEDICAID CLAIMS ACT, §§ 49-4-168 to 49-4-168.6), Indiana (INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IC § 5-11-5.5, *et seq.*), Massachusetts (MASSACHUSETTS FALSE CLAIMS ACT, MA ST 12, § 5, *et seq.*), Montana (MONTANA FALSE CLAIMS ACT, M.C.A. § 17-8-401, *et seq.*), Nevada (NEVADA- SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT, NRS § 357.010, *et seq.*), North Carolina (NORTH CAROLINA FALSE CLAIMS ACT, NC ST § 1-605, *et seq.*), Tennessee (TENNESSEE FALSE CLAIMS ACT, § 4-18-101, *et seq.* and TENNESSEE MEDICAID FALSE CLAIMS ACT, TN ST § 71-5-181, *et seq.*), Virginia (VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA ST § 8.01-216.1, *et seq.*), Washington (WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT, RCW §74.66.005, *et seq.*), and Wisconsin

to be presented for payment or approval to Medicare and Medicaid by Defendants.

## I.    INTRODUCTION

1.    This case involves a nationwide scheme by Kindred, to obtain payment from Medicare and Medicaid for necessary resident care that it claimed to have provided, but, in fact, did not provide.

2.    Kindred, which at all times pertinent was one of the largest and most profitable conglomerates in the country, implemented and deliberately pursued a strategy to recruit residents[3] with high acuity levels (*i.e.,* residents who were extremely dependent upon staff for their most basic care needs) in order to allow it to reap higher Medicare and Medicaid reimbursements.  While pressuring its nursing homes to target and recruit physically-dependent, seriously impaired residents, Kindred intentionally understaffed its facilities in order to skim more money from federal and state healthcare payors.  These continuing practices not only violated the law but made it humanly and mathematically impossible for the subject nursing homes to deliver essential care services that they claimed to Medicare and Medicaid were required and provided.  In short, Kindred was paid for services it claimed to provide, but did not.

3.    Medicare, a federal program, covers care in "skilled nursing facilities" ("SNFs") for a fixed period for those who need skilled nursing services following discharge from a qualifying hospital stay.  42 U.S.C. § 1395i-3.  Medicaid, a joint federal  and state program, covers long-term care in a "nursing facility" ("NF") for those who are medically qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.  Since a

_____

(WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW, W.S.A. § 20.931, *et seq*.).

[3]The Social Security Act §§ 1810 and 1919, and 42 CFR § 483, *et seq.,* refer to a nursing home *patient* as a *resident.*  The terms are used interchangeably herein.

2

single Kindred facility may and typically does serve residents in each program, the term "nursing home" will refer to a facility with both Medicare and Medicaid residents.  By reason of their loss of physical function and cognitive decline, both Medicare and Medicaid residents may need essential bedside care, which is also known as assistance with activities of daily living ("ADL(s)"), including: (a) toileting assistance; (b) incontinent care and changing of wet and soiled clothing and linen; (c) assistance transferring to chair and back; (d) assistance with dressing; (e) assistance with bathing and personal hygiene; (f) assistance with turning and repositioning immobile residents; (g) feeding assistance; (h) a.m. and p.m. care; and (i) exercise or range of motion for debilitated residents.

4.      When Kindred knowingly admitted Medicare and Medicaid residents, it knew that it was required by law to provide these essential ADLs to every resident who needed them.

5.      Despite its aggressive recruitment of residents who were dependent upon nursing home staff for all or many of the labor-intensive ADLs listed above, Kindred deliberately limited the number of staff members allowed to be on duty in its nursing homes.  This practice made it impossible for Kindred to deliver the ADL services that it claimed to Medicare and Medicaid were provided to residents in an individualized resident document known as a Minimum Data Set ("MDS"),4 as well as the Comprehensive Care Plan[5] and daily ADL staff support and

---

[4]The MDS is a document that is required to be completed for every nursing home resident and submitted to Medicare/Medicaid as a condition of payment.  The MDS contains a list of specific ADLs required for each resident, as well as a list of the ADL services the nursing home claimed to have provided (including whether any of those services required the assistance of two staff members).  A nursing home must complete an MDS for each resident upon admission to the facility and then periodically update it at specified times (five-day, 14-day, 30 day, quarterly, annually) and upon significant changes in the resident's condition.  The MDS information is collected electronically by the facility and transmitted to states and/or to the national MDS database at the Centers for Medicare and Medicaid ("CMS").  As the Seventh Circuit has stated, the MDS "form is both a billing document and a care assessment certification for Medicare and Medicaid...."  *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.,* 764 F.3d 699, 703 (7th Cir. 2014).

[5] The facility must develop a Comprehensive Care Plan for each resident that includes measurable

performance records[6] for each resident.  As a consequence, Kindred residents were routinely deprived of essential bedside care.  Kindred employed "staffing ladders" and other mandatory controls designed to limit labor hours and costs and deliberately forced its nursing homes to be staffed at levels that were (a) incompatible with the amount of ADL services required by residents, (b) insufficient to deliver the ADL services for which Kindred submitted claims for payment from Medicare and Medicaid, (c) which resulted in Kindred violating both federal and state false claims acts, and (d) neglected and harmed its most vulnerable residents.

6.     The profound difference between the amount of ADL services that Kindred claimed to have provided and the amount of those services that were humanly possible given Kindred's staffing is at the heart of this case.

7.     Relator, who was the Director of Nursing Services ("DNS") also known as the Director of Nursing ("DON") at Heritage Manor Healthcare Center ("Heritage Manor") between

---

objectives and timetables to meet a resident's medical, nursing, mental and psychosocial needs that are identified in the comprehensive assessment.  42 CFR § 483.21(b).  This document is part of each resident's medical record.  The Comprehensive Care Plan must be:

(i)     Developed within seven days after completion of the comprehensive assessment;

(ii)    Prepared by an interdisciplinary team that includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff in disciplines as determined by the resident's needs, and, to the extent practicable, the participation of the resident, the resident's family or the resident's legal representative; and

(iii)   Periodically reviewed and revised by a team of qualified persons after each assessment.

The services provided or arranged by the facility also must:

(i)     Meet professional standards of quality;  and

(ii)    Be provided by qualified persons in accordance with each resident's written plan of care.

42 CFR § 483.21(b)(2)-(3).

[6]Additionally, facilities must have sufficient medical record documentation to justify the ADL coding in each resident's MDS for ADL care claimed to be required and provided to residents.

April 2014 and June 2014, has direct and independent knowledge of the following facts:

      a.     Kindred continually exerted pressure from the top down on its subject nursing homes to recruit highly-dependent residents who required assistance with labor-intensive ADL care.

      b.     Despite its aggressive recruitment of highly-dependent residents, Kindred deliberately employed a non-acuity-based staffing scheme that ignored the essential ADL care needs of its residents and caused the staffing levels/labor hours to be insufficient to meet the needs of its residents as defined by their MDSs and Comprehensive Care Plans.

      c.     Kindred's systemic, non-acuity-based staffing practices resulted in dependent residents routinely not receiving the essential ADL care that Defendants certified such residents required and were provided and which directly resulted in resident neglect and  harm.

      d.     Despite Kindred's awareness of the care deprivations its staffing and resident recruitment practices caused, it refused to increase staffing levels or decrease the number of heavy care residents in the subject facilities to make it possible for the limited number of staff to deliver the essential ADL care required by dependent residents.

      e.     The staffing targets and resident recruitment targets that Kindred imposed and relentlessly enforced at its facilities made it humanly impossible for the limited numbers of staff to deliver the essential bedside care that Kindred claimed, in its MDSs, resident Comprehensive Care Plans and resident medical records, was necessary for and actually provided to its highly-dependent nursing home residents.

      8.     Relator has direct knowledge that Kindred understaffed each of the subject nursing homes and quantified the extent to which it deprived residents of the basic ADL care that

was required and that Kindred claimed was provided.  Kindred nonetheless submitted claims for payment to the Government for ADL services that were mathematically and humanly impossible for it to have provided.

9.      While the gravamen of Relator's claim, brought pursuant to federal and state False Claims Acts, is that government payors were being billed for services that were not provided, it is also the case here that Defendants have shortchanged care to their most vulnerable resident population -- many of whom lack the capacity to complain on their own -- in order to increase Kindred's profits and raise the cash necessary to finance debt and support excessive spending and its zealous acquisition strategy.

10.      The false claims and statements in this case include tens of thousands of false MDSs and Form CMS-1500s ("Form 1500s")[7] submitted to Medicare and Medicaid. Kindred knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in these MDSs and the Form 1500s, and that the submission of false resident ADL information in these MDSs and concomitant false representations in the Form 1500s may subject it to substantial criminal, civil and administrative penalties.  The false claims in this case also include the various other claims for payment that Kindred submitted to Medicare and Medicaid (discussed more fully

---

[7]Form CMS-1500 requires the provider to certify, as a condition for payment, that, *inter alia*: (1) the information on the form is "true, accurate and complete"; (2) it has "familiarized" itself "with all applicable regulations, and program instructions"; (3) it has "provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision"; (4) the claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions"; and (5) "***the services . . . were medically necessary and personally furnished***" by either the provider or an employee under the provider's supervision."  CMS 1500, at 2 (emphasis added), available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS1188854.html. As detailed herein, Kindred submitted, or caused to be submitted, CMS 1500s for services it did not provide. Medicare Claims Processing Manual, Chapter 26, Completing and Processing Form CMS 1500 Data Set, publicly available at https://www.cms.gov/RegulationsandGuidance/Guidance/Manuals/downloads/clm104c26.pdf.

below), certifying as a condition of payment that the care it claimed to have delivered complied with federal and state laws.

## II.    JURISDICTION AND VENUE

11.    Relator brings this action on behalf of himself and on behalf of the United States for Defendants' violations of the FCA and on behalf of the States of California, Colorado, Connecticut, Georgia, Indiana, Montana, Nevada, North Carolina, Tennessee, Washington, and Wisconsin, and the Commonwealths of Virginia and Massachusetts, for violations of their respective State False Claims Acts (collectively referred to as the "Qui Tam States").

12.    This Court has both subject matter and personal jurisdiction under 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law causes of action, as well as claims brought under state false claims acts under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

13.    Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because one or more of Defendants can (1) be found in, (2) resides in, and (3) transacts business in this District, and because acts proscribed by 31 U.S.C § 3729 occurred in this District.  For example, Defendants owned, operated, and managed the Kindred Transitional Care and Rehabilitation Center--Wyomissing in Reading, Berks County (provider number #395237).  Further, the acts proscribed by 31 U.S.C § 3729 occurred at this Pennsylvania facility.

14.    There has been no public disclosure of the allegations herein.  To the extent that there has been a public disclosure unknown to the Relator, he is the "original source" under 31 U.S.C. § 3730(e)(4), and similar state laws.  Relator has direct and independent

7

knowledge of the information on which the allegations are based.

## III.   THE PARTIES

### A.   RELATOR

15.   Relator is a citizen of the United States and has standing to bring this action under the FCA and the various state false claims acts.

16.   Relator has complied with all procedural requirements of the laws under which this case is brought.

17.   Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

18.   Relator brings this action based on his direct knowledge and, where indicated, on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4).

19.   Relator is the original source of the information upon which this Complaint is based, and the facts alleged herein, as that phrase is used in the FCA and other laws at issue in this Complaint.

### B.   DEFENDANTS

20.   Defendant, Kindred Healthcare Inc. ("Kindred"), is a healthcare services conglomerate incorporated in Delaware and headquartered in Louisville, Kentucky.  Kindred, through its subsidiaries operates a home health, hospice and community care business, transitional care hospitals, inpatient rehabilitation hospitals, and contract rehabilitation services business across the United States.  As of June 30, 2015, Kindred reported that it  provided healthcare services through its subsidiaries at 2,730 locations in 47 states, including 96

8

transitional care hospitals, 16 in-patient rehabilitation hospitals, 90 nursing centers, 21 sub-acute units, 656 home health, hospice and non-medical home care sites, 99 in-patient rehabilitation units (hospital-based), and contract rehabilitation services at 1,752 sites.[8] Excluding its insurance company in the Cayman Islands, Kindred operated through 327 subsidiary companies in 46 states and Puerto Rico.[9] As of March 31, 2018, Kindred's "Kindred at Home" division primarily provided home health, hospice, and community care services from 606 sites of service in 40 states. Kindred's hospital division operated 75 TC hospitals (certified as long-term acute care ("LTAC") hospitals under the Medicare program) in 17 states. Kindred's Rehabilitation Services division operated 19 IRFs and 98 hospital-based acute rehabilitation units and provided rehabilitation services primarily in hospitals and long-term care settings in 45 states.[10]

21.    At all pertinent times, Kindred was one of the largest diversified providers of post-acute services in the United States, pumping out revenues totaling over $31 billion from 2008 through 2014 (including approximately $5 billion in 2013 and $3.6 billion in 2014), a substantial portion of which is derived through Medicare and Medicaid funding paid to Kindred's nursing home operations (skilled nursing facilities and nursing facilities). In its annual SEC report for the period ending December 31, 2012, Kindred boasted that it was the fourth largest skilled nursing facility provider in the nation, operating a national network of 223 nursing homes with 27,142 licensed beds in 27 states.[11] Prior to going private in May 2018, Kindred was the

---

[8]*See* Kindred's Second Quarter 2015 Reports https://www.businesswire.com/news/home/ 20150805006653/en/Kindred-Healthcare-Reports-Quarter-2015-Results. During the height of its nursing home operations (from 2008 to 2014), Kindred operated more than 200 nursing homes across the United States.

[9]*See* Kindred's SEC 10-K Annual Report for fiscal year ending December 31, 2014.

[10]*See* Kindred's SEC 10-Q Quarterly Report filed May 8, 2018. https://www.sec.gov/Archives/edgar/- data/1060009/000156459018011897/knd-10q_20180331.htm

[11]*See* Kindred's SEC 10-K Annual Report for fiscal year ending December 31, 2012. In 2013, to support its expansion into long-term care hospitals and therapy providers, Kindred sold a number of its nursing home facilities and, as of December 31, 2013, it operated 12,638 licensed beds in 23 states. By

376th ranked company in the Fortune 500 with assets of $6.11 billion.[12]

22.    From 2008 to 2017, Kindred's nursing home operations generated revenues greater than $12.9 billion, based on a volume of over 50 million resident days.   By far, the largest purchaser of this nursing home care was the Government, with over 82% of these revenues since 2008 being derived from the Medicare, Medicare Advantage and Medicaid.[13]

23.    Kindred's growth and diversification was financed by the nursing home[14] Medicare/Medicaid reimbursement system.  The guaranteed chunk of taxpayer cash derived from Kindred's nursing home operations provided the revenue stream necessary to service Kindred's debt.

24.    Kindred is a Delaware corporation with its principal place of business located at 680 South Fourth Street, Louisville, Kentucky  40202-2412.

25.    Kindred owns as a subsidiary, Kindred Healthcare Operating, Inc., which in turns owns Kindred Nursing Centers East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers North, LLC; and Kindred Nursing Centers South, LLC.  Additionally, Kindred owns, as a subsidiary, Kindred Healthcare Services, Inc.

26.    Kindred Healthcare Operating, Inc. is also a Delaware corporation with its principal place of business located at 680 South Fourth Street, Louisville, Kentucky 40202-2412.

27.    Kindred Healthcare Services, Inc. is also a Delaware corporation with its principal place of business located at 680 South Fourth Street, Louisville, Kentucky 40202-2412.

---

2014, the number of nursing homes had been reduced further to 90, with 11,910 beds in 18 states.
[12]*See* https://fortune.com/fortune500/2017/kindred-healthcare/
[13]*See* Kindred's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2014.
[14]For purposes of this Second Amended Complaint, the term "nursing home" means a dually certified skilled nursing facility and nursing facility as such are defined in Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r.  Further, such term includes all state-licensed nursing homes/nursing facilities.

10

28.     Kindred Nursing Centers East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers South, LLC; and Kindred Nursing Centers North, LLC., hold the licenses for approximately 90% of the nursing homes included in the attached Exhibits "1" and "2." As such, the overwhelming majority of Kindred's nursing homes were directly controlled and operated by the named Defendants. The principal place of business for each the Defendants listed in this paragraph is 680 South Fourth Street, Louisville, Kentucky 40202-2412. Each is a Delaware entity that, at all times material to this case, was a wholly-owned subsidiary of Kindred. Defendants were regularly designated by Kindred as the legal entities owning and operating those facilities in Exhibits "1" and "2." As described in more detail below, each of the aforementioned legal entities and nursing homes was merely an instrumentality or conduit through which Kindred did business and operated the facilities listed in Exhibits "1" and "2."

29.     Of particular relevance to this case are the 174 Kindred owned, operated, managed, and/or maintained nursing homes listed in Exhibits "1" and "2" by name, address, and provider number, including the facility in the Eastern District of Pennsylvania. These nursing homes are both "skilled nursing facilities" and "nursing facilities" as defined by Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r, as well as by state laws and regulations governing the operation of nursing facilities. With respect to each of the nursing homes listed in Exhibits "1" and "2," Kindred entered into provider agreements with Medicare and Medicaid and systematically presented false claims for government payment under each facility's unique provider number in violation of 31 U.S.C. § 3729, as described in more detail below.

30.     As described in greater detail below, the facilities listed in Exhibits "1" and

11

"2" were not only owned, operated, controlled, managed, and dominated by Defendants, but were also mere agents, instrumentalities, or conduits through which Defendants did business.  Defendants managed, operated, obtained licenses, and distributed the revenues, profits and assets for a national network of nursing homes, including the facilities listed in Exhibits "1" and "2."  By reason of the conduct described herein, Defendants and the subject nursing homes directly participated in the FCA violations described herein and were the alter egos of one another, there being a sufficient unity of interest and ownership among and between them that the acts of one were for the mutual benefit of and can be imputed to the others.

31.     At all pertinent times, all Defendants acted as alter egos of each other, as an integrated enterprise and as a single or joint employer.

## IV.   MEDICARE, MEDICAID, AND KINDRED'S CERTIFIED CLAIMS OF STAFF AND CARE PROVIDED

32.     The federal and state governments are the principal purchasers of nursing home services, primarily through their Medicare and Medicaid programs.  Medicare is a federal Government health program primarily benefiting the elderly and disabled that is administered by CMS.  Medicare pays for short-term, post-acute nursing home care that includes SNFs.  It covers up to 100 days of nursing home services per episode of illness after a qualifying in-patient hospital stay.  Medicare's payments to SNFs are for the provision of both skilled nursing services and the ADLs needed by the Medicare beneficiary.

33.     Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that pays for medical expenses of primarily low-income residents.  Funding for Medicaid is shared between the federal Government and state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  Medicaid pays

for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS.  42 U.S.C. §§ 1396a(a)-(b).  Medicaid pays for long-term care in an NF, including ADLs, for those who are medically qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.

      34.     Federal law requires operators of both SNFs and NFs to conduct a comprehensive assessment of each resident's specific needs, and to submit the list of these needs to CMS.  42 U.S.C. § 1395i-3 (Medicare); 42 U.S.C. § 1396 (Medicaid).  The nursing homes report this list on the MDS -- for every resident in the nursing home regardless of the resident's age, diagnosis, length of stay, or payment category (*i.e.,* Medicare, Medicaid, or private insurance).  42 CFR § 483.20.  In Section G of the MDS, the nursing home provides a specific list of the ADL care each resident needs and a list of the AOL services the nursing home claimed to have provided to the resident.  An example of Section G of the MDS is set forth below:

| Section G | Functional Status |
|---|---|

**G0110. Activities of Daily Living (ADL) Assistance**
Refer to the ADL flow chart in the RAI manual to facilitate accurate coding

**Instructions for Rule of 3**
- When an activity occurs three times at any one given level, code that level.
- When an activity occurs three times at multiple levels, code the most dependent, exceptions are total dependence (4), activity must require full assist every time, and activity did not occur (8), activity must not have occurred at all. Example, three times extensive assistance (3) and three times limited assistance (2), code extensive assistance (3).
- When an activity occurs at various levels, but not three times at any given level, apply the following:
  ○ When there is a combination of full staff performance, and extensive assistance, code extensive assistance.
  ○ When there is a combination of full staff performance, weight bearing assistance and/or non-weight bearing assistance code limited assistance (2).
**If none of the above are met, code supervision.**

| 1. **ADL Self-Performance** | 2. **ADL Support Provided** |
|---|---|
| Code for **resident's performance** over all shifts - not including setup. If the ADL activity occurred 3 or more times at various levels of assistance, code the most dependent - except for total dependence, which requires full staff performance every time | Code for **most support provided** over all shifts; code regardless of resident's self-performance classification |

**ADL Self-Performance Coding:**

**Activity Occurred 3 or More Times**
0. **Independent** - no help or staff oversight at any time
1. **Supervision** - oversight, encouragement or cueing
2. **Limited assistance** - resident highly involved in activity; staff provide guided maneuvering of limbs or other non-weight-bearing assistance
3. **Extensive assistance** - resident involved in activity, staff provide weight-bearing support
4. **Total dependence** - full staff performance every time during entire 7-day period

**Activity Occurred 2 or Fewer Times**
7. **Activity occurred only once or twice** - activity did occur but only once or twice
8. **Activity did not occur** - activity (or any part of the ADL) was not performed by resident or staff at all over the entire 7-day period

**ADL Support Provided Coding:**
0. **No** setup or physical help from staff
1. **Setup** help only
2. **One** person physical assist
3. **Two+** persons physical assist
8. ADL activity itself **did not occur** during entire period

|  | 1. Self-Performance | 2. Support |
|---|---|---|
|  | ↓ Enter Codes in Boxes ↓ | |
| A. **Bed mobility** - how resident moves to and from lying position, turns side to side, and positions body while in bed or alternate sleep furniture | ☐ | ☐ |
| B. **Transfer** - how resident moves between surfaces including to or from: bed, chair, wheelchair, standing position (**excludes** to/from bath/toilet) | ☐ | ☐ |
| C. **Walk in room** - how resident walks between locations in his/her room | ☐ | ☐ |
| D. **Walk in corridor** - how resident walks in corridor on unit | ☐ | ☐ |
| E. **Locomotion on unit** - how resident moves between locations in his/her room and adjacent corridor on same floor. If in wheelchair, self-sufficiency once in chair | ☐ | ☐ |
| F. **Locomotion off unit** - how resident moves to and returns from off-unit locations (e.g., areas set aside for dining, activities or treatments). **If facility has only one floor**, how resident moves to and from distant areas on the floor. If in wheelchair, self-sufficiency once in chair | ☐ | ☐ |
| G. **Dressing** - how resident puts on, fastens and takes off all items of clothing, including donning/removing a prosthesis or TED hose. Dressing includes putting on and changing pajamas and housedresses | ☐ | ☐ |
| H. **Eating** - how resident eats and drinks, regardless of skill. Do not include eating/drinking during medication pass. Includes intake of nourishment by other means (e.g., tube feeding, total parenteral nutrition, IV fluids administered for nutrition or hydration) | ☐ | ☐ |
| I. **Toilet use** - how resident uses the toilet room, commode, bedpan, or urinal; transfers on/off toilet; cleanses self after elimination; changes pad; manages ostomy or catheter; and adjusts clothes. Do not include emptying of bedpan, urinal, bedside commode, catheter bag or ostomy bag | ☐ | ☐ |
| J. **Personal hygiene** - how resident maintains personal hygiene, including combing hair, brushing teeth, shaving, applying makeup, washing/drying face and hands (**excludes** baths and showers) | ☐ | ☐ |

14

| G0120. Bathing | |
|---|---|
| How resident takes full-body bath/shower, sponge bath, and transfers in/out of tub/shower (**excludes** washing of back and hair).  Code for **most dependent** in self-performance and support | |
| Enter Code | **A.  Self-performance**<br>  0.  **Independent** - no help provided<br>  1.  **Supervision** - oversight help only<br>  2.  **Physical help limited to transfer only**<br>  3.  **Physical help in part of bathing activity**<br>  4.  **Total dependence**<br>  8.  **Activity itself did not occur** during the entire period |
| Enter Code | **B.  Support provided**<br>  (Bathing support codes are as defined in item **G0110 column 2, ADL Support Provided**, above) |

*Example:* MDS 3.0 Section G

35.     On each MDS Kindred submitted to CMS and state governments, it made specific claims in Section G of the MDS regarding both the functional status of each of its residents *and* the number of staff provided to help residents with each ADL: (a) bed mobility; (b) transfer; (c) walk in room; (d) walk in corridor; (e) locomotion on unit; (f) locomotion off unit; (g) dressing; (h) eating; (i) toilet use; (j) personal hygiene; and (k) bathing.

36.     Every nursing home operated by Kindred is required to accurately assess and code in Column 1 ("Self-Performance") each resident's ability to perform each ADL, and in Column 2 ("Support") the level of assistance and support required by and provided to each resident by nursing home staff for each ADL.  In the example above, the use of code "3" in Column 1 to describe the resident's ability to perform basic ADL functions indicates the resident has minimal ability to perform these basic functions and is highly dependent on nursing home staff for the same.  Further, by coding a "3" in various "staff support" boxes under Column 2, the nursing home in this example claims that the resident required and was provided two-person physical assistance by nursing home staff for those specific ADL functions.  Thus, the example above indicates the resident required (and was provided) the assistance of two nursing home staff members in connection with moving in his or her bed (Bed Mobility), transfers to and from his or her bed (Transfer), and the use of toilet (Toileting).

15

37.     Every time Kindred submitted an MDS to the Government for a resident, Kindred made the following certification or one substantially similar to it:

> I certify that the accompanying information **accurately reflects resident assessment information** for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable **Medicare and Medicaid** requirements.  I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and **as a basis for payment from federal funds**. *I further* **understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information,** and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for **submitting false information**. I also certify that I am authorized to submit this information by this facility on its behalf.  (Emphasis added).

38.     Each Kindred nursing home was also required to submit staffing data to CMS, including specific information as to the time available to certified nurse aides and licensed nurses in a Form CMS-671 as part of the annual survey process.  As stated in CMS's State Operations Manual, completion of the Form CMS-671 is a condition of payment by Medicare and Medicaid: "Skilled nursing facilities and nursing facilities **must be in compliance** with the requirements in 42 CFR Part 483, Subpart B **to receive payment under Medicare or Medicaid**.  To certify a skilled nursing facility or nursing facility, complete at least:

> •     A life safety code survey; and
>
> •     A standard survey (Forms CMS-670, 671, 672, 677, 801 through 807)".
>       (emphasis added).[15]

---

[15]State Operations Manual, Chapter 7 - Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, pp. 23-24, (Rev. 12/13/13); s*ee also* §§ 1819 and 1919 of the Social Security Act, which requires the survey process.

16

39.     Kindred also repeatedly submitted claims to Medicare and Medicaid for

resident care.  If the resident was covered by Medicare, then the Kindred facility -- which

was providing SNF services and seeking reimbursement for the same -- submitted a claim to

a Medicare Administrative Contractor ("MAC") on either the 8371 electronic form or the

CMS-1450 paper form, which state in relevant part:

> The submitter of this form understands that misrepresentation or
> falsification of essential information as requested by this form, may serve
> as the basis for civil monetary penalties and assessments and may upon
> conviction include fines and/or imprisonment under federal and/or state
> law(s).
> ***
> Submission of this claim constitutes certification that the billing
> information as shown on the face hereof is true, accurate and complete.
> That the submitter did not knowingly or recklessly disregard or
> misrepresent or conceal material facts.

40.     Medicare pays SNFs a pre-determined daily rate for each day of care under a

prospective payment system ("PPS").  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

The PPS payment is expected to cover all operating and capital costs that efficient facilities

would be expected to incur in furnishing SNF services, and Medicare will pay more for

certain high-cost,  low-probability ancillary services not relevant here.  This PPS payment

consists of a nursing component and a therapy component.  Both of these are adjusted for (1)

geographic differences, and (2) the facilities' "case mix index" ("CMI").  As described below,

the CMI is unique to each facility and incorporates information from Section G of the MDS.

41.     Kindred also repeatedly submitted claims for payment to state Medicaid programs

to receive payments for residents covered by Medicaid, using an electronic form that contains

similar information as to that found in the CMS 1450.  While state Medicaid program payments

to NFs vary from state to state, every state (except Maryland and Wyoming) uses a prospective

payment system similar in nature to the Medicare PPS system.  The Medicaid programs in Arizona, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Montana, Nebraska, Nevada, North Carolina, Ohio, Pennsylvania, Utah, Vermont, Virginia, Washington, and Wisconsin, like Medicare, adjust the daily payment amount (a *per diem* payment) based on the facility's CMI, which includes the information Kindred reported in Section G of each resident's MDS.[16]

42.     The Alabama, California, Connecticut, Missouri, Oregon, and Tennessee Medicaid programs also pay NFs a *per diem* rate but do not use a case mix index in making adjustments to the *per diem* rate.  The Alabama, California, Connecticut, Missouri, Oregon, and Tennessee Medicaid programs, however, contain requirements that render them functionally equivalent to the other states at issue since reimbursement in each state is premised upon patient acuity and/or the requirements of adequate staffing.  For example, under Alabama's Medicaid program:

> (1)     Each resident must receive the necessary nursing, medical and psychosocial services to attain and maintain the highest possible mental and physical functional status, as defined by the comprehensive assessment and plan of care. Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.

---

[16] *See generally,* Ariz. Rev. Stat. § 36-2959 (Arizona); Colo. Rev. Stat. § 25.5-6-202 (Colorado); Ga. Laws 111-4-1-10 (Georgia); 405 Ind. Admin. Code 5-13-3 (Indiana); Idaho Admin. Coder. 16-03.10, *et seq.* (Idaho); 901 Ky. Admin. Regs. 1:022 (Kentucky); 10-144 Me. Code. R. § 115 (Maine); 130 Mass. Code. Reds. 456.401, *et seq.* (Massachusetts); Mont. Admin. R. 37.40.307 (Montana); 471 Neb. Admin Code *§* 12-011, *et seq.* (Nebraska); Nevada Medicaid Services Manual Chapter 500, publicly available at https://dhcfp.nv.gov/MSM/CH0500/MSM%20Ch%20500%20-Packet%20(03-22-1 3).pdf (Nevada); North Carolina Clinical Coverage Policy 2B-l, publicly available at www.ncdhbs.gov/dma/mp/2B1.pdf (North Carolina); Ohio Admin. Code § 5160-3-10, *et seq.,* (Ohio); 55 PA Code Chapter 1187 (Pennsylvania); Utah Admin. Code § r.414-504, *et seq.* (Utah); Vt. Stat Ann. Tit. 33, § 905 (Vermont); 12 Va. Admin. Code § 30-90-10 (Virginia); Wash. Admin. Code 388-96-010, *et seq.* (Washington); and Wis. Stat. § 49.45(6m) (Wisconsin).

Ala. Admin. Code 560-X-10-.24.  Additionally, nursing facilities receiving reimbursement from

Alabama's Medicaid program must comply with utilization review requirements contained in 42

C.F.R. §§456.350-456.438, which include, in relevant part, a certification of a need for care and

an individual written plan of care describing the functional level of each resident.  Ala. Admin.

Code 560-X-10-.12.  Failure to comply with the utilization review requirements may result in a

recoupment by Medicaid of payments made during the time in which the nursing facility was not

in compliance.  *Id*.

43.     In California, since August 2005, it likewise has been required that the

reimbursement methodology for long-term care facilities reflects the costs and staffing levels

associated with quality of care for residents.  Cal. Welf. & Inst. Code § 14126.02.  Attachment

4.19 D to California's State Medicaid Plan requires that long-term care providers be certified as

qualified to participate in the Medi-Cal program and also meet the requirements of Section 1919

of the Social Security Act.  The plan further requires that nursing facilities be reimbursed in part

based on resident acuity.  Available at https://www.dhcs.ca.gov/formsandpubs/laws/Documents/

Attach4.19D.pdf  (last accessed July 10, 2020).  In Connecticut, "[s]imilar to the federal law,

Connecticut's Public Health Code requires each nursing home to 'employ sufficient nurses and

nurse aides to provide appropriate care of patients housed in the facility 24-hours per day, seven

days a week,'" and requires that all nursing homes meet these staffing requirements for Medicaid

reimbursement.  *See* https://www.cga.ct.gov/pri/archives/2000sireportchap3.htm.

44.     Missouri's Medicaid program, MOHealthNet, also requires as a condition for

participation in the program that providers submit and certify the validity of cost reports for

reimbursement.  13 Mo. Code Regs. Ann., § 70-10.005.  Furthermore, Missouri Code of

Regulations specifically prohibits, in relevant part:

Submitting, or causing to be submitted, false information for the purpose of obtaining greater compensation than that to which the provider is entitled under applicable MO HealthNet program policies or rules, including, but not limited to, the billing or coding of services which results in payments in excess of the fee schedule for the service actually provided or billing or coding of services which results in payments in excess of the provider's charges to the general public for the same services or billing for higher level of service or increased number of units from those actually ordered or performed or both, or altering or falsifying medical records to obtain or verify a greater payment than authorized by a fee schedule or reimbursement plan;

13 Mo. Code Regs. Ann., § 70-3.030(3)(A)(2); and

Failing to provide and maintain quality, necessary, and appropriate services, including adequate staffing for long-term care facility MOHealthNet participants, within accepted medical community standards as adjudged by a body of peers, as set forth in both federal and state statutes or regulations.

13 Mo. Code Regs. Ann., § 70-3.030(3)(A)(5).

45.    Tennessee's State Medicaid Plan requires that all nursing facilities participating in the Medicaid program meet all applicable federal and state requirements for Medicaid reimbursement, and further requires that nursing facilities are reimbursed on the basis of patient acuity.  *See* Attachment 4.19 D to Tennessee's State Medicaid Plan at 740, https://www.tn.gov/content/dam/tn/tenncare/documents2/4-19-d.pdf.  (Last accessed July 10, 2020.)

46.    As a provider of health care to frail and elderly nursing home residents covered by Medicare and Medicaid, Kindred repeatedly affirmed and certified to federal and state governments for each of the subject nursing homes that the services it was paid by taxpayers to provide complied in all respects with applicable law and conditions of payment. In addition to  its certifications regarding the MDS and CMS-671 forms described above, Kindred also certified that it would abide by Medicare and Medicare regulations as a

20

condition of payment.

47.     The Social Security Act and federal regulations require all nursing homes to

have sufficient numbers of nursing staff, including CNAs, to provide "nursing and related

services to attain or maintain the highest practical physical, mental, and psychosocial well-

being of each resident, as determined by resident assessments and individual plans of

care."[17] 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r-(b)(4)(A)(i); and 42 C.F.R. §

483.35.[18] Further, every nursing home:

> [M]ust provide services by sufficient numbers of each of the following
> types of personnel on a 24-hour basis to provide nursing care to all
> residents in accordance with resident care plans: (i) Except when
> waived under paragraph (e) of this section, licensed nurses; and (ii)
> Other nursing personnel,  including but not limited to, [certified] nurse
> aides [CNAs].[19]

42 C.F.R. § 483.35(a)(l).  These staffing laws and regulations require, as a condition to

Medicare/Medicaid reimbursement, that each nursing home must have sufficient numbers of

staff on a 24-hour basis to provide the basic bedside care services needed by residents, as

---

[17]The definition and specific requirements for a "resident assessment" (also known as a Minimum Data
Set or MDS) and "individual plan of care" are also set forth in 42 U.S.C. § 1395i-3(b)(4)(A)(i), 42 U.S.C.
§ 1396r(b)(4)(A)(i), and 42 C.F.R. § 483.35.
[18]Effective October 4, 2016 42 C.F.R. § 483.35 was amended to read:
> The facility must have sufficient nursing staff with the appropriate competencies and skills sets to
> provide nursing and related services to assure resident safety and attain or maintain the highest
> practicable physical, mental, and psychosocial well-being of each resident, as determined by
> resident assessments and individual plans of care *and considering the number, acuity and
> diagnoses of the facility's resident population* in accordance with the facility assessment
> required at § 483.70(e).  (emphasis added).
[19]"Other nursing personnel" includes CNAs, which are specifically defined in 42 C.F.R. § 483.5 as:

> [A]ny individual providing nursing or nursing-related services to residents in a facility
> who is not a licensed health professional, a registered dietitian, or someone who
> volunteers to provide such services without pay. Nurse aides do not include those
> individuals who furnish services to residents only as paid feeding assistants as defined
> in § 488.301 of this chapter.

defined by each resident's MDS assessment and individual plan of care.

48.     Medicare and Medicaid payments to nursing homes are also explicitly premised upon compliance with Sections 1819(d)(l) (Medicare) and 1919(d)(l) (Medicaid) of the Social Security Act (42 U.S.C. § 1395i-3(d)(l)(A) and 42 U.S.C. § 1396r(d)(l)(A)), which provide as follows:

> A skilled nursing facility (and "non-skilled" nursing facility) must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.

49.     Further, Medicare and Medicaid payments to nursing homes are premised upon compliance with 42 CFR § 483.25 which provides, in relevant part:

> Quality of care is a fundamental principle that applies to all treatment and care provided to facility residents. Based on the comprehensive assessment of a resident, the facility must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices, including but not limited to the following: (a) vision and hearing; (b) skin integrity; (c) mobility; (d) accidents; (e) incontinence; (f) colostomy, urostomy or ileostomy care; (g) assisted nutrition and hydration; (h) parenteral fluids; (i) respiratory care, including tracheostomy care and tracheal suctioning; (j) prostheses; (k) pain management; (l) dialysis; (m) trauma-informed care; and (n) bed rails.

50.     Kindred's repeated assurances that it would comply with these laws began when it filed applications for each of its nursing homes to participate in the Medicare program.  Each Kindred facility subject to this case completed a Medicare Enrollment Application for Institutional Providers (CMS-855A), certifying and affirming on an ongoing basis as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor.

> I understand that **payment of a claim by Medicare is conditioned upon** the claim and the **underlying transaction complying with such laws, regulations, and program instructions** (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the **provider's compliance** with all applicable conditions of participation in Medicare.
>
> My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program (emphasis added).

51.     Further, in order to qualify for Medicare payments, Kindred's nursing homes were required to sign and did, in fact, execute Health Insurance Benefit Agreements (CMS-1561) under 42 U.S.C. § 1395cc, conditioning payment on compliance with federal regulations, including those referenced above.  Specifically, these agreements state as follows: "In order to **receive payment** under [Medicare]," the nursing home, "as the provider of services, agrees to conform to the ... applicable provisions in 42 CFR."[20]

52.     Kindred's certifications as compliance for payment from Medicare are described in the Medicare Benefit Policy Manual.  This manual provides that payment for care in a SNF is covered only if all of the following conditions have been met:

> •     The patient requires skilled nursing services or skilled rehabilitation services, *i.e.*, services that must be performed by or under the supervision of professional or technical personnel (*see* §§ 30.2 -30.4); are ordered by a physician and the services are rendered for a condition for which the resident received inpatient hospital services or for a condition that arose while receiving care in a SNF for a condition for which he received inpatient hospital services; [and]
>
> •     The patient requires these skilled services on a daily basis (*see* § 30.6); [and]

---

[20]*Id.*  CMS Form 1561 is available at http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Down1oad s/CMS156I.pdf.

- As a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a SNF (*see* § 30.7.); and

- The services delivered are reasonable and necessary for the treatment of a patient's illness or injury, i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. ***The services must also be reasonable in terms of duration and quantity.***

   If ***any one of these four factors is not met, a stay in a SNF, even though it might include the delivery of some skilled services, is not covered***.   For example, payment for a SNF level of care could not be made if a resident needs an intermittent rather than daily skilled service.

Medicare Benefit Policy Manual, Ch. 8, § 30 (emphasis added).

53.     Accordingly, throughout the applicable timeframe in this case, Kindred knew that Medicare would not pay it for services that were: (1) not reasonable, (2) not consistent with the nature and severity of the resident's individual needs, (3) not consistent with accepted standards of medical practice, and (4) not reasonable, both in terms of ***duration and  quantity***.

54.     Another condition of Medicare payment is found in the Patient's Assessment Requirements of the Social Security Act:

   A skilled nursing facility ***must conduct*** a comprehensive, accurate, standardized, reproducible ***assessment of each resident's functional capacity, which*** assessment-

   (i)     describes the resident's ***capability to perform daily life functions and significant impairments*** in functional  capacity;

   (ii)     ***is based on a uniform minimum data set [MDS] specified by the Secretary*** . . .;

   (iii)     uses an instrument which is specified by the State under subsection (e)(5); and

   (iv)     includes the identification of medical problems.

24

> Each such [MDS] assessment must be conducted or coordinated (with the appropriate participation of health professionals) by a registered professional nurse who signs and *certifies* the completion of the assessment. Each individual who completes a portion of such an assessment shall sign and *certify as to the accuracy* of that portion of the assessment.

42 U.S.C. 1395i-3 and 42 U.S.C. 1396r (emphasis added).  Put simply, to be paid by Medicare and Medicaid, nursing homes must accurately complete MDS assessments for each and every resident.

55.    Each Kindred nursing home also signed a Medicaid Provider Agreement agreeing that the provider is only entitled to be reimbursed for furnishing covered services when all federal and state laws, regulations and program rules have been followed by the provider.  Each state's Provider Agreement is slightly different, but this over-riding similarity -- that compliance with law is a required condition of payment -- is present throughout the country and in every state involved in this litigation.

56.    For example, the Kentucky Medicaid Provider Agreement (p. 6) states:

> All participating providers *agree to meet the requirements of all applicable state and federal laws and regulations* including Title VI of the Civil Rights Act of 1964 the Age Discrimination Act of 1975, the Americans with Disabilities Act and the Rehabilitation Act of 1973.[21]

57.    Similarly, the various state regulations under Medicaid establish the same requirements that are present under federal law concerning using nursing home resources to meet resident needs and having sufficient staff to meet those needs.[22] For example, in Kentucky, 902 KAR § 20:300, states "A nursing facility shall comply with

---

[21]This language is also present in the Kentucky Medicaid Nursing Facility Services Manual, Section II (p. 2.1).

[22]Each of the states in which Kindred operated have adopted specific regulations applicable to nursing home operations that correspond to the federal regulations at 42 CFR § 483.10, *et seq.*

the requirements of 42 C.F.R. §§ 483.1 – 483.95."

58.    The Kentucky Medicaid Provider Manual, page 17,  states:

Provider acknowledges and agrees that no reimbursement is due for a covered service and/or no claim is complete for a covered service unless performance of that covered service is fully and accurately documented in the member's medical record prior to the initial submission of any claim.

59.    The Kentucky Medicaid Nursing Facility Services Manual, Section II, page 2.2, states:

Providers of medical service or authorized representatives attest by their signatures, that the presented claims are valid and in good faith. Fraudulent claims shall be punishable by fine, imprisonment or both.

60.    The Kentucky Medicaid Electronic Media Agreement, which Kindred nursing homes have signed, states:

This is to certify that the transmitted information is true, accurate, and complete and that any subsequent transactions which alter the information contained therein will be reported to the KMP. I understand *that payment and satisfaction of these claims will be from Federal and State funds* and that any false claims, statements, or documents or concealment of a material fact, may be prosecuted under applicable Federal and State Law (emphasis added).

61.    Submission of accurate and true MDS information is also a condition of payment under Medicaid just as it is for Medicare.  Accordingly, Kindred certified in every one of its Medicaid and Medicare residents' MDSs as follows:

I certify that the accompanying information accurately reflects resident assessment information for this patient and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. *I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds.* I further understand that payment of such federal funds and continued participation in the government-funded

26

health care programs is conditioned on the accuracy and truthfulness of
this information, and that I may be personally subject to or may subject
my organization to substantial criminal, civil, and/or administrative
penalties for submitting false information. I also certify that I am
authorized to submit this information by this facility on its behalf.
(emphasis added).

## V.   KINDRED PACKED ITS NURSING HOMES WITH HEAVY CARE RESIDENTS WHILE INTENTIONALLY UNDERSTAFFING ITS NURSING HOMES

62.   Relator has direct and independent knowledge that the resident-to-staff ratios

established and enforced by Kindred made it humanly impossible to deliver the essential

ADL care required by dependent residents due to the sheer number of residents they were

assigned and the residents' overwhelming needs.[23]  As a result, Kindred nursing home

residents frequently were: (a) forced to use their beds as toilets; (b) left in their own urine

and feces for extended periods ("until the urine had dried and formed brown rings on the

bed linens" or "until the feces had dried and stuck hard to the resident's body"); (c) left in

pajamas/gowns and not gotten out of bed; (d) left in bed in the same position for hours

on end; (e) left with a food tray next to the bed without any feeding assistance; (f) left

smelly and unclean, unshaven, and unbathed; (g) left yelling/crying for help after call lights

were pushed but not answered; (h) not provided oral care; (i) not encouraged or even given

liquids to drink; and (i) found on the floor due to a lack of assistance.[24]

---

[23]CNAs were pressured to falsify medical records to make it appear that they had provided care that they
did not provide; for example, it was a practice to falsify records to show that residents received care on
days when, according to employee time cards, the CNA was not in the building to deliver such care
and/or on dates when the resident was not in the facility to receive it.
[24]Furthermore, Kindred had a practice of bringing in additional staff during surveys in order to make it
appear that residents were getting proper care.  After the surveyors left, staffing levels and ADL care
would go back to "normal" understaffed levels.  The limitations of the survey process and the likelihood
that surveys significantly understate care issues at nursing homes are well known and well documented.
A study done by the United States Government Accountability Office ("GAO") in 2008 described
widespread, nationwide patterns of state surveys failing to identify deficiencies; 70% of state surveys
missed one or more deficiencies.  The most frequently missed type of deficiency identified in these

63.     The residents who experienced the most care deprivation predictably were those who were most vulnerable and unable to move or transfer from bed to chair, who did not have control of bowel and bladder function, whose wet and soiled clothing frequently had to be changed, and who were incapable of feeding themselves, bathing themselves, dressing themselves, and getting out of bed by themselves.  Based on Relator's direct and independent knowledge, these are the very type of residents who Kindred targeted for recruitment.

64.     In its quest to increase revenues and cash flows,[25] Kindred directed and required every nursing home in its chain to target and recruit high acuity residents, including those requiring two-person assist (defined and discussed more fully below).  These targeted residents shared a common dependence upon nursing home staff for basic bedside care, including: (a) toileting assistance, (b) incontinent care and changing wet/soiled clothing/linen, (c) assistance transferring in and out of bed/wheelchair, (d) repositioning in bed or wheelchair, (e) assistance with feeding and hydration, and (f) bathing and personal hygiene.

## A.     KINDRED'S NURSING HOMES INCREASED OCCUPANCY RATES AND RECRUITED HEAVY CARE RESIDENTS

65.     At all times pertinent to this case, Kindred's financial goal was to fill all its beds in each of its nursing homes, as more residents translate to more revenue.  While there

_____

surveys was poor quality of care, including things like failing to ensure proper nutrition and hydration and failing to prevent pressure sores.  A 2009 study by the GAO identified several causes for this high level of deficiency understatement, including the high number of survey tasks that surveyors were expected to complete, surveyors' inexperience with the survey methodology, and surveyor workforce shortages.

[25] Kindred's corporate strategy of increasing occupancy levels, numbers of high acuity residents, and revenues and cash flows came from the top down.  This strategy was memorialized in multiple SEC filings and emails.

is nothing wrong with maximizing resident census[26] and revenue, it is wrong to do so when facility staffing levels have been deliberately limited to the point that necessary care cannot be provided to residents.

66.     Relator was the DON at Heritage Manor Healthcare between April 2014 and June 2014.

67.     The DON should have a pivotal role in deciding what types of patients should be admitted into a nursing facility.  This is because the DON is in the best position to know the staff's competency levels, time constraints, and ability to meet the new patient's needs. However, Relator had virtually no input or control over the census levels and patient recruiting efforts at Heritage Manor.  Instead, Kindred implemented policies to ensure that the nursing home's beds were constantly filled with the highest paying residents possible. Relator could always admit a new resident but had no authority to deny a new resident admission.

68.     Kindred made it clear Heritage Manor had to recruit and retain as many complex care residents as possible.  These residents generated the highest reimbursement levels and revenue and allowed Kindred the opportunity to make more money for the services they could charge related to those residents.  Importantly, these residents typically required the highest levels of care and demanded the most attention and time from Kindred's staff in order to properly care for their needs.

69.     Kindred's business strategy kept the acuity level at Heritage Manor above the average nursing home.  Almost all of the residents at Heritage Manor (90% or more) were extensively or totally dependent on the staff for their activities of daily living ADLs, including: (1) toileting or incontinent care; (2)  transfer from bed to wheelchair or back; (3)

---

[26]"Census" is the count of residents in a nursing home.

bathing; (4) dressing; (5) personal hygiene; (6) bed mobility; (7) eating; and (8) AM/PM

care.  A high percentage of these patients (approximately 40%) required two-person

assistance (discussed and defined below) with one or more ADL.  Over half of the residents

had dementia or Alzheimer's disease, further increasing the workload of the facility.

Heritage Manor, therefore, needed to have higher staffing in the facility to meet the needs of

the high resident acuity levels/workload at the facility.

70.     Kindred, however, did not staff Heritage Manor based on acuity levels/ADL

needs of the residents.  There was no tool, or method for determining staffing levels based

upon the acuity/need levels of residents.  Instead, staffing was based solely upon pre-

determined budgetary targets based upon the number of residents in the facility (census).

This practice was dangerous.  Heavy care residents who required extensive assistance with

time consuming ADL care such as eating assistance, toileting assistance, incontinent care,

transfers, dressing, hygiene care, turning and repositioning, and bathing, require

significantly more staff time than light care residents who are independent in these

functions.  However, based on Kindred's staffing method, there was no distinction made as

to workload or labor time required to meet resident needs.  All residents were staffed the

same regardless of their ADL needs and, in fact, a significant number of residents required

two-person assist (discussed and defined below) for these ADLs, effectively doubling the

amount of time required to provide this important care.

71.     Kindred made resident recruitment a top company-wide priority.  Declines in a

nursing home's resident census (also known as "negative budget variances") were regarded as a

crisis by the company, which strictly monitored the number of filled and empty beds each day in

every one of its facilities.  Kindred's Corporate District Director of Operations, Katherine Joy,

testified in a June 22, 2011 deposition, as follows:

Q.      Now, you told me that you reported directly to David Stordy [Kindred
        Senior Vice President] and Mr. Jim Scadlock [Kindred Senior Vice President
        for Marketing and Development], correct?

A.      Yes.

Q.      Do you know who they reported to?

A.      The president of the nursing home division for Kindred Healthcare.

Q.      Lane Bowen?

A.      Lane Bowen.

Q.      Is it true that you were being told by your corporate supervisors that you were
        expected to get the census changes that they wanted?

A.      Yes.

Q.      Is it true that you and your district team were being told by your corporate
        supervisors that you needed to micromanage and have a plan for increasing
        Medicare census at your nursing homes?

A.      Yes.

Q.      Is it true that you were being told by your corporate supervisors that you needed
        to make meeting your, or exceeding your census budget a top priority?

A.      That's what it said in this email.

72.     In an email dated October 17, 2004, Kindred's Senior Vice President, David

Stordy, wrote to Katherine Joy, as follows:

> You each need to **make census the priority**, and most importantly, your
> EDs [facility Executive Directors] have to take responsibility for this. I
> have spent most of this afternoon meeting with Rosemary and **she will be
> turning up the heat**. Your support and **shared ownership of the message
> that she delivers is the expectation** (emphasis added).

73.     Further, in an email dated March 17, 2006, Jim Scadlock, Kindred's Senior Vice

President for Marketing and Development, echoed Kindred's mandate that each of its nursing

homes increase census going forward in order to generate increased revenue for Kindred:

> [W]e as a company are confronted with significant challenges. That's
> why HSD [Kindred's Health Services Division] has a **mandate to
> significantly improve census this year.** A jump of **just one
> percentage point** [in company's nursing home census] equals more
> than 300 ADC [average daily census] and that alone would be over **$22
> million in added revenue annually** (emphasis added).

74.     Kindred also sought to increase its admission of high acuity residents who

required more care because Government health care programs pay more for such residents.

Indeed, some heavy care residents are so dependent that two CNAs are required to provide

certain services, known as "two-person assists."  Compared to a resident that does not require a two-person assist, Kindred could collect over $115 more per resident, per day, in Medicare reimbursement for a resident requiring two-person assist for ADL services, such as assistance for toileting/incontinent care, repositioning in bed, and transferring bed to chair and back.  For this reason, Kindred required every nursing home to target high rate-of-pay residents, including those requiring two-person assists.

75.     With a finite number of beds, Kindred wanted them filled with heavy care, high rate-of-pay residents.  Due to the fierce competition that existed in the marketplace for such residents, Kindred pursued a coordinated strategy to ensure that its nursing homes were aggressively recruiting heavy care residents.  Kindred hired admission coordinators and sales directors who were required to follow Kindred's corporate-wide marketing action plans designed to increase admissions of heavy care residents.  In Kindred's marketing plans and procedures, resident admissions were regarded as "sales."  Employing terminology like "sales blitz," "cluster marketing," "sales call," "sales volume" and "targeted sales," Kindred required each nursing home admission coordinator/sales director to document every "sales call" made to a hospital or physician to recruit a resident and to report to management all results and variances from targeted numbers.  Kindred also incentivized its admission coordinators/sales directors through bonuses paid for hitting the specified census and "payor-mix" targets.[27]  Kindred management also routinely chastised, reprimanded, and/or terminated admission coordinators/sales directors who failed to achieve Kindred's payor-mix objectives.

76.     Kindred's payor and patient acuity targets emanated from the top of Kindred's corporate structure and were implemented throughout the company by Kindred's Senior Vice President of Sales and Marketing and by its Regional and District Sales and Marketing teams.

---

[27]"Payor-mix" refers to the resident's source of payment or insurance, such as Medicare or Medicaid.

77.     Kindred's census and staffing targets were implemented in each of its geographic

regions (North, Central/South, East, and West).  For example, in the Central/South Region,

Kindred's District Director of Operations, Katherine Joy, testified in her June 22, 2011

deposition as follows:

> Q.     And would it be fair to say that the executive director at Kindred Healthcare
>        Mobile was also given specific budgeted census targets to meet?
> A      Yes.
> Q.     And specific quality mix targets to meet?
> A.     Yes.
> Q.     And specific labor cost targets to meet?
> A.     Yes.
> Q.     And like you, the executive director was evaluated based in part on their ability to
>        hit those targets?
> A.     Yes.
> Q.     Is it true that you were being told by your corporate supervisors including Lane
>        Bowen [Kindred's President] that it was unacceptable to be over budget in your
>        census, labor cost and controllable  targets?
> THE WITNESS: Yes.
> Q.     All right, so is it true that in April of 2005, an admissions coordinator bonus
>        program was implemented by Mr. Bowen to increase overall census or maintain
>        budget and quality mix census?
> THE WITNESS: Yes.
> Q.     And then he also sends this e-mail directly to the administrators letting them
>        know that it was imperative that they administer the program?
> A.     Yes.
> Q.     And under the program, the admissions coordinators got a cash bonus every
>        month if the census targets were met?
> THE WITNESS: Yes.
> Q.     Or if they met or exceeded their quality mix which was the census minus
>        Medicaid?
> A.     Yes.

78.     Similarly, in the West Region, a Kindred District Director of Operations, Gwyn

Rucker, testified in a deposition on November 10, 2011, that Kindred targeted "clinically

complex" residents to increase revenue:

> Q.     And there was even instruction from Corporate to allow the admissions of more
>        clinically complex residents,  right?
> A.     Correct.
> Q.     Which means you would want to target residents who have an increased
>        acuity, right?

33

A.    That's what clinically complex means.

Q.    For example, Medicaid is on the low end of reimbursement, right?

A.    Correct.

Q.    And Medicare is on the high end, right?

A.    Correct.

Q.    That's why Corporate was targeting the high-end residents, the Medicare residents, because it increases the revenue, true?

A.    Correct.

79.    Likewise, Richard Kackmeister, an Administrator in Kindred's West Region,

testified in a sworn declaration dated October 17, 2011, as follows:

> Despite my title, I had virtually no input or control over the census levels and resident recruiting efforts at Edmonds. Instead, Kindred implemented policies to ensure that the nursing home's beds were constantly filled with the highest paying residents possible. Kindred gave me and enforced specific census targets, payor mix targets, and discharge targets - all of which were meticulously monitored on a daily basis by Kindred.

> Kindred made it clear that we should recruit and retain as many Medicare residents as possible. Medicare residents generated the highest reimbursement levels for the facility and allowed Kindred' various subsidiaries that provided therapy the opportunity to make more money for the services they could charge related to those residents. However, Medicare residents typically require the highest levels of care.

> *Kindred stripped both me and my Director of Nursing of the discretion and professional judgment to refuse new admissions based on the limited number of staff in the facility.* Rather, if the salesmen recruited new residents, the home was expected to admit the residents.

> As administrator, *I was unable to place a moratorium on new admissions or to increase staffing levels* when in my professional judgment an increase was necessary to properly care for the acuity level of the residents in the building.

> Had I been allowed to exercise my professional judgment at Edmonds, we would have significant increased staff, changed staff positions, and raised wages immediately. This would have cost more money, which Kindred controlled and limited.

> However, none of my recommendations were implemented by Kindred and Edmonds continued to experience consequences. Despite the efforts of staff present, the care provided was insufficient, and

34

> residents suffered. Consequently, the facility continued to have
> residents with pressure sore related problems; many were left
> unsupervised and were not provided enough assistance with activities
> of daily living. (emphasis added).

80.     In the East Region, a Kindred Administrator, Byron Eshelman, testified in a

sworn affidavit dated April 22, 2011, that Kindred continuously demanded the admission of

high acuity residents and compliance with staffing levels that did not take into account the

needs of the residents:

> Kindred Healthcare, Inc. continuously demanded that new residents be
> recruited to the facility and that existing residents be retained. The
> company made it clear that we should recruit and retain as many
> Medicare residents as possible. Medicare residents generated the
> highest reimbursement levels for the facility, but they also needed the
> highest levels of care.
>
> Kindred further dictated the amount of money the home could spend
> on staff. If the census went down, I was required to send aides home
> early. If I did not meet the budget for staffing, I would be terminated.
> These were Kindred's policies.

**B.    KINDRED STAFFED ITS NURSING HOMES WITHOUT REGARD TO RESIDENT NEEDS**

81.     As noted above, federal law requires that every nursing home must have

sufficient numbers of nursing staff, including CNAs, to provide all nursing and related care

services to  each resident as defined by and in accordance with his/her MDS and

individualized care plan.  42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); 42

C.F.R. § 483.35 and § 483.35(a)(l).  The updated federal regulations further require that the

staffing decisions must consider the number, acuity and diagnoses of the facility's resident

population in accordance with the facility assessment required.  42 C.F.R. § 483.35 (updated

October 4, 2016).  These federal laws mandate that Kindred staff its nursing homes based on

the resident acuity, including the ADL services defined in MDS Section G that are required

by each home's unique resident population.

35

82.     Kindred deliberately ignored these regulations.  Rather than basing staffing on resident acuity, Kindred implemented a company-wide policy on or about April 28, 2006, mandating the following CNA staffing ratios: one aide to eight residents on the day shift, one aide to 12 residents on evening shift, and one aide to 20 residents on the night shift. Kindred's policy resulted in systemic understaffed nursing homes in violation of federal and state regulations.

83.     Relator has first-hand knowledge of the impact Kindred's staffing practices had on the delivery of care to residents.  During his employment at Heritage Manor, the largest obstacle that Relator faced was Kindred constantly interfering with his professional duties and responsibilities.  As the DON, Relator was responsible by law to ensure the residents were provided with appropriate care.  Relator, however, was not given professional discretion to determine or control: (a) the budgeted or actual staffing levels at Heritage Manor; (b) the budgets for care related supplies at Heritage Manor; (c) the hiring and firing of nursing staff; (d) the discipline of nursing staff when they violated protocols and basic care standards; (e) the admissions into Heritage Manor and types of patients admitted to Heritage Manor; (f) the census at Heritage Manor and marketing targets; and, (g) the patient recruitment programs and discharge practices.  These matters were not determined by Relator but, rather, by Kindred.  All cash management functions, revenues and expenditure decisions at the nursing home level were tightly controlled by Kindred.  As a result, Kindred significantly hampered Relator in doing his job as the DON.  More importantly, Kindred made it impossible to remedy the problems at Heritage Manor and knowingly perpetuated the problems at Heritage Manor.

84.     Kindred dictated the maximum number of staff allowed to work, as well as the maximum amount of money that could be spent for staffing at Heritage Manor.  These

36

maximum staffing levels were mandated by Kindred through the budget established and monitored by Kindred with respect to Heritage Manner and were determined by the number of residents in the building, without regard for the needs of the residents. The nursing staff and Relator had absolutely no authority to adjust the staffing levels to the acuity needs of Heritage Manor's residents. Whenever Relator tried to address and adjust the staffing levels at Heritage Manor to address the acuity needs of patients, Donna Brown, the District Director of Operations ("DDO Brown") for Kindred, became angry and reprimanded Relator.

85.    Labor costs are the largest expense in a nursing home and DDO Brown specifically instructed Relator to control these expenses at or below the budgeted levels. DDO Brown made it a point to tell Relator that controlling labor cost at or below budget was vital to meeting Kindred's profit targets and that his continued employment with Kindred was dependent on meeting these requirements. Kindred required daily reporting on the number of staff working to make sure Relator and Heritage Manor stayed at or below the staffing budget. Relator had no ability to exercise his professional judgment in determining the number and nature of staff that were necessary to meet the needs of Heritage Manor's residents. Relator found not having the authority to determine the staffing levels at Heritage Manor to be very frustrating, as it hampered his ability to insure that residents received the care they needed.

86.    During Relator's tenure, the budgeted staffing levels at Heritage Manor were 2.13 hours per patient day for nurse aides, 0.76 hours per patient day for licensed practical nurses and 0.38 hours per patient day for registered nurses (totaling 3.27 hours per patient day). These were the maximum numbers of staff that Kindred allowed Relator to have on duty on any given day at Heritage Manor.

87.     Further, based on Relator's experience as a nurse, one nurse aide could care for no more than six residents (a minimum ratio of 1:6) on the day shift (7:00 a.m. to 3:00 p.m.) due to the acuity/care needs of Heritage Manor residents.  On the evening shift (3:00 p.m. to 11:00 p.m.), one nurse aide could care for no more than six residents per nurse aide (a minimum ratio of 1:6) for the first half of the shift (3:00 p.m. to 7:00 p.m.) and no more than eight residents (a minimum ratio of 1:8)  on the second half (7:00 p.m. to 11:00 p.m). On the night shift (11:00 a.m. to 7:00 a.m.), one nurse aide could care for no more than 10 residents (a minimum ratio of 1:10).

88.     Relator was never allowed to staff Heritage manor at these staff to resident ratios because DDO Brown, would not allow it.  Between March 1 to June 19, 2014: (a) the actual day shift ratio averaged one CNA to 10 residents (nearly doubling the maximum work capacity of a nurse aide on a day shift); (b) the actual evening shift ratio averaged one CNA to 11 residents (significantly exceeding the maximum work capacity of a nurse aide on an evening shift); and (c) the actual night shift ratio averaged one CNA to 21 residents (more than doubling the maximum work capacity of a nurse aide on a night shift).  This made it impossible for the CNAs to provide the residents appropriate hygiene, repositioning) feedings, supervision and other necessary and required services.[28]

89.     Relator quickly recognized Kindred's budgeted staffing levels at Heritage Manor were too low to be able to fix the problems at Heritage Manor and provide basic care to the heavy care residents in the building.  Relator never formally requested that Kindred increase the budgeted staffing levels because DDO Brown made it clear that any such request would be fruitless.  Relator never requested authority to increase the actual number

---

[28]Nurses rarely provided basic daily care services direct care (toileting, incontinence care, bathing, hygiene, repositioning, feedings, supervision, etc.) to residents unless Office of the Inspector General auditors were in the facility.

of staff to match the high acuity needs of the residents at Heritage Manor because DDO

Brown became upset anytime Heritage Manor exceeded its budget.  Relator requested

authority to deny the admission of several high acuity patients that he felt Heritage Manor

could not handle.  This request was denied by Kindred and Heritage Manor never stopped

admitting high acuity residents while Relator was the DON.  Relator discussed the poor care

and unnecessary injuries which he witnessed during his resident rounds, as well as

complaints from staff, residents and family members, with Cynthia Porter, the Executive

Director of Heritage Manor, also known as the Administrator ("Administrator Porter").

90.     Relator and Administrator Porter also discussed the results of the annual Office of

Inspector General for the Commonwealth of Kentucky (" Kentucky OIG") survey and how the

underlying cause of the poor care practices noted therein was the lack of sufficient and

competent staff and noncompetitive wage rates.  Administrator Porter shared Relator's

frustrations but both lacked the authority to change any of it.  When questioned about poor care

practices, DDO Brown always stated that her primary focus was to maintain the census, hit the

profit targets and clear any survey deficiencies.  The mentality of doing just enough to get out of

existing problems instead of implementing the steps to prevent them in the first place was

frustrating to Relator because they were not permanent fixes.  And, as soon as the existing

problems were "cleared" with the Kentucky OIG, more problems arose and the old problems

resurfaced.  DDO Brown stated that, from her point of view, Heritage Manor mostly had "paper

compliance issues."  Relator informed DDO Brown that this was not true and that Heritage

Manor had fundamental systemic breakdowns.  In practice, despite Relator's title, DDO Brown

was the DON at Heritage Manor and had all the authority, even though she had no nursing

background.

91.     Relator knew better than to ask for assistance with the shortcomings described above and tried to correct the problems within the constraints imposed upon him by Kindred. Heritage Manor employed a number of caring aides and nurses who worked hard.  But, due to understaffing, those employees all faced an impossible task.  The care provided was insufficient, and residents suffered.  Many residents developed pressure sores, became malnourished and dehydrated, lost weight and suffered falls and fractures.  The degree of neglect depended to some extent on how dependent the resident was on the staff for their needs.  The more dependent a resident was for simple things such as eating, drinking and hygiene, the more that resident suffered.

92.     Every day, Relator received a complaint from the staff, resident and/or a family member regarding the needs of residents not being met because of short staffing. Relator verified those complaints with first-hand observations, and he almost always conveyed them to Administrator Porter and often conveyed them to Sheri Newton, Kindred's District Director of Clinical Services.  Despite Relator's reports, Kindred refused to adjust the staffing restrictions to the needs of the patients and continued to demand recruitment of residents with high care needs.

93.     The disconnect between the highly-dependent nature of residents and staffing is confirmed by the Affidavit of Johnna Dobson, LPN dated August 22, 2014:

> I am a Licensed Practical Nurse (LPN) in Kentucky. I became a Licensed Practical Nurse in 2007 and my license is current. Prior to becoming a nurse in 2007, I worked as a patient tech in an emergency room. I was also a police officer and detention officer for approximately 6 years prior to this as well. I was employed at the Heritage Manor nursing home for approximately 4 months (February - June of 2014) . . . .
>
> I worked both the day shift and evening shift at Heritage Manor. On both shifts we were understaffed of nurses and nurse aides. Rozella [Young]'s hall was considered the heaviest and the hardest in the

facility containing approximately 25 residents. All of them required
staff assistance for their ADLs. Although this was the heaviest and
most difficult hall, Heritage Manor only staffed the hall with one nurse
and two CNAs. Then, there were several occasions when only one
CNA would show up for work.

94.     The impact of Kindred's staffing policies on the care residents received at

Heritage Manor, Kentucky, is further corroborated by the June 10, 2015 Affidavit of Angela

Austin, LPN:

> I worked for the Heritage Manor Nursing Home from about April 2014
> to July of 2014. I could not risk my license and livelihood by
> continuing my employment there so I decided to leave. The staffing
> situation at Heritage Manor  was bad when I started and got much
> worse by the time I left. My career ended with them when I worked a
> night shift and found out that me and one other nurse were required to
> cover the entire building. That was insane. I gave my notice the
> following morning after that shift. There was no way possible to
> provide my residents the care they needed or deserved. Being constantly
> shorthanded and understaffed put the residents at serious risk and placed
> the nurses and CNAs working at risk of losing their license. I have worked
> in 5 different nursing homes in the area and Heritage Manor was by far the
> worst staffed facility and provided the worst care to their residents.
>
> The chronic understaffing at Heritage Manor made it impossible
> for nurses and CNAs to do their job and provide the residents the
> care they so critically needed. Complaints to nurse managers,
> DONs and Administrators went nowhere. My CNAs complained to
> me but I was powerless to change anything. State was in the home
> many times investigating complaints. But nothing changed and if
> anything, it got worse when the state left. While state was in the
> building it was all hands on deck. Every person in that building
> was on the floor helping out including office or administrative
> persons. They tried to put on a show for state, however, if state had
> been in the home in the late evening or night shift hours, they
> would have seen a different picture. Often times the schedule
> reflected that enough people would show up but that was not the
> case in reality. The most CNAs scheduled for a day shift was two
> for the 100 Hall and possibly a floater that would be floating the
> entire building. That's if they showed up. On the evening it was
> never more than two scheduled and again, if they showed up. On
> nights it only allowed for one CNA and ........often times that did
> not happen. It was not unusual for CNAs to have cover more than
> one hall or leave their hall to go help another aide on another hall. I
> would say that 75% of the time we were understaffed and even
> when "full" staffed not all care could be provided. On the day shift

alone, 50% of the available CNA time could be taken away with breakfast and lunch duties.

95.     These staffing complaints are echoed by CNA Jessica Sasseen in her Affidavit of

June 2015:

> I am a certified nurse's aide (CNA) in Kentucky. I have been a CNA for approximately 11 years and my license is still active and in good standing. I was employed with Heritage Manor Nursing home from approximately July 2011 to April of 2015. I had some breaks in my employment but was full time for several years. In 2014, I was working a fulltime schedule of 4 days on then 2 days off.
>
> Although it fluctuated a little, the 100 hall had about 25 residents. On the night shift I was required to work this hall by myself. Once or twice a week I also had to cover another hall because of staff shortages. At best, I was one CNA with 25 residents and at worst it was just me to 50 residents. It was not physically possible for me to deliver all the care the residents required when I was the only person there for 25 residents. You can only image how much worse it got when I was the only person for 50 residents. Of the 4 different nursing homes that I've worked in the area, Heritage Manor was by far the worst staffed home and patient care suffered. On those nights where I had to cover two halls, it was all I could do to provide some basic care and at least make sure they were alive by shifts end. This situation always scared me.
>
> There were many problems at Heritage Manor that were caused by understaffing of CNAs and nurses. Aside from not being able to perform the turning and repositioning that many residents of the 100 hall required, incontinent care suffered for all of them as well. There were many fall risks including Regina and Rozella that were not monitored ""properly or not monitored at all. There were several other residents on the 100 hall who had developed problems with skin breakdown. Record keeping and documentation also suffered. The records maintained by the CNAs were mostly pure guesswork at best. At worst they were being filled in falsely as there was no way to know if care had been given to a resident. Management did not care if the records were right or wrong but only that they were filled in. I do not know how they could even expect a CNA with 50 residents to be able to provide all the care those 50 human beings needed, perform the other duties they required of night shift aides, like cleaning wheelchairs, and still be able to chart on all 50 that all care was in fact given. Management wanted blanks to be filled in no matter what so they pressured the nurses who in turned pressured us to fill them in.
>
> We all complained about the working conditions at Heritage Manor. We complained many times and so did the residents. I personally complained to my nurses and the staffing coordinator and I know those complaints

were carried up the chain of command. I also complained to the DON and administrator about the poor working conditions that residents were suffering. There was no way that management could possibly be unaware of the staffing problems and the negative effect it was having on our residents.

96.     Further, Richard Kackmeister, Administrator, Edmonds Healthcare Center

testified in a December 15, 2011 deposition in *Sande v. Kindred,* Superior Court of State of

Washington for King County, No. 10-2-06726-4-SEA, that staffing numbers were set by

Kindred's corporate headquarters and were based on census (number of residents) and not on

acuity (resident needs):

A.     But my complaint is that it says in one of the documents when they [Kindred corporate] are setting the budgets they are supposed to take in to account the acuity levels of the residents. And we had one of the highest acuity levels in the area and we had one of the lowest CNA budgets to work with.

Q.     So your issue was the staff levels?

A.     *We were way understaffed for the acuity level*. And I can't help but believe that they *[Kindred corporate] should have known*. If they are looking at data that shows that *we have the highest acuity in the state and we have got the third lowest CNA ratio* when they've got two other buildings right beside us who have basically the same staffing but one of them is 7th in acuity and the other one is 118th in acuity. I don't understand ... (emphasis added).

97.     Similarly, Byron Eshelman, the Kindred Administrator for Silas Creek

Rehabilitation and Healthcare Center in North Carolina, testified in a sworn affidavit dated April

22, 2011, that Kindred's staffing levels that did not take into account the needs of the  residents:

Kindred Healthcare, Inc. *dictated that staffing levels* in the facility be based solely on the number of residents in the home, *without regard to the residents' care needs* or acuity (emphasis  added).

98.     To ensure compliance with its prescribed staffing targets, Kindred required its

nursing homes to use its "staffing ladders" that memorialized its mandatory ratios to determine

the number of licensed nurses and CNAs on each work shift in each Kindred nursing home.

Specifically, Kindred's staffing ladder was a computer spreadsheet into which nursing home

managers entered the daily census (beds filled) and received an instant calculation of the number

of nursing staff approved by Kindred for the day.  Significantly, the "staffing ladder" that

Kindred mandated did not take into account the acuity of the residents at a particular nursing

home.  Consequently, on a daily basis, the number of CNAs, LPNs, and RNs on duty at each

Kindred facility was determined by the number of residents in the nursing home, regardless of

those resident's actual needs.[29]

---

[29]Despite repeated Requests for Production of Documents (to Kindred for any kind of acuity-based staffing tool) made between 2003 and 2013 in the following cases, Kindred has never produced or claimed the existence of any such tool or instrument that adjusts staffing (numbers of nurse assistants and nurses) to the acuity of residents in their facilities: Case No. 09 CVS 1813; *Hiepler v. Kindred Nursing Centers East, LLC, et al.;* In the General Court of Justice, Superior Court Division; Forsyth County, North Carolina; Case No. 09 CVS 1103; *Reid v. Kindred Nursing Centers East, LLC, et al;* In the General Court of Justice, Superior Court Division, Orange County, North Carolina; Case No. 10 CVS 00069; *Thompson v. Kindred Nursing Centers East, LLC, et al.;* In the General Court of Justice, Superior Court Division, Orange County, North Carolina; Case No. 09 CVS 2137; *Muccino v. Kindred Nursing Centers East, LLC, et al.;* In the General Court of Justice, Superior Court Division, Orange County, North Carolina; No. 09 CVS 025100; *Edwards v. Kindred Nursing Centers East, LLC, et al.;* In the General Court of Justice, Superior Court Division, Wake County, North Carolina; No. 10 CVS 313; *Page v. Kindred Nursing Centers East, LLC, et al;* In the General Court of Justice, Superior Court Division, Forsyth County, North Carolina; CV-2008-900492; *Perkins v. Kindred Healthcare, Inc., et al.;* In the Circuit Court of Mobile County, Alabama; No. CV-09-450; *Rocker v. Kindred Healthcare, Inc., et al.;* In the Circuit Court of Mobile County, Alabama; Case No. 07-CI-00271; *Gibson v. Kindred Healthcare, Inc., et al.;* In the Commonwealth of Kentucky, 25th Judicial Circuit, Clark Circuit Court, Division I; Civil Action No. 07-CI-00489; *Hawkins v. Kindred Healthcare, Inc., et al.;* In the Commonwealth of Kentucky, 25th Judicial Circuit, Clark Circuit Court, Division II; Case No. 07-CI-00479; *Fox v. Kindred Healthcare, Inc., et al.;* In the Commonwealth of Kentucky, 50th Judicial Circuit, Boyle Circuit Court; Case No. CT- 004204-07; *Cotton v. Kindred Healthcare, Inc., et al.;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CI-002155-07; *Wellington v. Cordova Rehabilitation and Nursing Home, et al.;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CT-003029-07; *Matthews v. Cordova Rehabilitation and Nursing Home, et al*.; In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. 005927-05, *Monroe v. Primacy Rehabilitation and Healthcare Center, et al.;* In the Circuit Court of Tennessee for the 30th Judicial District at Memphis, Shelby County; Cause No. CT 005059-05; *Porter v. Spring Gate Rehabilitation and Healthcare Center, et al.;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CT-006540-06, *Johnson v. Spring Gate Rehabilitation and Healthcare Center, et al.;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No.: CT-005061-05: *Brown v. Spring Gate Rehabilitation and Healthcare Center, in its Assumed or Common Name;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County; Cause No. CT-004669-07; *Lewis v. Kindred Healthcare, Inc,; et al.;* In the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County, Div. II; Case No. No. 10-2-06726-4 SEA; *Sande v. Kindred Healthcare Operating, Inc., et al.;* In the Superior Court of the State of Washington for King County.

99.     An example of a Kindred staffing ladder for Certified Nurse Aides (CNAs) which prescribed specific CNA-to-resident ratios is set forth below:

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Staffing Ladder for Aides per Shift | | | | | |
| 2 | At   1:8, 1:12, 1:20 | | | | | |
| 3 | | | | | | |
| 4 | | | Number of aides per shift | | | |
| 5 | | | 8 | 12 | 20 | |
| 6 | Census | | 1st Shift | 2nd Shift | 3rd Shift | Total |
| 7 | 100 | | 12.5 | 8.3 | 5.0 | 25.8 |
| 8 | 101 | | 12.6 | 8.4 | 5.1 | 26.1 |
| 9 | 102 | | 12.8 | 8.5 | 5.1 | 26.4 |
| 10 | 103 | | 12.9 | 8.6 | 5.2 | 26.6 |
| 11 | 104 | | 13.0 | 8.7 | 5.2 | 26.9 |
| 12 | 105 | | 13.1 | 8.8 | 5.3 | 27.1 |
| 13 | 106 | | 13.3 | 8.8 | 5.3 | 27.4 |
| 14 | 107 | | 13.4 | 8.9 | 5.4 | 27.6 |
| 15 | 108 | | 13.5 | 9.0 | 5.4 | 27.9 |
| 16 | 109 | | 13.6 | 9.1 | 5.5 | 28.2 |
| 17 | 110 | | 13.8 | 9.2 | 5.5 | 28.4 |
| 18 | 111 | | 13.9 | 9.3 | 5.6 | 28.7 |
| 19 | 112 | | 14.0 | 9.3 | 5.6 | 28.9 |
| 20 | 113 | | 14.1 | 9.4 | 5.7 | 29.2 |
| 21 | 114 | | 14.3 | 9.5 | 5.7 | 29.5 |
| 22 | 115 | | 14.4 | 9.6 | 5.8 | 29.7 |
| 23 | 116 | | 14.5 | 9.7 | 5.8 | 30.0 |
| 24 | 117 | | 14.6 | 9.8 | 5.9 | 30.2 |
| 25 | 118 | | 14.8 | 9.8 | 5.9 | 30.5 |

*Example: Kindred Staffing Ladder*

100.     According to this staffing ladder, if the Kindred nursing home had 100 residents, the facility should then have 12.5 nurse aides on the first shift, 8.3 nurse aides on the second shift, and 5.0 nurse aides on the third shift.[30]  The number of nurse aides per shift identified in columns C, D and E of Kindred's staffing ladder were derived by dividing the staffing ratios Kindred prescribed for each shift which are set forth in the upper left-hand column of the staffing ladder by the census found in Column A.  The number of nurse aides allowed by Kindred was a

---

[30]In order to staff at a fraction such as 12.5 or 8.3 CNAs during a shift, a nursing home can reduce the number of hours that one or more staff members work.

function of its prescribed ratios -- first shift, 1:8, second shift, 1:12; and third shift, 1:20.

101.    A similar staffing ladder used by Kindred was based on the number of CNA hours per resident per day.  Rather than prescribing a ratio of residents to CNAs, Kindred specified the number of CNA hours and minutes per resident in a 24-hour period.[31]  Although  the staffing ladders changed minutely over the years, none of them took into account the acuity of the particular residents at each nursing home.

102.    These staffing targets prescribed for each facility were closely monitored and enforced by Kindred.  Kindred used payroll software programs to meticulously track all staffing levels and identify staffing or budget variances at each of its facilities on a daily basis.  The results of this monitoring were regularly reported in Kindred's *Payroll Analysis and Trend Report* that Kindred used at every nursing home on an ongoing basis from at least 2008 through 2015.  These *Payroll Analysis and Trend Reports* show that Kindred set, knew, and controlled the staffing levels at each of its nursing homes.

103.    During the relevant time frame, Kindred made it clear to the employees of each nursing home that the inability to comply with Kindred's staffing targets and budgets was unacceptable.  Nursing home administrators unable to comply with Kindred's set staffing targets were admonished and/or fired.  An example of the mandatory nature of Kindred's staffing and budget directives can be found in the email dated July 27, 2007, from Charlotte Nelson, a Kindred District Director of Operations, to a nursing home administrator:

---

[31]For example, in a nursing home with a census of 100 residents on December 1, and with 12.5 CNAs working the 6-2 shift, 8.3 CNAs on the 2-10 shift, and 5.0 CNAs on the 10-6 shift, the CNA hours per resident day (for this 24 hour period) would be calculated by multiplying the 24-hour total of CNAs (25.8) by eight hours (25.8 x 8 = 206.4) and then dividing the product (206.4 hours) by the resident census (100).  In this example, 206.4 hours of CNA time must be divided between 100 residents resulting in 2.06 CNA hours per patient day  ("PPD").

> Attached you will find a staffing ladder shell to assist you (and your scheduler) to *control labor to in-house census daily*. We have several facilities running over and I trust this tool will assist you to manage this *critical area of the business.* Enter in your census numbers, and your budgeted RN, LPN and CNA ppd- this excludes Nursing Administration (DNS, ADNS, MDS, CM). *Variance to the budget will require Rick's [Regional Vice President] approval. Otherwise, you are expected to run the budgeted numbers.* (emphasis added).

104.    Verbal and written communications, including emails, were routinely sent by Regional Senior Vice President and District Directors of Operations making it clear that facilities had to run their labor hours according to the prescribed budget.  For example, District Northeast Director of Operations, Gwyn Rucker, testified in a deposition dated November 10, 2011, that the West/Pacific Regional Vice President, Donna Kelsey, instructed all of the West/Pacific Directors of Operations via email to run labor hours at or below budget - **"*no excuses.*"**

Q.    Don't go over budget is what she's telling you?

A.    Correct.

Q.    And she's instructing the direct - Directors of Operations, you, that you need to inform both your Administrators and your Directors of Nursing that *running the labor hours is an expectation of working for Kindred.  right?*

A.    Yes.

Q.    *And she says enough is enough, get this fixed now, right?*

A.    That's what it says.

Q.    And this is instructions from your boss to you, and instructing you to inform the DONs, and the Administrators *never to exceed the budget for labor hours* in the nursing homes, true?

A.    That's what it says. (emphasis added.

## VI.    KINDRED KNEW ITS ADMISSION AND STAFFING POLICIES RESULTED IN POOR CARE THAT HARMED ITS RESIDENTS

105.    Kindred's policies of admitting as many residents as possible and recruiting high acuity residents (which maximized workload) while understaffing its nursing homes resulted in residents not receiving necessary care.  The fallout from such policies has not

only inundated Kindred with an avalanche of lawsuits by families of residents, but also generated countless complaints from Kindred's own employees, as discussed below.

106.    Kindred knew that the levels of staff it mandated and enforced in its facilities made it impossible to provide for the Section G needs of residents.  At all pertinent times, Kindred was aware that the core care services required by the heavy care residents it recruited vastly exceeded the physical work capacity of the limited number of CNAs approved to work in its facilities.

107.    As previously described, Kindred implemented a strict company-wide staffing policy.  In prescribing and enforcing these staffing levels, Kindred either knew of or acted with reckless disregard to widely disseminated and scientifically uncontroverted findings that:

    a.    CNA staffing levels of 1:8 day shift, 1:10 evening shift, and 1:20 night shift had been determined to cause very long waits for services and no assistance during meals for many residents, even when staff  worked hard.[32]

    b.    Staffing at 2.2 CNA hours per patient day was predicted to result in long waits for service and inconsistent implementation of care even when staff worked at unrealistically high productivity levels.[33]

    c.    Staffing at the CNA levels Kindred dictated, in its staffing ladders, and enforced, had been determined to cause two to three hour waits for changes of diapers and wet linens, as well as high rates of omitted care and missed or late food service.[34]

    d.    In even low workload nursing homes, 2.8 CNA hours per patient day were minimally required to meet the core care needs of residents as defined by their MDS assessments.[35]

---

[32]Phase II Final Report to Congress: *The Appropriateness of Minimum Nursing Staff Ratios in Nursing Homes*, at 3-28.
[33]*Id.* at 1-7
[34]*Id.* at 3-26.
[35]*Id.* at 3-31.

108.    Such findings were published by CMS in 2001 in its report to Congress. Accordingly, five years after CMS tested the effects of CNA staffing levels on care and reported its findings, Kindred implemented mandatory policies and staffing ladders requiring its nursing homes to staff at the very same CNA PPDs and ratios known to cause widespread and significant care deprivation.

109.    Furthermore, Kindred knew the CNA staffing levels it imposed upon its facilities were also woefully below the minimum nursing home staffing levels recommended by the Institute of Medicine in 2004.[36]

110.    By reason thereof, in continuing to pressure its nursing homes to hit CNA staffing targets, Kindred knew it was humanly impossible for the limited workforce in its facilities to provide: (a) the essential bedside care required by the high acuity residents it purposely recruited; and (b) essential bedside care and staff support it claimed to have actually provided in Section G of each resident's MDS.

A.    **KINDRED KNEW ITS UNDERSTAFFING POLICIES RESULTED IN POOR CARE THAT WAS HARMING VULNERABLE PATIENTS BASED ON AN AVALANCHE OF COMPLAINTS FROM 2008 TO THE PRESENT**

111.    Kindred's policies of maximizing workload levels while minimizing labor levels created a dangerous gap between the amount of time required by caregivers to provide the necessary Section G care versus the amount of time available to provide such care. The fallout from such policies has not only inundated Kindred with an avalanche of lawsuits by families of residents, but also generated countless complaints from Kindred's own employees (e.g., CNAs,

---

[36]The Institute of Medicine in its 2004 report entitled, *Keeping Patients Safe,* recommended a minimum of "one RN for every 32 patients (0.75 hours per resident day), one licensed nurse for every 18 patients (1.3 hours per resident day), and one nurse assistant for every 8.5 patients (2.8 hours per resident day)." The Institute of Medicine's recommendations were based on the findings contained in CMS's Phase II Report to Congress, *Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes.*

nurses, and facility administrators).  For example, Richard Kackmeister, an Administrator in the

Kindred West/Pacific Region, testified in a sworn declaration on October 17, 2011, that Kindred

repeatedly ignored his employees' requests for increased staff to prevent neglect:

> The staff inundated me with complaints and concerns regarding the needs of residents not being met because of short staffing. These complaints came from the Director of Nursing, nurses, and nurse aides. I verified those complaints based with first-hand observations while working in the facility.

> When I received complaints, I conveyed them to Gwen Rucker [District Director of Operations]. Despite my reports, Kindred refused to modify the staffing restrictions and continued to demand recruitment of residents with high care needs.

> In addition to staff, the family of residents and the residents complained to us about the various negative impacts the low staffing levels had on the care being provided at the home.

> I expressed my own concerns, and I passed on the complaints of the staff, residents and their family members, and all of them were ignored by Ms. Rucker and Kindred. Despite the complaints that were communicated regarding resident care, Kindred failed to increase staffing levels or decrease resident numbers or acuity.

> Despite the staffs [sic] and my numerous requests for meaningful help, Kindred continued to operate the facility in the same manner.

112.    Kindred not only ignored the complaints of its administrators, but also ignored

complaints from its own medical directors. In a written statement dated May 6, 2012 Dr. Joseph

Palermo, a medical director of a Kindred nursing home in the West/Pacific Region, stated that he

was forced to resign from his position due to Kindred's unwillingness to increase staffing to

prevent adverse consequences:

> I became aware of the facilities' dwindling census and its poor reputation in the community in the year before I left on 9/18/07. I had determined that the limited staffing that became evident to me was placing residents at risk for adverse occurrences, which certainly included skin breakdown related to poor hygiene and general care of incontinent residents. When I had questions about a given resident, it was often difficult to find a nurse, especially one who was familiar with a given resident. I had no role in the

50

Administration and could play no role in reversing the problems. This left me no recourse but to tell the Administrator that I could not stay and jeopardize my reputation and license.

113.     Similarly, Kathleen Jarvis, RN, a Director of Nursing, Staff Development Coordinator and Wound Treatment Nurse in Kindred's West/Pacific Region, testified in a sworn declaration dated March 20, 2012, that she and her staff repeatedly made Kindred aware that her nursing home was understaffed and that residents were deprived of needed care. Kindred, however, refused to increase staff:

> As part of my daily duties, I had to be present at meetings in the morning that were attended by all department heads including; the DNS Rita Eden and then Jeannie Russell, the Executive Director, Jane Davis and the Richard Kackmeister, and on many occasions Gwynn Rucker, the District Director of Operations. The purpose of these meetings was to discuss issues regarding residents, staffing, budget and daily management, complaints and a host of other topics. Staffing and complaints about staffing was always a hot topic. Edmonds was constantly understaffed in terms of nurse aides and nurses. . . The residents to nurse aide ratios were incredibly high and placed an impossible workload on the aides....

> As a result, turnover was high and continuity of care suffered greatly. Management, including Gwynn Rucker, was aware of the constant problem and the fact that residents were not getting the care they desperately needed. Though it was discussed in detail and in-house pressure sore development continued to rise, Kindred did nothing to increase the number of floor staff.

> Complaints from family members and employees, which were frequent, were discussed in these meetings. I made complaints about staffing and poor resident care directly through my chain of command. I made these complaints to ED Jane Davis, ED Richard Kackmeister, DNS Rita Eden, DNS Jeannie Russell, DDO Gwynn Rucker and Diane Tiliano, the corporate SDC. Complaints from family members frequently concerned lack of care totally or substandard care. . . .

> Management was well aware that the home was understaffed constantly. Evidence of skin breakdown at Edmonds was rampant throughout the building. The fact that we could not offload pressure from these high-risk residents such as Ms. Sande was extremely harmful and counterproductive to preventing and healing skin breakdown. Management and corporate were made aware by floor staff via their complaints, informed by family members who could not

51

get staff to respond to their loved ones [sic] needs, as well as the fact
the daily ratios were impossibly high which made it impossible to meet
the needs of the residents. Gwynn Rucker, when in attendance at these
meetings, would always say she was aware of the problem and that she
was working on it. Ms. Rucker would promise the staff hope and
change, but ultimately nothing ever changed.

114.   Laurie Adams, RN, a Wound Treatment Nurse in Kindred's South Region,

testified in an affidavit dated October 19, 2011, that the underlying cause of the injuries in

her facility was Kindred's refusal to provide sufficient staff to meet the needs of the

residents:

> On the second floor, workload was extremely high because the vast
> majority of the residents required significant assistance with activities
> of daily living. During my tenure, understaffing was always a problem.
> It seemed like the staff was complaining to management on a daily
> basis that the residents were being neglected due to insufficient staff.
> And although the care was poor when I first started, it significantly
> deteriorated during the latter part of my tenure. I wholly agree with the
> email written by Scott Lindsey wherein he described the staffing levels
> at Kindred as both dangerous and critical.

115.   Georgia Jessie, a Licensed Nurse working with Laurie Adams, agreed with

her assessment of Kindred's indifference in a sworn affidavit dated December 1, 2011:

> I observed numerous care issues that resulted in neglect of the
> residents at Kindred. I, like many other nurses and CNAs, tried to keep
> up, but the number of residents, compounded with their high acuity
> levels, made it impossible for us to do our jobs. This was extremely
> frustrating to the staff and led to conflicts as  work routinely did not
> get done. I, along with other staff,  reported these problems to the
> management of Kindred, but I saw nothing change, unless state was in
> our building or management believed state was coming. Only during
> this time did management call in additional staff to care for residents.
> It was evident to me that they could staff better when they wanted to
> present a false picture to state officials.

116.   The utter lack of any meaningful corporate response to address the problems

in Kindred's nursing homes is evident in the Affidavit of Kayla Sanders, CNA, dated June

9, 2015:

It was apparent to me that management did not care about the residents
or the staff at Heritage Manor. We were working 12 hour shifts, back
to back in many cases, and it was physically and emotionally
exhausting. I was completely drained when I left. If you cared about
those residents, you were moving constantly. Going from high priority
to high priority all day. I was never able to conduct anything that
resembled a routine or rounds. It was chaos management most of the
time, especially when I was on the 100 hall alone. On those days,
which were many, I could only do the bare basics for the residents and
even then it was late. I made complaints to management about the
situation but nothing changed. Turnover of staff was constant as they
could not handle the stress and workload at Heritage Manor. When
Tim Sirls was hired, he tried to make some changes but management
stopped him cold. Tim quit after only few months. I think I had three
DONs in the 6 months I was there.

Many residents had to wait long periods of time. Many times call
lights stayed on for more than an hour because there was no one
available to answer them. Turning and repositioning did not occur
every two hours. Some nights they were lucky to be turned at all.
Incontinent care suffered constantly. It is no wonder why residents
such as Jerrelldeane and Rozella suffered skin breakdown and they
could not heal properly. It is also no surprise that Regina fell and was
on the floor for hours until she was finally found.

117.    The staff's frustrations were summed up by the Affidavit of Starr Foster dated

June 2015:

I tried my best and I know other staff tried their best as well. It was
simply impossible to keep up when Kindred forced you to work with
such little help. I made complaints to my supervisors and I know [the]
state was investigating the home for the very problems I observed
every day. But despite all of this, management never changed anything
and the residents and staff suffered for it. I left the facility after I
realized that this home had no intention of taking care of their residents
or staff. It bothered be a great deal to leave because a part of me felt
like I was abandoning these helpless residents, but I was powerless to
change things, exhausted, and was in fear for my license. I have
worked at several nursing homes in Kentucky and I would rate
Heritage Manor as the worst one.

**B.    KINDRED KNEW ITS UNDERSTAFFING POLICIES RESULTED IN POOR CARE THAT HARMED ITS VULNERABLE PATIENTS, THE KNOWN HUMAN COSTS OF ITS STAFFING AND RESIDENT RECRUITMENT SCHEME**

118.    The human costs of Kindred's staffing practices were often drastic and devastating, causing widespread deprivations of human dignity, suffering, catastrophic injuries, and even death to residents across the country.  While the severity and nature of the injuries suffered by residents varied due to a number of factors,[37] the core care omission levels at Kindred's subject facilities remained intractably high due to the Kindred's willful blindness to the effects of its staffing based on headcount and without consideration of acuity.

119.    The disparity between Kindred's staffing and acuity in the subject facilities had real world consequences.  Not only were residents of these facilities forced to suffer the indignities and health consequences from such routine care omissions, they further were subjected to long waits for the most basic human care, frequently exceeding two hours.

**VII.    THE PRINCIPAL PURCHASER OF KINDRED'S NURSING HOME SERVICES: FEDERAL AND STATE GOVERNMENTS**

120.    Federal and state Medicare and Medicaid programs are the primary purchasers of SNF and NF services, and the major source of income for Kindred's nursing homes.[38]

121.    Since 2008, Kindred's nursing home operations have generated revenues in excess of $12.9 billion, based on a volume of over 50 million patient days.  By far, the largest purchaser of this nursing home care was the Government, with over 82% of this revenue from

___

[37]Factors affecting the degree and nature of injury suffered by residents exposed to routine understaffing and core care omissions include: (a) the precise nature of the resident's dependency and length of exposure to care deprivation; (b) whether the resident received a proportionate or disproportionate share of the limited care; (c) how care omissions for an individual resident were distributed among the Section G core services; *i.e.;* which basic services were neglected the most; (d) the individual resident's physiological capacity to withstand care deprivation; and (e) the extent to which the resident's diagnosis and chronic disease process mask facility neglect.
[38]Most Kindred nursing homes are certified to provide both Medicare and Medicaid services.

2008 to 2014 being derived from the Medicare and Medicaid reimbursement system.[39]

## VIII.  COMPLIANCE WITH FEDERAL STAFFING REQUIREMENTS IS MATERIAL TO THE GOVERNMENT'S PAYMENT DECISION

122.    Having sufficient, competent staff is vital to providing adequate care.  CMS has long recognized that staffing is critical to meeting resident needs and preventing neglect.  At all pertinent times, Kindred also knew or should have known that providing sufficient numbers of staff to deliver the care specified in each resident's MDS and care plan as required by 42 U.S.C. § 1395i-3(b)(4)(A)(i), 42 U.S.C. § 1396r-(b)(4)(A)(i), and 42 C.F.R. § 483.35 was a material condition of payment by the United States and the Qui Tam States under Medicare and Medicaid.

123.    The Government's decision to remit payment for nursing home services could have been and was, in fact, influenced by (a) Kindred's misrepresentations and false claims that it had complied with 42 U.S.C. § 1395i-3(b)(4)(A)(i), 42 U.S.C. § 1396r-(b)(4)(A)(i), and 42 C.F.R. § 483.35 and (b) Kindred's submission of claims for payment without disclosing to the Government its noncompliance with these essential staffing laws.

124.    The Government has repeatedly demonstrated that adequate staffing is material to its reimbursement decisions by pursuing actions under the FCA that arise as a result of understaffing, including:

a.    *U.S. et al. v. Vanguard Healthcare, LLC et al.*, ($18 million settlement arising from "grossly substandard" nursing home care) (February 27, 2019) https://www.justice.gov/opa/pr/vanguard-healthcare-agrees-resolve-federal-and-state-false-claims-act-liability;

---

[39]*See* Brown University data at ltcfocus.org.

b.      *United States ex rel. Hinkle v. Caris Healthcare, L.P.*, No. 3:14-CV-212-TAV-HBG, 2017 WL 3670652, at *2 (E.D. Tenn. May 30, 2017) (Court found in FCA action that a reasonable jury could conclude that Defendant "did not have enough staff to properly care for residents as promised under Medicare/Medicaid agreements");

c.      *United States v. Extendicare Health Services, Inc.*, ($38 million settlement based upon substandard care arising from inadequate staffing) (October 10, 2014) https://www.justice.gov/opa/pr/extendicare-health-services-inc-agrees-pay-38-million-settle-false-claims-act-allegations;

d.      *United States v. George D. Houser*, https://www.justice.gov/archive/usao/gan/press/2012/08-14-12.html (nursing home operator sentenced to prison based upon substandard nursing home and chronic staff shortages) (August 14, 2012); and

e.      *United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051, 1056-57 (W.D. Mo. 2001) (summary judgment denied on basis that plaintiff had produced sufficient evidence for jury to conclude that defendant did not have enough staff to properly care for residents as promised pursuant to terms of Medicare/Medicaid agreement).

125.    Further evidence that compliance with the above-cited federal staffing requirements is material to the Government's payment decisions include:

a.      The OIG's Compliance Program Guidance for Nursing Facilities published on March 16, 2000 ("OIG Guidance").  There, OIG specifically states that a nursing home's compliance program should require the reporting of "inadequate staffing levels or insufficiently trained or supervised staff to provide medical, nursing, and related services" (OIG Guidance, 65 Fed. Reg. 14289, 14293) and that "[i]n addition to facing criminal sanctions and significant monetary, providers that have failed to adequately

56

ensure the accuracy of their claims and cost report submissions can have their Medicare payments suspended (42 CFR 405.371), be excluded from program participation (42 U.S.C. 1320a–7(b)), or, in lieu of exclusion, be required by the OIG to execute a corporate integrity agreement (CIA)," (*Id*. at 14296), and that maintaining a compliance program that, among other things, identifies inadequate staffing can "minimiz[e] loss to the Government from false claims, and thereby reduc[e] the nursing facility's exposure to civil damages and penalties, criminal sanctions, and administrative remedies."  (*Id*. at 14290)[40];

  b. The Office of Inspector General of Health and Human Services, specifically acknowledged that "CMS developed the Conditions of Participation (CoPs) that healthcare organizations must meet to start and continue participating in Medicare and Medicaid, that these CoPs establish health and safety standards, which are the foundation for improving quality and protecting the health and safety of beneficiaries," which can be found at 42 CFR § 483 (including specific requirements for staffing) and which has been in effect since December 27, 2005.  *See* "Incidents of Potential Abuse and Neglect at Skilled Nursing Facilities Were Not Always Reported and Investigated" dated June 2019, at 2-3 (emphasis added),  (finding that 20% of emergency room admissions from nursing homes arose from abuse and neglect); and

  c. CMS's denial of payments to nursing homes that are found to have significant and pervasive staffing violations of the kind described here[41] (for example, the

---

[40] Relator was never advised as part of a Kindred compliance program, or otherwise, that he should report the chronic understaffing that Kindred itself required and, in fact, he was expressly discouraged from doing so.
[41]*See* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-16-27.pdf (describing remedies available for such violations to include denial of payment and imposition of civil penalties).

Taylor Health Care Center in Grafton, West Virginia was denied payment due to widespread staffing violations in March 2017 until those shortages were corrected and the Grandview Nursing and Rehabilitation Facility in Campbellsville, Kentucky was similarly denied payment for staffing shortages in July 2018 until those shortages were rectified.)

125.     Kindred likewise knew that its failure to disclose that it was funneling Medicare and Medicaid dollars that were supposed to be used in the first instance for staffing and patient care to fuel its corporate profits and acquisition spree was material information that, if known to the Government, would have resulted in the Government withholding or recouping payments from Kindred because, *inter alia*, the Government has the right and, in such instances, has insisted on the repayment of these funds on the basis of unjust enrichment. *See United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *7 (S.D. Fla. Jan. 29, 2007) (recognizing that the United States has a common-law right to recover Medicare overpayments); *United States v. Life Care Centers of America, Inc.*, https://www.justice.gov/opa/pr/life-care-centers-america-inc-agrees-pay-145-million-resolve-false-claims-act-allegations (October 24, 2016) (in which Life Care Centers of America, Inc. and its sole shareholder, Forrest L. Preston agreed to pay $145 million to resolve FCA allegations that they engaged in a systematic effort to increase Medicare and TRICARE therapy billings, submitted claims for therapy services that were not reasonable, necessary or skilled and that the owner was unjustly enriched as a result of these schemes).

## IX.     KINDRED'S FALSE CLAIMS

126.     Kindred knowingly and methodically presented, or caused to be presented, false or fraudulent claims for payment by or approval of the United States, as well as state governments, in violation of 31 U.S.C. § 3729(a)(l)(A) and similar state False Claim Acts.  From

at least 2008 to the present, Kindred knowingly presented, or caused to be presented, false or fraudulent claims by submitting false MDS forms and by submitting false claims for PPS payments for thousands of nursing home residents.

127.    The MDS form is "both a billing document and a care assessment certification for Medicare and Medicaid ..." *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.,* Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).  Each MDS Kindred submitted to CMS with false information is a false claim; each is also,  as described below, a false statement that caused a false claim to be submitted.  In addition to the MDS forms, the claims Kindred submitted to Medicare and Medicaid for PPS payments for services that it did not provide are also false claims.

128.    Kindred knowingly made, used, or caused to be made or used, false statements, claims, and certifications in its MDS assessments which it (a) knew were a material condition of payment; (b) knew were the basis of payment from federal and state funds; (c) knew that such claims were required to be accurate and truthful as expressly certified; and (d) knew were impossible.

129.    Further, from at least 2008 to the present, Kindred knowingly presented, or caused to be presented, false or fraudulent claims to Medicare and Medicaid for *per diem* payments, usually via the CMS 1450, 8371, and 1500 forms, for services that it did not provide.  Additionally, these forms also contained false and inflated Resource Utilization Groups ("RUG") and Health Insurance Prospective Payment System ("HIPPS") billing codes.

130.    Government payment to Kindred for nursing home care, by statute, is conditioned on that care being "reasonable."  As set forth above, the care that Kindred delivered to its residents was so patently unreasonable in duration, quantity, and medical value that Kindred's submission of requests for payments for the same constituted false or

fraudulent claims, in violation of 31 U.S.C. § 3729(a)(l)(A) and (B), as well as similar state False Claim Acts.

131.    Furthermore, throughout the timeframe of this case, Kindred understood -- and certified -- in its Medicare Enrollment Application for Institutional Providers (CMS-855A) and Health Insurance Agreements (CMS-1561) -- that payment of claims by Medicare and Medicaid were conditioned upon the claim and underlying transaction complying with applicable laws.[42] Accordingly, Kindred knew that its payments from federal and state governments were conditioned on compliance with those previously discussed regulations which govern: (a) nursing home allocation and use of government funds, 42 C.F.R. § 483.70[43]; and (b) essential staffing, 42 CFR § 483.35. Moreover, by reason of the above enrollment certifications, Kindred certified, as to each Form CMS-1450 (UB-04) it submitted for payment, that it had complied with the above regulations.  Kindred's certifications of compliance stand in contrast to its knowing violations of these laws by its diversion of government payments intended for nursing home care and its decision to staff its facilities without regard for resident acuity.

132.    In addition to the above, as a matter of practice, Kindred knowingly made, caused to be made, or used false records and statements within the medical records of numerous residents to support and mask its false claims for payment and certifications of compliance. Such conduct also violated 31 U.S.C. §  3729(a)(l)(B).

---

[42]*See* above discussion of Kindred's *Medicare Enrollment Application for Institutional Providers* (CMS-855A) and Kindred's *Health Insurance Agreements* (CMS-1561).
[43]"A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident."  42 C.F.R. § 483.70, prior to October 4, 2016, this provision was found at 42 C.F.R. § 483.75.

A. **THE AMOUNT OF DAILY PAYMENT TO KINDRED UNDER MEDICARE AND MOST MEDICAID PROGRAMS HINGED UPON ACCURATE REPORTING ON THE MDS FORM**

133. Medicare and the California, Colorado, Connecticut, Georgia, Indiana, Massachusetts, Montana, Nevada, North Carolina, Tennessee, Vermont, Virginia, Washington, and Wisconsin Medicaid programs, as well as the other Medicaid programs in the United States, paid Kindred and other nursing home providers a predetermined daily amount on a per resident, per day basis. The *per diem* rate for each Medicare and Medicaid resident was determined, in part for Medicare and for most Medicaid programs, by the MDS assessment that was a prerequisite to payment for all Medicare and Medicaid claims.

134. The Medicare program uses the PPS to pay a pre-determined daily rate to nursing homes (also called a *per diem* payment). *See* 63 Fed. Reg. 26,252, 26, 259-60 (May 12, 1998). California, Colorado, Connecticut, Georgia, Indiana, Massachusetts, Montana, Nevada, North Carolina, Tennessee, Vermont, Virginia, Washington, and Wisconsin Medicaid programs, as well as the other Medicaid programs in the United States, use a similar *per diem* payment system.[44]

135. Medicare and Medicaid programs adjust the *per diem* rate based on a variety of factors. Medicare and most Medicaid programs recognize the differences in resources utilized by residents in determining a range of *per diem* reimbursement rates. Some residents require total assistance with their activities of daily living, while others require less care. The recognition of these differences forms the premise for Medicare and most Medicaid programs' "case-mix" adjustment to the *per diem* rate, which alters the reimbursement amount based on the resource needs of each resident in a particular nursing home. Residents with heavy care needs

---

[44]As previously noted, these states adjust the daily Medicaid payment amount based on the facilities CMS.

61

require more staff resources, and payment levels are higher than for those with less intensive care needs. In a case-mix adjusted payment system, the amount of reimbursement to a nursing home is based on the resource intensity of the resident as measured by items on the MDS, including in Section G.[45]

136.    Accordingly, insomuch as these MDS ADLs are used to classify each resident into different case-mix categories called RUGs, Kindred's coding of residents' needs and services provided directly influenced the amount of its Medicare and most Medicaid payments.

## B.    RELATIONSHIP BETWEEN MDS, RUGS, AND KINDRED'S MEDICARE PER DIEM PAYMENTS

137.    The daily PPS/*per diem* rate that Medicare and the Arizona, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Montana, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, Utah, Vermont, Virginia, Washington, and Wisconsin Medicaid programs pay a nursing facility depends, in part, on the RUG to which a resident is assigned which, as stated above, is calculated off a resident's MDS.  Each  distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries (i.e., residents) with similar characteristics or resource needs.  The number of possible RUGs categories and the corresponding payment rate depends on whether RUG-III or RUG-IV was in effect. For Medicare, for example, from January 1, 2006, to October 1, 2010, there were 53 RUGs in the RUG-III classification system.  *See* 70 Fed. Reg. 45026 to 45031 (Aug. 4, 2005).  After October 1, 2010, Medicare began the implementation of RUG-IV, which recognized 66 possible resident classifications and payment rates.  Regardless of whether payment was based on a RUG-III or RUG-IV classification, at all times material to this case, the

---

[45]CMS's RAI Version 3.0 Manual, Chapter 6, *Medicare Skilled Nursing Facility Prospective Payment System* (SNF PPS).

*per diem* rate for Medicare and most Medicaid programs for each of the 53 to 65 RUGs categories[46] was based on CMS-initiated nursing home staff time measurement studies and estimated cost for required care.

138.    The RUG-IV classification system has eight major classification categories: (1) Rehabilitation Plus Extensive Services; (2) Rehabilitation; (3) Extensive Services; (4) Special Care High; (5) Special Care Low; (6) Clinically Complex; (7) Behavioral Symptoms and Cognitive Performance Problems; and (8) Reduced Physical Function.  All eight major categories, except for Extensive Services, are further subdivided based on the resident's "late loss" ADL score, which enables Medicare (and/or a Medicaid program) to distinguish those nursing home residents requiring more care and therefore requiring more  resources.[47]

139.    In addition to reflecting a resident's rehabilitation therapy needs and special clinically complexities, each RUG also takes into account each resident's ability to perform and the staff support provided for the following four ADLs: (1) toileting; (2) bed mobility; (3) transferring in and out of bed or chair; and (4) eating.  These four ADL activities are known as "late-loss" ADLs because they are generally the last physical functions to be lost in the cycle of life.  For RUGs classification purposes, each resident received a "late loss" ADL score[48] that is

---

[46]CMS has made certain modifications to the RUG-III structure through its RUG-IV classification system, which became effective October 1, 2010.  CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every seven days, and revised certain rules pertaining to group therapy, among other changes.  74 Fed. Reg. 40288 (Aug. 11, 2009).

[47]CMS's RAI Version 3.0 Manual, Chapter 6.3, Resource Utilization Groups Version IV (RUG-IV). Additionally, the Special Care High, Special Care Low, and Clinically Complex categories are also divided by the presence of depression.  Finally, the Behavioral Symptoms and Cognitive Performance Problems and the Reduced Physical Function categories are divided by the provision of restorative nursing services.

[48]CMS recognizes that the "late loss" ADL score is "very important component of the classification process."  "Other ADLs are also very important, but the research indicates that the 'late loss' ADLs predict resource use most accurately."  *See* CMS RAI Version 3.0 Manual, CH 6: Medicare SNF PPS, page 6-24.

based on the resident's dependency levels and staff support that Kindred provided in Section G of the MDS.  For example, a very dependent resident who (a) could not toilet, change position in bed, or transfer without assistance and (b) was provided two-person staff support would receive the maximum "late loss" ADL score of four for each of these three *late loss* ADLs or a total "late loss" score of 12 (not including feeding).[49]  Significantly, to obtain the highest "late loss" ADL score, highest RUG code, and largest Medicare (and/or Medicaid) reimbursement, a nursing home must claim in Section G of the MDS that the resident was provided the assistance of two staff members for a number of these "late loss" ADLs.  In sum, the extent of the "late loss" ADL services required by a resident and actually provided by staff significantly impacts the resident's RUG classification and the nursing home's corresponding payment from Medicare and most Medicaid programs.

140.    The table below contains the October 1, 2012 RUG adjusted[50] rates paid by Medicare for nursing homes operated in Louisville, Jefferson County, Kentucky – the site of Kindred's corporate headquarters.  The first column identifies each of the eight major RUG Categories that are associated with a rehabilitation level or clinical needs grouping.  The second column provides an abbreviated description of the rehabilitation or clinical basis for the RUG grouping, and the third column provides the specific RUG payment classification utilizing a three-letter code.  Column four provides a breakdown of the possible MDS "late loss" ADL scores for each RUG billing code, and the fifth and final column provides the corresponding *per diem* rate for each RUG classification.

---

[49]Under MDS 2.0 which was in effect until October 1, 2010, the possible "late loss" ADL scoring ranged from 4 to 18 under MDS 3.0, the "late loss" ADL scoring ranged/ranges from 0 -16.
[50]Medicare makes annual adjustments to RUGs rates based on but on locality and wage index. *See* 42 U.S.C § 1395yy(e)(4)(E)(ii)(IV).

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | RUG Daily Rate |
|---|---|---|---|---|
| 1 | RU (Rehab Ultra-High) | RUX | 11 to 16 | $692.25 |
| | RU (Rehab Ultra-High) | RUL | 2 to 10 | $677.15 |
| 2 | RU (Rehab Ultra-High) | RUC | 11 to 16 | $524.80 |
| | RU (Rehab Ultra-High) | RUB | 6 to 10 | $524.80 |
| | RU (Rehab Ultra-High) | RUA | 0 to 5 | $438.81 |
| | RV (Rehab Very High) | RVX | 11 to 16 | $616.15 |
| | RV (Rehab Very High) | RVL | 2 to 10 | $552.79 |
| | RV (Rehab Very High) | RVC | 11 to 16 | $450.22 |
| | RV (Rehab Very High) | RVB | 6 to 10 | $389.87 |
| | RV (Rehab Very High) | RVA | 0 to 5 | $388.37 |
| | RH (Rehab High) | RHX | 11 to 16 | $558.24 |
| | RH (Rehab High) | RHL | 2 to 10 | $497.91 |
| | RH (Rehab High) | RHC | 11 to 16 | $392.30 |
| | RH (Rehab High) | RHB | 6 to 10 | $353.09 |
| | RH (Rehab High) | RHA | 0 to 5 | $310.84 |
| | RM (Rehab Medium) | RMX | 11 to 16 | $512.08 |
| | RM (Rehab Medium) | RML | 2 to 10 | $469.85 |
| | RM (Rehab Medium) | RMC | 11 to 16 | $344.64 |
| | RM (Rehab Medium) | RMB | 6 to 10 | $323.52 |
| | RM (Rehab Medium) | RMA | 0 to 5 | $266.20 |
| | RL (Rehab Low) | RLX | 2 to 16 | $449.72 |
| | RL (Rehab Low) | RLB | 11 to 16 | $335.07 |
| | RL (Rehab Low) | RLA | 0 to 10 | $215.90 |
| 3 | ES (Extensive Services) | ES3 | 2 to 16 | $632.00 |
| | ES (Extensive Services) | ES2 | 2 to 16 | $494.73 |
| | ES (Extensive Services) | ES1 | 2 to 16 | $441.92 |
| 4 | (Special Care High) | HE2 | 15 to 16 | $426.84 |
| | (Special Care High) | HD2 | 11 to 14 | $399.68 |
| | (Special Care High) | HC2 | 6 to 10 | $377.07 |
| | (Special Care High) | HB2 | 2 to 5 | $372.53 |
| | (Special Care High) | HE1 | 15 to 16 | $354.43 |
| | (Special Care High) | HD1 | 11 to 14 | $333.32 |
| | (Special Care High) | HC1 | 6 to 10 | $315.21 |
| | (Special Care High) | HB1 | 2 to 5 | $312.20 |
| 5 | (Special Care Low) | LE2 | 15 to 16 | $387.62 |
| | (Special Care Low) | LD2 | 11 to 14 | $372.53 |
| | (Special Care Low) | LC2 | 6 to 10 | $327.28 |

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | RUG Daily Rate |
|---|---|---|---|---|
| | (Special Care Low) | LB2 | 2 to 5 | $310.68 |
| | (Special Care Low) | LE1 | 15 to 16 | $324.26 |
| | (Special Care Low) | LD1 | 11 to 14 | $312.20 |
| | (Special Care Low) | LC1 | 6 to 10 | $275.99 |
| | (Special Care Low) | LB1 | 2 to 5 | $263.91 |
| 6 | (Clinically Complex) | CE2 | 15 to 16 | $345.37 |
| | (Clinically Complex) | CD2 | 11 to 14 | $327.28 |
| | (Clinically Complex) | CC2 | 6 to 10 | $286.55 |
| | (Clinically Complex) | CB2 | 2 to 5 | $265.43 |
| | (Clinically Complex) | CA2 | 0 to 1 | $224.70 |
| | (Clinically Complex) | CE1 | 15 to 16 | $318.22 |
| | (Clinically Complex) | CD1 | 11 to 14 | $300.13 |
| | (Clinically Complex) | CC1 | 6 to 10 | $265.43 |
| | (Clinically Complex) | CB1 | 2 to 5 | $245.82 |
| | (Clinically Complex) | CA1 | 0 to 1 | $209.62 |
| 7 | (Behavior Symptoms and Cognitive Performance) | BB2 | 2 to 5 | $238.27 |
| | (Behavior Symptoms and Cognitive Performance) | BA2 | 0 to 1 | $197.55 |
| | (Behavior Symptoms and Cognitive Performance) | BB1 | 2 to 5 | $227.71 |
| | (Behavior Symptoms and Cognitive Performance) | BA1 | 0 to 1 | $188.50 |
| 8 | (Reduced Physical Functioning) | PE2 | 15 to 16 | $318.22 |
| | (Reduced Physical Functioning) | PD2 | 11 to 14 | $300.13 |
| | (Reduced Physical Functioning) | PC2 | 6 to 10 | $257.89 |
| | (Reduced Physical Functioning) | PB2 | 2 to 5 | $218.67 |
| | (Reduced Physical Functioning) | PA2 | 0 to 1 | $180.95 |
| | (Reduced Physical Functioning) | PE1 | 15 to 16 | $303.14 |
| | (Reduced Physical Functioning) | PD1 | 11 to 14 | $285.03 |
| | (Reduced Physical Functioning) | PC1 | 6 to 10 | $245.82 |
| | (Reduced Physical Functioning) | PB1 | 2 to 5 | $209.62 |
| | (Reduced Physical Functioning) | PA1 | 0 to 1 | $173.40 |

*Table 4*: *RUG Rates for Jefferson County, Kentucky—October 1, 2012*

141.    The RUG billing is incorporated into the HIPPS code that Kindred submits to Medicare (or to the Medicaid programs in Arizona, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Montana, Nebraska, Nevada, North Carolina, Ohio, Pennsylvania, Utah, Vermont, Virginia, Washington, and Wisconsin) and would affect the

amount paid to Kindred.

142.    Kindred used CMS software, or private software developed with the CMS tools, to encode and electronically transmit to Medicare and/or Medicaid its residents' most current MDS assessment data and to automatically convert the data into a RUG billing group/HIPPS code which it submitted per resident on at least a monthly basis as part of its request for payment.  In the PPS/*per diem* claims submitted by Kindred to Medicare and Medicaid programs, the first three characters in the HIPPS code matched the RUG billing code and the last two characters defined the applicable payment periods and the type of assessment.

143.    Accordingly, submission of false MDS forms were also false statements that caused Medicare and the Arizona, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Montana, Nebraska, Nevada, North Carolina, Ohio, Pennsylvania, Utah, Vermont, Virginia, Washington, and Wisconsin Medicaid programs to pay Kindred in excess of what Kindred was actually entitled to receive.

## X.    KINDRED FINANCED ITS EXPANSION STRATEGY, DEBT, AND OVERHEAD BY STEALING FROM THE GOVERNMENT

144.    During the time period described above in which Kindred conspired to defraud the Government of millions of dollars in Medicare and Medicaid reimbursements, its revenues and returns on investment grew to record levels.  As part of its corporate strategy to diversify and expand its long-term care brand, Kindred gobbled up long-term care hospitals, hospice, and rehabilitation therapy businesses across the country.  The aggressive growth and diversification of this Fortune 500 company was financed on the back of the Medicare and Medicaid reimbursement system.  The immense debt that funded Kindred's expansion was raised, secured, and serviced by its strong nursing home cash flows provided primarily by the Medicare and Medicaid systems or, more precisely, taxpayers.  Rather than deploying its Medicare and

Medicaid funds in a manner to ensure that the most basic needs of its vulnerable residents were met, Kindred diverted taxpayer dollars specifically earmarked for nursing home care to fund its purchase of non-nursing home related businesses, to pay for massive corporate administrative expenses and maintain compliance with its stringent financial covenants with lenders that prescribed specific EBITDA/EBITDAR targets and other financial ratios for its nursing home operations.  This scheme siphoned off critical Medicare and Medicaid dollars from nursing homes that could have paid for critically needed nurse aide staffing throughout the relevant timeframe.  For example, rather than using such funds, as intended (to provide care to meet the needs of its residents), Kindred reallocated and repurposed these resources to pay, in part, for its:

a.    Bloated corporate overhead and home office cost in excess of $1.1 billion from 2008 through 2014 ($133 million in 2008, $135 million in 2009, $134 million in 2010, $175 million in 2011, $179 million in 2012, $176 million in 2013, and $201 million in 2014);[51]

b.    Self-dealing through its related-party subsidiaries and internal corporate charges that drained over $2.0 billion from the conglomerate's nursing home revenue stream between 2008 and 2014;[52]

c.    Lavish compensation and performance bonuses paid to the top senior executives despite the fact that Kindred's revenue stream was primarily derived from Government funding;[53]

d.    Costly private, corporate jet travel across the United States;[54] and

---

[51]*See* Kindred's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2014.

[52]*See* Skilled Nursing Facility and Skilled Nursing Facility Healthcare Complex Cost Report and worksheets for all individual Kindred nursing homes from 2008 to most currently available.

[53]*See* Kindred's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2014.  *See* Kindred's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2014.

[54]*See* the locations and frequency of Kindred's private corporate jet travel across the United States at

e.     Substantial indebtedness totaling $1.6 billion as of December 31, 2013[55] that was not only incurred to support Kindred's aggressive growth and diversification strategy, but also required it to:

   i.     Dedicate a substantial portion of the cash flows, including those from Kindred's nursing home operations, to make debt service payments on this indebtedness (Kindred's annual interest expense alone has grown fifteen-fold since 2010 from $7 million to $107 million in 2012 and $108 million in 2013);[56] and

   ii.    Comply with the restrictive covenants contained in the loan agreements governing its $1.6 billion debt, which included significant operating limitations on how nursing home revenues were used, imposed through a variety of financial thresholds and ratios, the breach of which subjected Kindred to default.[57]

145.   Furthermore, Kindred's willingness to drain revenues from nursing home operations in order to support the expansion of its non-nursing home-related businesses is seen in its May 30, 2013 Credit Agreement with JP Morgan.  There, Kindred pledged the resources of over 250 of its subsidiaries, including its nursing home operators as "Restricted Guarantors," to service and secure all of Kindred's debt, regardless of which Kindred sector used the borrowed money to expand.  As guarantors, these subsidiaries were obligated "to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation."  In short, not only

---

http://pro jec ts.w j.co m/ je ttracker/#a=&d=&eo:2011-01- 01&m=grouped&o= KINDRED+HEALTHCARE+INC&p==O&s=2007-0l -01&sort=d&t=Nl 96SB&v=table

[55] *See* Kindred's SEC 10-K Annual Reports for fiscal year ending December 31, 2013.

[56]*See* Kindred's SEC 10-K Annual Reports for fiscal years ending December 31, 2010, 2012, 2013, and 2014.

[57]For example*, see* Term Loan Credit Agreement between Kindred and JP Morgan Chase Bank, *et al.,* dated June 1, 2011, wherein Article 6, Section 6.01--Financial Ratios, prescribes that Kindred's consolidated EBITDAR divided by its consolidated fixed charges (interest expense plus rent expense) will not be less than a ratio of 1.25 to 1 or be subject to default under Article 8.  Accordingly, Kindred contractually bound itself to a loan agreement that potentially conflicted with its obligation to utilize its nursing home resources effectively and efficiently to meet the care needs of residents under the Social Security Act §§ 1819(d)(l) and 1919(d)(l).  Clearly, as Kindred's financial ratios dropped closer to the loan's default line (1.25 to 1), the more pressure it was under to reduce its nursing home resource expenditures and/or to increase its nursing home revenues.

were taxpayers and nursing home residents ultimately saddled with the cost of this complex transaction, they were also hobbled by Defendants' staggering corporate overhead, related-party transactions, immense debt service payments and restrictive loan covenants which drained vital funds from each nursing home.

## XI.   KINDRED'S CORPORATE STRUCTURE

146.   Defendants Kindred Healthcare, Inc., Kindred Healthcare Operating, Inc.; Kindred Healthcare Services, Inc.; Kindred Nursing Centers, East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers South, LLC; and Kindred Nursing Centers North, LLC directly participated in the false claim violations described above at the subject nursing homes by:

a.   requiring Kindred nursing homes to increase their occupancy rates and target high acuity residents, whose needs were well beyond the care capabilities of the nursing home's staff;

b.   directing Kindred's nursing homes to: (i) recruit and admit high acuity residents and increase residents, and (ii) retain residents whose needs exceeded the qualification and care capability of the nursing home staff;

c.   determining and controlling at each Kindred nursing home: (i) the numbers of staff and hours of labor at each facility, (ii) the expenditures for labor, (iii) the revenue targets, census targets and payor-mix targets, and (iv) resident recruitment strategies and discharge practices;

d.   overriding the decisions of nursing home administrators, department heads and licensed nursing staff charged with the legal responsibility for determining the staffing necessary to meet the needs of residents;  and

e.   submitting claims for payment on behalf of its nursing homes and centrally

70

controlling the claims and reimbursement process at each nursing home.

147.    Further, Defendants and the nursing homes listed in Exhibits "1-2" were the alter egos of one another, each forming a part of a single entity and acting as an integrated enterprise and as a single or joint employer.   Defendants exerted pervasive and continual control over the nursing homes listed in Exhibits "1-2" such that the nursing homes were mere agents, instrumentalities and conduits through which Defendants did business.

148.    Kindred Healthcare, Inc. filed consolidated financial statements and consolidated statements of operations of its subsidiaries with the Securities and Exchange Commission.  Such consolidation was proper pursuant to Generally Accepted Accounting Standards because Kindred Healthcare, Inc. controlled the other named subsidiary entities.  More specifically, each of the wholly-owned nursing homes subsidiary identified in Exhibits "1" and "2" were mere instrumentalities or conduits through which Kindred Healthcare, Inc. did business.[58]

149.    Furthermore, at all pertinent times, Defendants treated the funds of one entity as the funds of another.  Defendants collected, distributed and shared the revenues, profits, and assets of its nursing homes and continually siphoned all the revenues from each of the individual nursing homes including those listed in Exhibits "1-2" into a centralized master account. Additionally, Defendants diverted revenues away from nursing homes to related business entities.  Without control of their revenues and with no significant assets, Kindred's nursing homes were entirely dependent on Defendants for their continued existence and ongoing operations.

---

[58]For example, in *Courchaine v. Kindred Healthcare, Inc, et al.*, No. MICV 2012-0267, Commonwealth of Massachusetts Superior Court, Middlesex County, Kindred Healthcare, Inc., Kindred Healthcare Operating, Inc. and Kindred Nursing Centers East LLC stipulated that they were doing business as Kindred Transitional Care and Rehabilitation-Malborough and acknowledged that they should be considered a single entity.

150.     Each of Kindred's nursing homes were grossly undercapitalized with essentially all cash generated by the nursing homes' operations swept into accounts controlled by Defendants.  Defendants collected and managed all revenues created by operations of its nursing homes and controlled all of their expenditures.

151.     Defendants and the nursing homes portrayed themselves as a single entity, publicly promoting themselves as a unified nation-wide operation through brochures, marketing materials, website, communications with the media, as well as correspondence to state licensing and certification agencies.  Kindred Healthcare, Inc. was, at all pertinent times, a vertically-integrated company that uses "Kindred" as a brand, often branding its facilities by using Kindred in their name and inserting Kindred's logo throughout facility policies, procedures, and forms, as well as the medical records of residents.  At all pertinent times, Kindred Healthcare, Inc. held the trademark for the Kindred logos that are found on virtually all its nursing homes' signs, advertisements, medical records, policies, contracts, and websites.

152.     Defendants also provided a broad range of administrative, consulting, and support services to Kindred's nursing homes, including accounting and administrative services, auditing, compliance services, cost report preparation and audit representation, legal services, operational consulting and oversight support, and local, state, and federal tax preparation.

153.     Accordingly, there is and was sufficient unity of interest and ownership among and between each Defendant and the subject nursing homes, such that the acts of one were for the benefit of and could be imputed to all others.  Further, at all times herein mentioned, each Defendant acted as the agent and partner of, conspired and participated in a joint venture with the remaining Defendants.  Additionally, in engaging in the conduct described below, Defendants all acted with the express or implied knowledge, consent, authorization, approval, and/or ratification

of their co-Defendants.

## COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(A)

154.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

155.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §3729(a)(l)(A).

156.    By virtue of the conduct described above, Defendants knowingly, deliberately, and/or in reckless disregard of the truth presented or caused to be presented to Medicare, Medicaid and other Government-funded health insurance programs and/or to the contractors that ran these programs, on behalf of the Government, false or fraudulent claims for the improper payment or approval of nursing home services.

157.    Defendants knowingly, deliberately, and/or in reckless disregard of the truth, supported and continue to support claims to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs, on behalf of the Government, false or fraudulent claims for the improper payment or approval of nursing home services.

158.    The United States and its contractors, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

159.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(B)

160.    Relator re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

161.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(l)(B).

162.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims submitted to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs, on behalf of the Government, false or fraudulent claims for the improper payment or approval of nursing home services.

163.    Defendants knowingly, deliberately, and/or in reckless disregard of the truth, supported and continue to support claims to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs, on behalf of the Government, false or fraudulent claims for the improper payment or approval of nursing home services.

164.    The United States and its contractors, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

165.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE
### California False Claims Act, Cal. Gov't Code § 12651(a)(l)

166.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

167.    This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code, § 12651, *et seq.*

168.    By virtue of conduct described above, Defendants knowingly presented, or caused to be presented, to the California Medicaid Program (i.e., Medi-Cal), false or fraudulent claims for improper payment for nursing home services.

169.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

170.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOUR
### Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (l)(a)

171.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

172.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*

173.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Colorado Medicaid Program, false or fraudulent claims for payment or approval for improper payment for nursing home services.

174.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

175.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FIVE
### Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (l)(b)

176.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177.    This is a claim for treble damages and civil penalties under the Colorado

Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*

178.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to made or used, false records or statements material to a false or fraudulent claim made to the Colorado Medicaid Program for improper payment for nursing home services.

179.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

180.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIX
### Connecticut False Claims Act, Conn. Gen. Stat. § 17B-301b(a)(l)

181.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

182.    This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b, *et seq.*

183.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Connecticut Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

184.    The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

185.    By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVEN
### Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b(a)(2)

186.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

187.    This is a claim for treble damages and civil penalties under the Connecticut False

Claims Act, Conn. Gen. Stat. § 17b-301b, *et seq.*

188.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to made or used, false records or statements material to a false or fraudulent claim made to the Connecticut Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

189.    The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

190.    By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.l(a)(l)

191.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

192.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.l(a)(l).

193.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Georgia Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

194.    Georgia, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

195.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINE
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.l(a)(2)

196.    Relator re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

197.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.l(a)(2).

198.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims for improper payment for nursing home services.

199.    Georgia, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims for nursing home services that otherwise would not have been allowed.

200.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

### COUNT TEN
### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(l)

201.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

202.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(l).

203.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Georgia Medicaid Program, and other Government-funded health insurance programs, false or fraudulent claims for improper payment for nursing home services.

204.    Georgia, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

205.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT ELEVEN
**Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2)**

206.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

207.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2).

208.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements to the Georgia Medicaid Program and other Government-funded health insurance programs material to false or fraudulent claims for improper payment for nursing home services.

209.    Georgia, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

210.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWELVE
**Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5-2(b)(l)**

211.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

212.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

213.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Indiana Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

214.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

215.   By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THIRTEEN
**Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5-2(b)(2)**

216.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

217.   This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

218.   By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to obtain payment or approval of a false claim from the Indiana Medicaid Program for improper payment for nursing home services.

219.   The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOURTEEN
**Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5(B)(a)(1)**

220.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

221.   This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act. Mass. Ann. Laws ch. 12, § 5(B)(a)(l).

222.   By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Massachusetts Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

223.   The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature

of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

224.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FIFTEEN
## Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5(B)(a)(2)

225.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

226.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act. Mass. Ann. Laws ch. 12, § 5(B)(a)(2).

227.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to made or used, a false record or statement material to a claim made to Massachusetts Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

228.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

229.     By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIXTEEN
## Montana False Claims Act, Mont. Code Ann. §  17-8-403(1)(a)

230.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

231.    This is a claim for treble damages and civil penalties under the Montana False Claims Act.  Mont. Code Anno. § 17-8-401, *et seq.*

232.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Montana Medicaid Program, false or fraudulent claims for nursing homes services.

233.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

234.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVENTEEN
### Montana False Claims Act, Mont. Code Ann. § 17-8-403(1)(b)

235.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

236.    This is a claim for treble damages and civil penalties under the Montana False Claims Act.  Mont. Code Anno. § 17-8-401, *et seq.*

237.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false records or statements to get a false claim paid or approved by the Montana Medicaid Program for nursing homes services.

238.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

239.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHTEEN
### Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(a)

240.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

241.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act.  Nev. Rev. Stat. § 357.010, *et seq.*

242.    By virtue of the conduct described above, Defendants knowingly caused to be presented to the Nevada Medicaid Program, false or fraudulent claims for improper payment for

nursing home services.

243.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

244.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINETEEN
### Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(b)

245.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

246.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act.  Nev. Rev. Stat. § 357.010, *et seq.*

247.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the Nevada Medicaid Program for nursing home services.

248.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

249.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY
### North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(l)

250.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

251.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*

252.    By virtue of the conduct described above, Defendants knowingly presented, or

caused to be presented to the North Carolina Medicaid Program, false or fraudulent claims for payment or approval for nursing home services.

253.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

254.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-ONE
### North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(2)

255.    Relator re-alleges and incorporates the allegations contained in the preceding paragraphs of this Complaint.

256.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*

257.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the North Carolina Medicaid Program for nursing home services.

258.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

259.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-TW0
### Tennessee Medicaid False Claims Act, Tenn. Code Ann.§ 71-5-182(a)(l)(A) and Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a)(l)

260.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

261.    This is a claim for treble damages and civil penalties under the Tennessee

Medicaid False Claims Act, and the Tennessee False Claims Act.  Tenn. Code Ann. § 71-5-181, *et seq.* and Tenn. Code Ann. § 4-18-101, *et seq.*

262.    By virtue of the conduct described above, Defendants knowingly caused to be presented to the Tennessee Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

263.    The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

264.    By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-THREE
### Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(l)(B) and Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a)(2)

265.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

266.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, and the Tennessee False Claims Act.  Tenn. Code Ann. § 71-5-182, *et seq.* and Tenn. Code Ann. § 4-18-103, *et seq.*

267.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false records or statements to get a false claim paid or approved by the Tennessee Medicaid Program for nursing home services.

268.    The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

269.    By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWENTY-FOUR**
**Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3(A)(l)**

270.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

271.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act.  Va. Code Ann. §8.01-216.3, *et seq.*

272.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Virginia Medicaid Program, false or fraudulent claims for improper payment for nursing home services.

273.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

274.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWENTY-FIVE**
**Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3(A)(2)**

275.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

276.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act.  Va. Code Ann. §8.01-216-3, *et seq.*

277.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the Virginia Medicaid Program for nursing home services.

278.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

279.    By reason of these payments, the Virginia Medicaid Program has been damaged,

and continues to be damaged, in a substantial amount.

## COUNT TWENTY-SIX
### Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66.020(l)(a)

280.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

281.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 48.80.010, *et seq.*

282.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Washington Medicaid Program, false or fraudulent claims for payment or approval for nursing home services.

283.    The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

284.    By reason of these payments, the Washington Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-SEVEN
### Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66.020(l)(b)

285.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

286.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 48.80.010, *et seq.*

287.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the Washington Medicaid Program for nursing home services.

288.    The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

289.    By reason of these payments, the Washington Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-EIGHT
### Wisconsin False Claims Act, Wis. Stat. § 20.931(2)(a)

290.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

291.    By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented to the Wisconsin Medicaid Program, false or fraudulent claims for payment or approval for nursing home services.

292.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act.  Wis. Stat. § 20.931, *et seq*.

293.    The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

294.    By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-NINE
### Wisconsin False Claims Act, Wis. Stat. § 20.931(2)(b)

295.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

296.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act.  Wis. Stat. § 20.931, *et seq.*

297.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the Wisconsin Medicaid Program for nursing home services.

298.    The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of

the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

299.    By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## XII.    REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands a trial by jury.

**WHEREFORE**, Relator, on behalf of himself, the United States of America and the Qui Tam States, demands and prays that judgment be entered as follows against the Defendants under the Federal FCA Counts and under supplemental FCA counts, as follows:

a.    In favor of the United States against Defendants for treble the amount of damages to the United States, Medicare, Medicaid and other Government-funded health insurance programs, from the false or fraudulent claims for improper payment or approval of nursing home services alleged herein, plus the maximum civil penalties (plus interest) for each false claim caused to be submitted, for each false record submitted by Defendants, conspiracy to submit false claims;

b.    In favor of the United States and/or the Qui Tam States against Defendants for disgorgement of the profits earned by the Defendants as a result of their false or fraudulent claims for improper payment or approval of nursing home services alleged herein;

c.    In favor of Relator for the maximum allowed pursuant to 31 U.S.C. §3730(d) to include reasonable expenses, attorneys' fees and costs incurred by Relator;

d.    For all costs of this Federal FCA civil action;

e.    In favor of Relator and the United States for such other relief as this Court deems just and equitable;

f.      In favor of Relator and the Qui Tam States against Defendants in an amount equal to three times the amount of damages that the Qui Tam States have sustained as a result of the Defendants' actions, as well as the statutory maximum penalty against the Defendants for each violation of each state's FCA;

g.      In favor of Relator for the maximum amount allowed as Relator's share pursuant to the Qui Tam States' FCAs as follows: the California False Claims Act, Cal Govt. Code §12651(a) *et seq*.; Colorado Medicaid False Claims Act,§ 25.5-4- 303.5, *et seq*.; Connecticut False Claims Act For Medical Assistance Programs, § 17b-301, *et seq*.; Georgia False Medicaid Claims Act, GA. Code Ann. §49-4-168.1(a)(l) and § 49-4-168.I(A)(2); Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)( l ); Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2); Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5-2(b)(1); Indiana False Claims and Whistleblower Protection Act, Indiana Code§ 5-11-5.5-2(b)(2); Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12,§ 5(B); Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5(B); Montana False Claims Act, MCA § 17-8-401, *et seq*.); Nevada - Submission of False Claims to State or Local Government, NRS § 357.010, *et seq*.; North Carolina False Claims Act, N.C. Gen. Stat.§ 1-605(a)( l ); North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(2); Tennessee Medicaid False Claims Act, Tenn. Code Ann.§ 71-5-182(a)(l)(A) and Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a)(l); Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(l)(B) and Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a)(2); Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(l); Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(2); Washington State Medicaid Fraud False Claims Act, RCW § 74.66.005, *et seq*.; and Wisconsin False Claims Act, Wis. Stat. § 20.931(2)(a); and Wisconsin False Claims Act, Wis. Stat. § 20.931(2)(b);

h.      In favor of the Relator for all costs and expenses associated with the supplemental

claims of the Qui Tam States, including attorney's fees and costs;

i.      In favor of the Qui Tam States and Relator for all such other relief as the Court deems

just and proper; and

j.      Such other relief as this Court deems just and appropriate.

Dated:  July 14, 2020

Respectfully submitted,

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP


/s/ Nathan C. Zipperian
Natalie Finkelman Bennett
James C. Shah
Nathan C. Zipperian
Michael P. Ols
John C. Roberts
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: nfinkelman@sfmslaw.com
        jshah@sfmslaw.com
        nzipperian@sfmslaw.com
        mols@sfmslaw.com
        jroberts@sfmslaw.com

James E. Miller
Laurie Rubinow
Shepherd, Finkelman, Miller
  & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Thomas W. Sheridan
Sheridan & Murray, LLC
424 S. Bethlehem Pike, Third Floor
Fort Washington, PA 19034
Telephone: (215) 977-9500
Facsimile: (215) 977-9800

Joseph Trautwein
Joseph Trautwein & Associates, LLC
1777 Sentry Parkway West
Abington Hall, Suite 100
Blue Bell, PA 19422
Telephone: (215) 764-2301
Facsimile: (267) 464-0400

David Marks
Marks, Balette & Giessel, PC
10000 Memorial Dr., Suite 760
Houston, TX 77025
Telephone: (713) 681-3070
Facsimile: (713) 681-2811

Mark DiCello
The DiCello Law Firm
7556 Mentor Ave.,
Mentor, OH 44060
Telephone: (440) 953-8888
Facsimile: (440) 953-9138

*Attorneys for Plaintiff-Relator*

# Exhibit 1

**Exhibit 1- Kindred Nursing Homes Names**

| Provider # | Kindred Nursing Home Name | Address | City | State | Zip | Applicable Kindred Ownership Dates (During Reviewed Period) | Kindred's Wholly-Owned Designated Corporate Operator | Facility Exhibit Designation |
|---|---|---|---|---|---|---|---|---|
| 15111 | KINDRED TRANSITIONAL CARE & REHAB-BIG SPRINGS | 500 ST. CLAIR AVENUE SOUTHWEST | HUNTSVILLE | AL | 35801 | 11/25/05 to 2/28/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 15116 | KINDRED TRANSITIONAL CARE&REHAB-WHITESBURG GARDENS | 105 TEAKWOOD DRIVE | HUNTSVILLE | AL | 35801 | 11/25/05 to 5/31/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 35094 | KACHINA POINT HEALTH CARE & REHAB CENTER | 505 JACKS CANYON ROAD | SEDONA | AZ | 86351 | 11/25/05 to 2/1/13 | Kindred Nursing Centers West, LLC | Exhibit 1 |
| 56260 | KINDRED NURSING AND HEALTHCARE - BAYBERRY | 1800 ADOBE STREET | CONCORD | CA | 94520 | 2/6/07 to 12/21/15 | Kindred Nursing Centers West, LLC California Nursing Centers, LLC Bayberry Care Center, LLC | Exhibit 1 |
| 65077 | KINDRED TRANSITIONAL CARE AND REHAB-CHERRY | 3575 SOUTH WASHINGTON STREET | ENGLEWOOD | CO | 80110 | 11/25/05 to 5/31/14 | Kindred Nursing Centers West, LLC | Exhibit 1 |
| 75185 | ANDREW HOUSE HEALTHCARE | 66 CLINIC DR | NEW BRITAIN | CT | 06051 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 115115 | SPECIALTY CARE OF MARIETTA | 26 TOWER RD | MARIETTA | GA | 30060 | 11/25/05 to 2013 | | Exhibit 1 |
| 115120 | SAVANNAH HEALTHCARE AND REHABILITATION CENTER | 815 EAST 63 STREET | SAVANNAH | GA | 31405 | 11/25/05 to 2013 | | Exhibit 1 |
| 115132 | KINDRED TRANSITIONAL CARE AND REHAB - ABERCORN | 11800 ABERCORN STREET | SAVANNAH | GA | 31419 | 11/25/05 to 4/30/14 | Kindred Nursing Centers, LP | Exhibit 1 |
| 115360 | KINDRED TRANSITIONAL CARE AND REHAB - LAFAYETTE | 110 BRANDYWINE BOULEVARD | FAYETTEVILLE | GA | 30214 | 11/25/05 to 12/21/15 | Lafayette Health Care Centers, Inc. | Exhibit 1 |
| 135051 | KINDRED NURSING & REHAB - CANYON WEST | 2814 SOUTH INDIANA AVENUE | CALDWELL | ID | 83605 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 1 |
| 155188 | KINDRED TRANSITIONAL CARE AND REHAB-GREENFIELD | 200 GREEN MEADOWS DR | GREENFIELD | IN | 46140 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155193 | KINDRED TRANSITIONAL CARE AND REHAB-GREENWOOD | 377 WESTRIDGE BLVD | GREENWOOD | IN | 46142 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155218 | KINDRED TRANSITIONAL CARE AND REHABILITATION-DYER | 2300 GREAT LAKES DR | DYER | IN | 46311 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155219 | REGENCY PLACE OF SOUTH BEND | 52654 N IRONWOOD RD | SOUTH BEND | IN | 46635 | 11/25/05 to 8/5/13 | | Exhibit 1 |
| 155222 | KINDRED TRANSITIONAL CARE AND REHAB-KOKOMO | 429 W LINCOLN RD | KOKOMO | IN | 46902 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155242 | MUNCIE HEALTH & REHABILITATION CENTER | 4301 N WALNUT ST | MUNCIE | IN | 47303 | 11/25/05 to 5/15/13 | | Exhibit 1 |
| 155243 | REGENCY PLACE OF LAFAYETTE | 300 WINDY HILL DR | LAFAYETTE | IN | 47905 | 11/25/05 to 8/5/13 | | Exhibit 1 |
| 155265 | KINDRED TRANSITIONAL CARE AND REHAB-WEDGEWOOD | 101 POTTERS LN | CLARKSVILLE | IN | 47129 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155272 | KINDRED TRANSITIONAL CARE AND REHAB-CASTLETON | 5226 E 82ND ST | INDIANAPOLIS | IN | 46250 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155312 | KINDRED TRANSITIONAL CARE AND REHAB-INDIAN CREEK | 240 BEECHMONT DR | CORYDON | IN | 47112 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155378 | PARKWOOD HEALTH CARE CENTER | 1001 N GRANT ST | LEBANON | IN | 46052 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 155426 | ROYAL OAKS HEALTH CARE AND REHABILITATION CENTER | 3500 MAPLE AVE | TERRE HAUTE | IN | 47804 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 155474 | KINDRED NURSING AND REHABILITATION-BREMEN | 316 WOODIES LN | BREMEN | IN | 46506 | 11/25/05 to 4/30/14 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155484 | KINDRED TRANSITIONAL CARE AND REHAB-SOUTHWOOD | 2222 MARGARET AVE | TERRE HAUTE | IN | 47802 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155488 | KINDRED TRANSITIONAL CARE AND REHAB-ROLLING HILLS | 3625 ST JOSEPH RD | NEW ALBANY | IN | 47150 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155496 | KINDRED NURSING AND REHABILITATION VALLEY VIEW | 333 W MISHAWAKA RD | ELKHART | IN | 46517 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155657 | KINDRED TRANSITIONAL CARE AND REHAB-HARRISON | 150 BEECHMONT DR | CORYDON | IN | 47112 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155659 | KINDRED TRANSITIONAL CARE AND REHAB-SELLERSBURG | 7823 OLD HWY # 60 | SELLERSBURG | IN | 47172 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 155670 | ANGEL RIVER HEALTH AND REHABILITATION | 5233 ROSEBUD LN | NEWBURGH | IN | 47630 | 11/25/05 to 8/5/13 | | Exhibit 1 |
| 185089 | KINDRED TRANSITIONAL CARE AND REHABILITATION ROSEWOOD | 550 HIGH ST. | BOWLING GREEN | KY | 42101 | 11/25/05 to 3/31/14 | | Exhibit 1 |
| 185118 | KINDRED NURSING AND REHABILITATION-WOODLAND | 1117 WOODLAND DRIVE | ELIZABETHTOWN | KY | 42701 | 11/25/05 to 3/31/14 | | Exhibit 1 |
| 185120 | KINDRED TRANSITIONAL CARE AND REHABILITATION - HILLCREST | 3740 OLD HARTFORD RD | OWENSBORO | KY | 42303 | 11/25/05 to 3/31/14 | | Exhibit 1 |
| 185127 | KINDRED NURSING AND REHABILITATION-DANVILLE | 642 NORTH THIRD STREET | DANVILLE | KY | 40422 | 11/25/05 to 3/31/14 | Kindred Nursing Centers, LP | Exhibit 1 |
| 185142 | HERITAGE MANOR HEALTH CARE CENTER | 401 INDIANA AVE | MAYFIELD | KY | 42066 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 185287 | KINDRED NURSING AND REHABILITATION-HARRODSBURG | 853 LEXINGTON ROAD | HARRODSBURG | KY | 40330 | 11/25/05 to 3/31/14 | Kindred Nursing Centers, LP | Exhibit 1 |
| 225133 | KINDRED TRANSITIONAL CARE & REHAB-BLUEBERRY HILL | 75 BRIMBAL AVENUE | BEVERLY | MA | 01915 | 11/25/05 to 5/1/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225210 | KINDRED NURSING & REHABILITATION-RIVER TERRACE | 1675 NORTH MAIN STREET | LANCASTER | MA | 01523 | 11/25/05 to 5/31/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225230 | KINDRED NURSING & REHAB CENTER - GREAT BARRINGTON | 148 MAPLE AVENUE | GREAT BARRINGTON | MA | 01230 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225242 | KINDRED TRANSITIONAL CARE & REHAB-WESTBOROUGH | 5 COLONIAL DRIVE | WESTBOROUGH | MA | 01581 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225263 | KINDRED TRANSITIONAL CARE & REHABILTIATION-QUINCY | 11 MCGRATH HIGHWAY | QUINCY | MA | 02169 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225320 | KINDRED TRANSITIONAL CARE & REHAB-EAGLE POND | 1 LOVE LANE | SOUTH DENNIS | MA | 02660 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225322 | SACHEM SKILLED NURSING & REHABILITATION CENTER | 66 CENTRAL STREET | EAST BRIDGEWATER | MA | 02333 | 11/25/05 to 6/1/13 | | Exhibit 1 |

| Provider # | Kindred Nursing Home Name | Address | City | State | Zip | Applicable Kindred Ownership Dates (During Reviewed Period) | Kindred's Wholly-Owned Designated Corporate Operator | Facility Exhibit Designation |
|---|---|---|---|---|---|---|---|---|
| 225326 | BOLTON MANOR NURSING & REHABILITATION CENTER | 400 BOLTON STREET | MARLBOROUGH | MA | 01752 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 225332 | COUNTRY REHABILITATION & NURSING CENTER | 180 LOW STREET | NEWBURYPORT | MA | 01950 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 225435 | COLONY HOUSE NURSING & REHABILITATION CENTER | 277 WASHINGTON STREET | ABINGTON | MA | 02351 | 11/25/05 to 6/1/13 | | Exhibit 1 |
| 225444 | KINDRED NURSING & REHAB-BLUE HILLS ALZHEIMER'S | 1044 PARK STREET | STOUGHTON | MA | 02072 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225456 | KINDRED NURSING AND REHABILITATION-DEN-MAR | 44 SOUTH STREET | ROCKPORT | MA | 01966 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225461 | KINDRED TRANSITIONAL CARE & REHAB-FRANKLIN | 130 CHESTNUT STREET | FRANKLIN | MA | 02038 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225483 | KINDRED NURSING AND REHABILITATION-OAKWOOD | 11 PONTIAC AVENUE | WEBSTER | MA | 01570 | 11/25/05 to 5/31/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225512 | KINDRED TRANSITIONAL CARE & REHABILITA-FORESTVIEW | 50 INDIAN NECK ROAD | WAREHAM | MA | 02571 | 3/15/06 to 12/21/15 | Kindred Nursing Centers, East, LLC Forestview Nursing, LLC | Exhibit 1 |
| 225516 | ELIOT HEALTHCARE CENTER | 168 WEST CENTRAL STREET | NATICK | MA | 01760 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 225536 | KINDRED TRANSITIONAL CARE & REHAB-HARRINGTON | 160 MAIN STREET | WALPOLE | MA | 02081 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225549 | KINDRED NURSING & REHABILITATION-BRIGHAM | 77 HIGH STREET | NEWBURYPORT | MA | 01950 | 11/25/05 to 12/31/13 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 225719 | KINDRED TRANSITIONAL CARE & REHAB-HIGHGATE | 10 CAREMATRIX DRIVE | DEDHAM | MA | 02026 | 3/15/06 to 12/21/15 | Kindred Nursing Centers East, LLC Highgate Nursing, LLC | Exhibit 1 |
| 225737 | KINDRED NURSING & REHABILITATION-HARBORLIGHTS | 804 EAST 7TH STREET | BOSTON | MA | 02127 | 3/15/06 to 12/21/15 | Harborlights Nursing, LLC Kindred Nursing Centers East, LLC | Exhibit 1 |
| 265288 | TABLEROCK HEALTHCARE | 276 FOUNTAIN LANE | KIMBERLING CITY | MO | 65686 | 11/25/05 to 1/1/11 | | Exhibit 1 |
| 345002 | KINDRED TRANSITIONAL CARE & REHAB-CYPRESS POINTE | 2006 S 16TH ST | WILMINGTON | NC | 28401 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345003 | KINDRED TRANSITIONAL CARE & REHAB-SILAS CREEK | 3350 SILAS CREEK PARKWAY | WINSTON-SALEM | NC | 27103 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345053 | KINDRED TRANSITIONAL CARE & REHAB-PETTIGREW | 1515 W PETTIGREW ST | DURHAM | NC | 27705 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345077 | KINDRED TRANSITIONAL CARE & REHAB-SUNNYBROOK | 25 SUNNYBROOK RD | RALEIGH | NC | 27610 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345104 | KINDRED NURSING & REHABILITATION-ZEBULON | 509 W GANNON AVE | ZEBULON | NC | 27597 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345254 | KINDRED TRANSITIONAL CARE & REHAB-MONROE | 1212 EAST SUNSET DR | MONROE | NC | 28112 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345336 | GUARDIAN CARE OF ROANOKE RAPIDS | 305 FOURTEENTH STREET | ROANOKE RAPIDS | NC | 27870 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 345344 | KINDRED TRANSITIONAL CARE & REHAB-HENDERSON | 280 SOUTH  BECKFORD DR | HENDERSON | NC | 27536 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 345375 | KINDRED NURSING & REHAB-SCOTLAND NECK | 920 JR HIGH SCHOOL RD | SCOTLAND NECK | NC | 27874 | 11/25/05 to 8/5/13 | | Exhibit 1 |
| 305018 | DOVER REHABILITATION AND LIVING CENTER | 307 PLAZA DRIVE | DOVER | NH | 03820 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 305020 | KINDRED NURSING AND REHABILITATION-HANOVER TERRACE | 49 LYME ROAD | HANOVER | NH | 03755 | 11/25/05 to 6/30/14 | | Exhibit 1 |
| 295006 | LAS VEGAS HEALTHCARE AND REHAB CENTER | 2832 S. MARYLAND PARKWAY | LAS VEGAS | NV | 89109 | 11/25/05 to 12/19/12 | | Exhibit 1 |
| 365329 | KINDRED NURSING AND REHABILITATION-COMMUNITY | 175 COMMUNITY DRIVE | MARION | OH | 43302 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 365435 | KINDRED TRANSITIONAL CARE & REHAB-LOGAN | 300 ARLINGTON AVENUE | LOGAN | OH | 43138 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 365636 | KINDRED TRANSITIONAL CARE & REHAB-PICKERINGTON | 1300 HILL ROAD NORTH | PICKERINGTON | OH | 43147 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 365644 | KINDRED TRANSITIONAL CARE & REHAB-WINCHESTER PLACE | 36 LEHMAN DR | CANAL WINCHESTER | OH | 43110 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 365694 | KINDRED TRANSITIONAL CARE AND REHABILITATION - CHILLICOTHE | 60 MARIETTA ROAD | CHILLICOTHE | OH | 45601 | 11/25/05 to 5/1/13 | | Exhibit 1 |
| 365920 | KINDRED NURSING AND REHABILITATION - LEBANON | 700 MONROE ROAD | LEBANON | OH | 45036 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 366225 | KINDRED NURSING & REHAB - STRATFORD | 7000 COCHRAN ROAD | GLENWILLOW | OH | 44139 | 2/8/11 to 12/21/15 | KND Development 51, LLC | Exhibit 1 |
| 395237 | KINDRED TRANSITIONAL CARE AND REHABILITATION-WYOMISSING | 1000 EAST WYOMISSING BLVD | READING | PA | 19611 | 11/25/05 to 6/30/14 | | Exhibit 1 |
| 445075 | MADISON HEALTHCARE AND REHABILITATION CENTER | 431 LARKIN SPRING RD | MADISON | TN | 37115 | 11/25/05 to 8/14/13 | | Exhibit 1 |
| 445136 | KINDRED NURSING AND REHABILITATION-MASTERS | 278 DRY VALLEY RD | ALGOOD | TN | 38501 | 11/25/05 to4/30/14 | Kindred Nursing Centers, LP | Exhibit 1 |
| 445245 | KINDRED NURSING AND REHABILITATION-MARYVILLE | 1012 JAMESTOWN WAY | MARYVILLE | TN | 37803 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 445253 | KINDRED NURSING AND REHABILITATION -LOUDON | 1520 GROVE ST BOX 190 | LOUDON | TN | 37774 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 445286 | KINDRED NURSING AND REHABILITATION- FAIRPARK | 307 N FIFTH ST BOX 5477 | MARYVILLE | TN | 37801 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 445297 | KINDRED HEALTH AND REHABILITATION-NORTHHAVEN | 3300 BROADWAY NE | KNOXVILLE | TN | 37917 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 1 |
| 465006 | WASATCH VALLEY REHABILITATION | 2200 EAST 3300 SOUTH | SALT LAKE CITY | UT | 84109 | 11/25/05 to 10/31/09 | | Exhibit 1 |
| 465055 | KINDRED TRANSITIONAL CARE AND REHABILITATION-FEDERAL HEIGHTS | 41 SOUTH 900 EAST | SALT LAKE CITY | UT | 84102 | 11/25/05 to 1/1/13 | | Exhibit 1 |
| 465064 | KINDRED NURSING AND REHABILITATION - ST GEORGE | 1032 EAST 100 SOUTH | ST GEORGE | UT | 84770 | 11/25/05 to 6/30/14 | Kindred Nursing Centers West, LLC | Exhibit 1 |
| 465110 | CROSSLANDS REHABILITATION AND HEALTHCARE CENTER | 575 EAST 11000 SOUTH | SANDY | UT | 84070 | 11/25/05 to 1/1/13 | | Exhibit 1 |

| Provider # | Kindred Nursing Home Name | Address | City | State | Zip | Applicable Kindred Ownership Dates (During Reviewed Period) | Kindred's Wholly-Owned Designated Corporate Operator | Facility Exhibit Designation |
|---|---|---|---|---|---|---|---|---|
| 495241 | KINDRED NURSING AND REHABILITATION-RIVER POINTE | 4142 BONNEY ROAD | VIRGINIA BEACH | VA | 23452 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 1 |
| 475003 | KINDRED TRANSITIONAL CARE & REHAB BIRCHWOOD TERRACE | 43 STARR FARM RD | BURLINGTON | VT | 05408 | 11/25/05 to 12/21/15 | | Exhibit 1 |
| 475030 | STARR FARM NURSING CENTER | 98 STARR FARM RD | BURLINGTON | VT | 05408 | 11/25/05 to 12/21/15 | Starr Farm Partnership | Exhibit 1 |
| 505304 | KINDRED TRANSITIONAL CARE & REHAB - RAINIER VISTA | 920 12TH AVENUE SOUTHEAST | PUYALLUP | WA | 98372 | 11/25/05 to 5/31/14 | Kindred Nursing Centers West, LLC | Exhibit 1 |
| 505347 | KINDRED TRANSITIONAL CARE & REHAB CENTER- LAKEWOOD | 11411 BRIDGEPORT WAY | TACOMA | WA | 98499 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 1 |
| 525420 | KENNEDY PARK NURSING AND REHAB CENTER | 6001 ALDERSON ST | SCHOFIELD | WI | 54476 | 11/25/05 to 2/1/13 | KINDRED NURSING CENTERS LIMITED PARTNERSHIP | Exhibit 1 |
| 525482 | KINDRED NURSING AND REHAB-BURLINGTON (MOUNT CARMEL MEDICAL | 677 E STATE ST | BURLINGTON | WI | 53105 | 11/25/05 to 5/31/14 | Kindred Nursing Centers, LP | Exhibit 1 |
| 535013 | KINDRED TRANSITIONAL CARE AND REHABILITATION-CHEYENNE | 3128 BOXELDER DRIVE | CHEYENNE | WY | 82001 | 11/25/05 to 9/8/15 | Kindred Nursing Centers West, LLC | Exhibit 1 |

# Exhibit 2

Exhibit 2- Kindred Nursing Homes Names (Facilities for Which Additional Staffing Data Is Required)

| Provider # | Kindred Nursing Home Name | Address | City | State | Zip | Applicable Kindred Ownership Dates (During Reviewed Period) | Kindred's Wholly-Owned Designated Corporate Operator | Facility Exhibit Designation |
|---|---|---|---|---|---|---|---|---|
| 15151 | KINDRED TRANSITIONAL CARE & REHABILITATION-MOBILE | 1758 SPRINGHILL AVE | MOBILE | AL | 36607 | 11/25/05 to 2/15/13 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 35070 | KINDRED TRANSITIONAL CARE AND REHAB-NORTHWEST | 1919 WEST MEDICAL STREET | TUCSON | AZ | 85704 | 11/25/05 to 4/30/14 | | Exhibit 2 |
| 35086 | KINDRED NURSING AND REHABILITATION-HACIENDA | 660 SOUTH CORONADO DRIVE | SIERRA VISTA | AZ | 85635 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 55042 | ALTA VISTA HEALTHCARE | 9020 GARFIELD STREET | RIVERSIDE | CA | 92503 | 11/25/05 to 1/20/10 | Riverside Hawthorne & Wellness Center, LLC | Exhibit 2 |
| 55252 | KINDRED HEALTHCARE CENTER OF ORANGE | 920 WEST LA VETA STREET | ORANGE | CA | 92868 | 11/25/05 to 12/1/09 | | Exhibit 2 |
| 56327 | KINDRED TRANSITIONAL CARE & REHAB - WALNUT CREEK (CARE CENTER OF ROSSMOOR) | 1224 ROSSMOOR PARKWAY | WALNUT CREEK | CA | 94595 | 2/6/07 to 12/21/15 | Care Center of Rossmoor , LLC CNC, LLC | Exhibit 2 |
| 555090 | KINDRED NURSING AND TRANSITIONAL CARE-PACIFIC COAST | 720 EAST ROMIE LANE | SALINAS | CA | 93901 | 2/6/07 to 12/21/15 | Pacific Coast Care Center, LLC California Nursing Centers, LLC Kindred Nursing Centers West, LLC | Exhibit 2 |
| 555256 | CALIFORNIAN CARE CENTER | 2211 MOUNT VERNON AVENUE | BAKERSFIELD | CA | 93306 | 11/25/05 to 12/14/09 | | Exhibit 2 |
| 555356 | KINDRED TRANSITIONAL CARE AND REHAB - CANYONWOOD | 2120 BENTON DRIVE | REDDING | CA | 96003 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 555416 | KINDRED TRANSITIONAL CARE AND REHAB-FOOTHILL | 401 W. ADA AVE. | GLENDORA | CA | 91741 | 11/25/05 to 12/21/15 | Foothill Nursing Company Partnership | Exhibit 2 |
| 555754 | KINDRED TRANSITIONAL CARE AND REHABILITATION-VILLA | 1586 W. SAN MARCOS BLVD | SAN MARCOS | CA | 92069 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 65001 | KINDRED NURSING AND REHABILITATION-AURORA | 10201 EAST THIRD AVENUE | AURORA | CO | 80010 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 65196 | KINDRED HEALTHCARE AND REHABILITATION CENTER OF NORTHGLENN | 401 MALLEY DRIVE | NORTHGLENN | CO | 80233 | 11/25/05 to 4/9/13 | | Exhibit 2 |
| 75011 | KINDRED TRANSITIONAL CARE & REHAB-WINDSOR | 581 POQUONOCK AVE | WINDSOR | CT | 06095 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 75195 | KINDRED TRANSITIONAL CARE & REHAB-PARKWAY PAVILION | 1157 ENFIELD ST | ENFIELD | CT | 06082 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 75196 | CROSSINGS EAST CAMPUS, THE | 78 VIETS ST EXTENSION | NEW LONDON | CT | 06320 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 135019 | KINDRED NURSING & REHAB - NAMPA | 404 NORTH HORTON STREET | NAMPA | ID | 83651 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 135021 | KINDRED TRANSITIONAL CARE & REHAB - LEWISTON | 3315 8TH STREET | LEWISTON | ID | 83501 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 135077 | BOISE HEALTH AND REHABILITATION CENTER | 1001 SOUTH HILTON STREET | BOISE | ID | 83705 | 11/25/05 to 4/9/13 | | Exhibit 2 |
| 135093 | KINDRED NURSING & REHAB - ASPEN PARK | 420 ROWE STREET | MOSCOW | ID | 83843 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 155133 | KINDRED TRANSITIONAL CARE AND REHAB-COLUMBUS | 2100 MIDWAY ST | COLUMBUS | IN | 47201 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 2 |
| 155501 | KINDRED NURSING AND REHABILITATION-MEADOWVALE | 1529 W LANCASTER ST | BLUFFTON | IN | 46714 | 11/25/05 to 4/30/14 | Kindred Nursing Centers, LP | Exhibit 2 |
| 185146 | FOUNTAIN CIRCLE CARE & REHABILITATION CENTER | 200 GLENWAY ROAD | WINCHESTER | KY | 40391 | 11/25/05 to 5/15/13 | | Exhibit 2 |
| 185179 | NORTHFIELD CENTRE FOR HEALTH & REHABILITATION | 6000 HUNTING RD. | LOUISVILLE | KY | 40222 | 11/25/05 to 4/1/13 | | Exhibit 2 |
| 185196 | KINDRED NURSING AND REHABILITATION-BASHFORD | 3535 BARDSTOWN ROAD | LOUISVILLE | KY | 40218 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 2 |
| 185209 | KINDRED NURSING AND REHABILITATION-RIVERSIDE | 190 EAST HWY. 136 | CALHOUN | KY | 42327 | 11/25/05 to 3/31/14 | Kindred Nursing Centers, LP | Exhibit 2 |
| 185294 | KINDRED NURSING AND REHABILITATION-MAPLE | 515 GREENE DRIVE | GREENVILLE | KY | 42345 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 2 |
| 185408 | LIBERTY CARE AND REHABILITATION CENTER | 616 S WALLACE WILKINSON BLVD | LIBERTY | KY | 42539 | 11/25/05 to 8/5/13 | | Exhibit 2 |
| 225170 | KINDRED NURSING AND REHABILITATION-WALDEN | 785 MAIN STREET | WEST CONCORD | MA | 01742 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 225185 | KINDRED NURSING & REHABILITATION-COUNTRY GARDENS | 2045 GRAND ARMY HIGHWAY | SWANSEA | MA | 02777 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 225222 | NEWTON AND WELLESLEY ALZHEIMER CENTER | 694 WORCESTER RD | WELLESLEY FMS | MA | 02181 | 11/25/05 to 5/1/13 | | Exhibit 2 |
| 225227 | KINDRED NURSING & REHABILITATION-HILLCREST | 94 SUMMER STREET | FITCHBURG | MA | 01420 | 11/25/05 to 5/31/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 225309 | LEDGEWOOD REHABILITATION & SKILLED NURSING CENTER | 87 HERRICK STREET | BEVERLY | MA | 01915 | 11/25/05 to 12/21/15 | | Exhibit 2 |
| 225370 | KINDRED TRANSITIONAL CARE & REHAB-HAMMERSMITH | 73 CHESTNUT STREET | SAUGUS | MA | 01906 | 11/25/05 to 5/31/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 225445 | KINDRED NURSING AND REHABILITATION-BRAINTREE | 1102 WASHINGTON STREET | BRAINTREE | MA | 02184 | 3/15/06 to 12/21/15 | Kindred Nursing Centers East, LLC Braintree Nursing, LLC | Exhibit 2 |
| 225453 | KINDRED TRANSITIONAL CARE & REHAB-CRAWFORD | 273 OAK GROVE AVENUE | FALL RIVER | MA | 02723 | 11/25/05 to 6/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |

| Provider # | Kindred Nursing Home Name | Address | City | State | Zip | Applicable Kindred Ownership Dates (During Reviewed Period) | Kindred's Wholly-Owned Designated Corporate Operator | Facility Exhibit Designation |
|---|---|---|---|---|---|---|---|---|
| 225465 | KINDRED NURSING & REHABILITATION-HALLMARK | 1123 ROCKDALE AVENUE | NEW BEDFORD | MA | 02740 | 11/25/05 to 9/8/15 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 225469 | LAUREL RIDGE REHAB AND SKILLED CARE CENTER | 174 FOREST HILLS STREET | BOSTON | MA | 02130 | 11/25/05 to 6/13 | | Exhibit 2 |
| 225486 | PRESENTATION NURSING & REHABILITATION CENTER | 10 BELLAMY STREET | BOSTON | MA | 02135 | 11/25/05 to 6/13 | | Exhibit 2 |
| 225567 | SEACOAST NURSING & REHABILITATION CENTER INC | 292 WASHINGTON STREET | GLOUCESTER | MA | 01930 | 11/25/05 to 12/21/15 | | Exhibit 2 |
| 225587 | KINDRED NURSING AND REHABILITATION-TOWER HILL | ONE MEADOWBROOK WAY | CANTON | MA | 02021 | 3/15/06 to 12/21/15 | Kindred Nursing Centers, East, LLC Tower Hill, LLC | Exhibit 2 |
| 225642 | KINDRED TRANSITIONAL CARE & REHAB-COUNTRY ESTATES | 1200 SUFFIELD STREET | AGAWAM | MA | 01001 | 3/15/06 to 12/21/15 | Kindred Nursing Centers, East, LLC Country Estates Nursing, LLC | Exhibit 2 |
| 225668 | KINDRED TRANSITIONAL CARE & REHAB-THE MEADOWS | 111 HUNTOON MEMORIAL HIGHWAY | ROCHDALE | MA | 01542 | 3/15/06 to 9/3/13 | Kindred Nursing Centers, East, LLC Meadows Nursing, LLC | Exhibit 2 |
| 225674 | KINDRED TRANSITIONAL CARE & REHABILITATION-AVERY | 100 WEST STREET | NEEDHAM | MA | 02194 | 3/15/06 to 12/21/15 | Kindred Nursing Centers, East, LLC Avery Manor Nursing, LLC | Exhibit 2 |
| 225723 | KINDRED TRANSITIONAL CARE AND REHAB-HIGHLANDER | 1748 HIGHLAND AVENUE | FALL RIVER | MA | 02720 | 3/15/06 to 12/21/15 | Kindred Nursing Centers, East, LLC Highlander Nursing, LLC | Exhibit 2 |
| 225749 | KINDRED NURSING & REHABILITATION-LAUREL LAKE | 620 LAUREL STREET | LEE | MA | 01238 | 3/15/06 to 12/21/15 | Kindred Nursing Centers, East, LLC Laurel Lake Health and Rehabilitation, LLC | Exhibit 2 |
| 205062 | BREWER REHAB AND LIVING CENTER | 74 PARKWAY SOUTH | BREWER | ME | 04412 | 11/25/05 to 7/1/13 | | Exhibit 2 |
| 205077 | AUGUSTA REHABILITATION CENTER | 188 EASTERN AVE | AUGUSTA | ME | 04330 | 11/25/05 to 7/1/13 | | Exhibit 2 |
| 205078 | WINSHIP GREEN NURSING CENTER | 51 WINSHIP ST | BATH | ME | 04530 | 11/25/05 to 7/1/13 | | Exhibit 2 |
| 275030 | KINDRED TRANSITIONAL CARE & REHAB - PARK PLACE | 1500 32ND ST S | GREAT FALLS | MT | 59405 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 345049 | KINDRED TRANSITIONAL CARE & REHAB-RALEIGH | 616 WADE AVENUE | RALEIGH | NC | 27605 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 345081 | KINDRED TRANSITIONAL CARE & REHAB-ROSE MANOR | 4230 NORTH ROXBORO ROAD | DURHAM | NC | 27704 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 345159 | KINDRED NURSING & REHABILITATION-LINCOLN | 1410 EAST GASTON ST | LINCOLNTON | NC | 28092 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 345162 | REHABILITATION AND HEALTH CENTER OF GASTONIA | 416 N HIGHLAND ST | GASTONIA | NC | 28052 | 11/25/05 to 5/1/13 | | Exhibit 2 |
| 345359 | KINDRED TRANSITIONAL CARE & REHAB-AHOSKIE | 604 STOKES STREET  EAST | AHOSKIE | NC | 27910 | 11/25/05 to 8/5/13 | | Exhibit 2 |
| 345365 | KINSTON HEALTHCARE AND REHABILITATION CENTER | 907 CUNNINGHAM RD | KINSTON | NC | 28501 | 11/25/05 to 5/1/13 | | Exhibit 2 |
| 285049 | HOMESTEAD NURSING & REHABILITATION CENTER | 4735 SOUTH 54TH STREET | LINCOLN | NE | 68516 | 11/25/05 to 2010 | Kindred Healthcare Operating, Inc. Homestead Health and Rehabilitation Center, LLC | Exhibit 2 |
| 305005 | KINDRED TRANSITIONAL CARE & REHABILITATION-GREENBRIAR | 55 HARRIS ROAD | NASHUA | NH | 03062 | 11/25/05 to 12/21/15 | | Exhibit 2 |
| 295045 | TORREY PINES CARE CENTER | 1701 S. TORREY PINES DRIVE | LAS VEGAS | NV | 89146 | 11/25/05 to 12/19/12 | | Exhibit 2 |
| 365673 | KINDRED TRANSITIONAL CARE AND REHABILITATION - FRANKLIN WOODS | 2770 CLIME ROAD | COLUMBUS | OH | 43223 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 365713 | KINDRED TRANSITIONAL CARE & REHAB-LAKEMED | 70 NORMANDY DR | PAINESVILLE | OH | 44077 | 11/25/05 to 12/21/15 | PersonaCare of Ohio, Inc. | Exhibit 2 |
| 365770 | KINDRED NURSING &  REHABILITATION-CAMBRIDGE | 1471 WILLS CREEK VALLEY DRIVE | CAMBRIDGE | OH | 43725 | 11/25/05 to 4/30/14 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 365880 | COSHOCTON HEALTH & REHABILITATION CENTER | 100 SOUTH WHITEWOMAN STREET | COSHOCTON | OH | 43812 | 11/25/05 to 5/1/13 | | Exhibit 2 |
| 385189 | KINDRED NURSING AND REHABILITATION - SUNNYSIDE | 4515 SUNNYSIDE ROAD SE | SALEM | OR | 97302 | 11/25/05 to 5/31/14 | | Exhibit 2 |
| 445172 | KINDRED NURSING AND REHABILITATION-SMITH COUNTY | 112 HEALTH CARE DR | CARTHAGE | TN | 37030 | 11/25/05 to 12/21/15 | Kindred Nursing Centers, LP | Exhibit 2 |
| 465009 | KINDRED NURSING & REHABILITATION - WASATCH CARE | 3430 HARRISON BOULEVARD | OGDEN | UT | 84403 | 11/25/05 to 6/30/14 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 495068 | HARBOUR POINTE M & R CENTER | 1005 HAMPTON BLVD | NORFOLK | VA | 23507 | 11/25/05 to 5/1/13 | | Exhibit 2 |
| 495086 | KINDRED TCC AND REHABILITATION-BAY POINTE | 1148 FIRST COLONIAL RD | VIRGINIA BEACH | VA | 23454 | 11/25/05 to 12/21/15 | Kindred Nursing Centers East, LLC | Exhibit 2 |
| 505204 | QUEEN ANNE HEALTHCARE | 2717 DEXTER AVENUE NORTH | SEATTLE | WA | 98109 | 11/25/05 to 4/9/13 | | Exhibit 2 |
| 505206 | KINDRED TRANSITIONAL CARE & REHAB CTR VANCOUVER | 400 EAST 33RD STREET | VANCOUVER | WA | 98663 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |

| Provider # | Kindred Nursing Home Name | Address | City | State | Zip | Applicable Kindred Ownership Dates (During Reviewed Period) | Kindred's Wholly-Owned Designated Corporate Operator | Facility Exhibit Designation |
|---|---|---|---|---|---|---|---|---|
| 505214 | KINDRED NURSING AND REHABILITATION - ARDEN | 16357 AURORA AVENUE NORTH | SEATTLE | WA | 98133 | 11/25/05 to 12/21/15 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 505223 | BELLINGHAM HEALTH CARE AND REHABILITATION SERVICE | 1200 BIRCHWOOD AVENUE | BELLINGHAM | WA | 98225 | 11/25/05 to 4/9/13 | | Exhibit 2 |
| 505294 | KINDRED TRANSITIONAL CARE & REHAB CTR - BEACON HILL | 128 BEACON HILL DRIVE | LONGVIEW | WA | 98632 | 11/25/05 to 6/30/14 | Kindred Nursing Centers West, LLC | Exhibit 2 |
| 525330 | KINDRED NURSING AND REHAB-MIDDLETON VILLAGE | 6201 ELMWOOD AVE | MIDDLETON | WI | 53562 | 11/25/05 to 6/30/14 | PersonaCare of Wisconsin, Inc. | Exhibit 2 |
| 525389 | KINDRED NURSING AND REHABILITATION-NORTH RIDGE | 1445 N 7TH ST | MANITOWOC | WI | 54220 | 11/25/05 to 5/31/14 | Kindred Nursing Centers, LP | Exhibit 2 |
| 525407 | FOX RIVER NURSING AND REHAB CENTER (COLONY OAKS CARE CENTER) | 601 N BRIARCLIFF DR | APPLETON | WI | 54915 | 11/25/05 to 2/1/13 | KINDRED NURSING CENTERS LIMITED PARTNERSHIP | Exhibit 2 |
| 525410 | KINDRED TRANSITIONAL CARE AND REHAB-EASTVIEW | 729 PARK ST | ANTIGO | WI | 54409 | 11/25/05 to 5/31/14 | Kindred Nursing Centers, LP | Exhibit 2 |
| 525481 | VALLHAVEN CARE CENTER | 125 BYRD AVE | NEENAH | WI | 54956 | 11/25/05 to 2/1/13 | | Exhibit 2 |
| 535037 | SAGE VIEW CARE CENTER | 1325 SAGE STREET | ROCK SPRINGS | WY | 82901 | 11/25/05 to 1/31/13 | | Exhibit 2 |