**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF GEORGIA, STATE OF INDIANA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTH OF MASSACHUSETTS, and COMMONWEALTH OF VIRGINIA, ex rel. TIMOTHY SIRLS,** | **CIVIL ACTION** |
| $\qquad$ **Plaintiffs,** | **NO.  16-683** |
| **v.** | |
| **KINDRED HEALTHCARE, INC., KINDRED HEALTHCARE OPERATING, INC., KINDRED HEALTHCARE SERVICES, INC., KINDRED NURSING CENTERS EAST, LLC, KINDRED NURSING CENTER WEST, LLC, KINDRED NURSING CENTERS SOUTH, LLC, and KINDRED NURSING CENTERS NORTH, LLC, ,** | |
| $\qquad$ **Defendants.** | |

**DuBois, J.**                                             **February 4, 2021**

# M E M O R A N D U M

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 2

   A.  Overview of the Medicare and Medicaid Systems .......................................... 3

   B.  First Amended Complaint.................................................................................. 5

   C.  Second Amended Complaint ............................................................................. 6

III. LEGAL STANDARDS ...................................................................................... 9

   A.  Rule 12(b)(1)..................................................................................................... 9

B.   Rule 12(b)(6) ........................................................................................... 10

C.   Rule 9(b) ................................................................................................. 11

IV.   DISCUSSION ............................................................................................... 11

A.   Applicable Law ....................................................................................... 11

B.   Staffing Requirements ........................................................................... 12

   i.   Materiality ..................................................................................... 12

   ii.   Scienter ......................................................................................... 15

   iii.   Public Disclosure Bar .................................................................. 16

      a.   Pre-March 23, 2010 Public Disclosure Bar ........................ 17

         1.   Relator's Allegations .................................................... 18

         2.   Original Source .............................................................. 21

      b.   Post-March 23, 2010 Public Disclosure Bar ...................... 22

         1.   Relator's Allegations .................................................... 23

         2.   Original Source .............................................................. 24

C.   Government Funding ............................................................................... 24

   i.   Falsity ........................................................................................... 25

   ii.   Materiality ..................................................................................... 26

D.   Form 1500s ............................................................................................. 27

E.   MDS Forms and Rule 9(b) ..................................................................... 27

F.   State Claims ............................................................................................ 28

   i.   RUG States ................................................................................... 28

   ii.   California, Tennessee, and Connecticut ....................................... 29

   iii.   Other States and Rule 9(b) ........................................................... 31

V.   CONCLUSION ............................................................................................. 32

## I.  INTRODUCTION

This is a *qui tam* action brought on behalf of the United States under the False Claims Act ("FCA") and on behalf of California, Colorado, Connecticut, Georgia, Indiana, Montana, Nevada, North Carolina, Tennessee, Washington, Wisconsin, Massachusetts, and Virginia under their analogous false claims laws[1] by relator, Timothy Sirls, against defendants Kindred Healthcare, Inc.; Kindred Healthcare Operating, Inc.; Kindred Healthcare Services, Inc.; Kindred Nursing Centers East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers South, LLC; and Kindred Nursing Centers North, LLC.  Presently before the Court is defendants' Motion to Dismiss relator's Second Amended Complaint ("SAC").  For the reasons set forth below, defendants' Motion is granted in part and denied in part.

---

[1] These claims are brought pursuant to the California False Claims Act, Cal. Gov't Code § 12651(a)(1) (Count 3); Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (l)(a)-(b) (Counts 4 & 5); Connecticut False Claims Act, Conn. Gen. Stat. § 17B-301b(a)(1)-(2) (Counts 6 & 7); Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.l(a)(1)-(2) (Counts 8 & 9); Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-12l(a)(1)-(2) (Counts 10 & 11); Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5-2(b)(1)-(2) (Counts 12 & 13); Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5(B)(a)(1)-(2) (Counts 14 & 15); Montana False Claims Act, Mont. Code Ann. § 17-8-403(1)(a)-(b) (Counts 16 & 17); Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(a)-(b) (Counts 18 & 19); North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(l)-(2) (Counts 20 & 21); Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(l)(A)-(B) and Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a)(1)-(2) (Counts 22 & 23); Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(1)-(2) (Counts 24 & 25); Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66.020(1)(a)-(b) (Counts 26 & 27); and Wisconsin False Claims Act, Wis. Stat. § 20.931(2)(a)-(b) (Counts 28 & 29).

## II.     BACKGROUND

The facts of this case are summarized in detail in the Court's Memorandum dated June 29, 2020 (Document No. 60) ("Memorandum Addressing Defendants' First Motion to Dismiss"). They are recited in this Memorandum only as necessary to address the pending Motion.[2]

Relator Timothy Sirls worked as the Director of Nursing Services at Heritage Manor Healthcare Center in Mayfield, Kentucky, between April 2014 and June 2014.  Second Amended Complaint ("SAC") ¶ 7.  Heritage Manor is a nursing facility that was operated by Kindred Nursing Centers, LP from November of 2005 to December of 2015.  SAC Ex. 1.  Kindred Nursing Centers, LP is one of several wholly-owned subsidiaries through which defendant Kindred Healthcare, Inc. operated a network of nursing facilities around the country.  SAC 1 n.1, ¶¶ 20-21.  Kindred Healthcare, Inc. is a healthcare services conglomerate that operates through its subsidiary companies in 46 states and Puerto Rico.  *Id.* ¶ 20.  Among those subsidiaries are defendants Kindred Nursing Centers East, LLC; Kindred Nursing Centers West, LLC; Kindred Nursing Centers North, LLC; and Kindred Nursing Centers South, LLC.  *Id.* ¶ 25.  These entities owned and operated nursing facilities identified by relator in exhibits attached to the SAC.  SAC Exs. 1, 2.  Each of these entities were owned by defendant Kindred Healthcare Operating, Inc., which itself is a subsidiary of Kindred Healthcare, Inc.  *Id.* ¶¶ 20-21, 25-28.

---

[2] Defendants filed a Request for Judicial Notice with their Motion to Dismiss (Document No. 67, filed August 25, 2020).  In evaluating a Motion to Dismiss, the Court may look beyond the pleadings to "items subject to judicial notice."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted).  Defendants specifically cite public records published by CMS, HHS, and the California Department of Health Care Services, a complaint filed in a prior lawsuit, and a news report.  Judicial notice of these documents is proper as the Court may take judicial notice of public records such as those issued by CMS, HHS, and the California Department of Health Care Services, and documents that are publicly filed on a court docket.  *See* Carroll v. Prothonotary, No. 08-1683, 2008 WL 5429622, at *2 (W.D. Pa. Dec. 31, 2008).  Courts may also take judicial notice of news reports to evaluate "what was in the public realm" at a given time.  S*ee* Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006).

### A.  Overview of the Medicare and Medicaid Systems

Medicare is a federal health insurance program administered by the Centers for Medicare & Medicaid Services ("CMS"), a division of the U.S. Department of Health and Human Services ("HHS") that, *inter alia*, provides federally-funded insurance benefits for skilled nursing facilities ("SNFs").  *See* 42 U.S.C. § 1395, *et seq.*  Medicare reimburses SNFs using a prospective payment system.  SAC ¶ 41.  The prospective payment system pays a *per diem*, per patient amount at a rate that is based on the Resource Utilization Group ("RUG") to which a resident is assigned.  *See United States v. Long Grove Manor, Inc.*, 315 F. Supp. 3d 1107, 1110 (N.D. Ill. 2018).  The RUG "uses measures of staff time and service frequency, variety, and duration to classify patients."  Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities, 63 Fed. Reg. 26,252, 26,258 (proposed May 12, 1998).  "RUG levels also consider a person's capacity to perform activities of daily living ('ADL') such as 'bed mobility, toilet use, transfer from bed to chair, and eating.'"  *United States v. Life Care Centers of America, Inc.*, 114 F. Supp. 3d 549, 553 (E.D. Tenn. 2014) (quoting 63 Fed. Reg. 26,252).

Skilled nursing facilities use a clinical assessment tool referred to as the Minimum Data Set ("MDS") to periodically determine each beneficiary's RUG classification.  *See* 42 C.F.R. §§ 413.337, 413.343.  An MDS assessment is completed for each resident upon admission to a facility and periodically throughout the resident's stay.  *See* 42 C.F.R. §§ 413.337, 413.343, 483.20.  To conduct these assessments, facility staff evaluate the preceding seven days—the "look-back period"—and report the resident's self-performance of ADLs, as well as the level of staff assistance that was required by and provided to the resident.  Defs.' Req. Judicial Notice Ex. A, Centers for Medicare & Medicaid Services, *Long-Term Care Facility Resident Assessment Instrument User's Manual Version 3.0* (Oct. 25, 2013), at G-3.  Skilled nursing

facilities are instructed to identify "what the resident does for himself during each episode of each ADL activity definition as well as the type and level of staff assistance provided." *Id.* These facilities are specifically instructed to code for the most support provided by staff over the course of the look-back period—"even if that level of support only occurred once." *Id.* This information is specifically coded in Section G of the MDS form. *Id.* According to relator, such facilities expressly certify in each MDS form that "the accompanying information accurately reflects resident assessment information." SAC ¶¶ 37, 61.

Medicaid is a health insurance program for low-income people that is jointly funded by the federal and state governments. *See* 42 U.S.C. § 1396, *et seq.* Medicaid covers long-term care in nursing facilities.[3] *Id.* § 1396a. Both federal and state statutes and regulations apply to the state-administered Medicaid programs. *See id.*

Each state Medicaid program has its own payment system. SAC ¶ 41. As such, Medicaid reimbursement for nursing facilities varies from state to state. Relator alleges that the Medicaid programs in Colorado, Georgia, Indiana, Massachusetts, Montana, Nevada, North Carolina, Virginia, Washington, and Wisconsin mirror the Medicare reimbursement system by adjusting the *per diem* rate based on the facilities case-mix index. *Id.* ¶ 134. According to relator, "[i]n a case-mix adjusted payment system, the amount of reimbursement to a nursing home is based on the resource intensity of the resident as measured by items on the MDS, including in Section G." *Id.* ¶ 135. Relator claims that the remaining states—California,

---

[3] Relator avers that all nursing homes specifically listed in the SAC qualified as both "skilled nursing facilities" covered by Medicare and "nursing facilities" covered by Medicaid. SAC ¶ 29; *see also Northport Health Servs. of Ark., LLC v. United States Dep't of Health & Human Servs.*, No. 19-5168, 2020 WL 1696009, at *1 n.2 (W.D. Ark. April 7, 2020) ("The Medicare statute refers to 'skilled nursing facilities,' and the Medicaid statute refers to 'nursing facilities.' Despite this difference in terminology, the requirements placed on these facilities by each statute are materially identical"). The Court will use the terms "SNF" or "facility" to refer to the facilities referenced in the SAC.

Connecticut, and Tennessee—have Medicaid programs that also pay nursing facilities a *per diem*

rate but "do not use a case mix index in making adjustments to the *per diem* rate." *Id.* ¶ 42.

**B. First Amended Complaint**

Relator filed the First Amended Complaint ("FAC") on June 28, 2019 (Document

No. 18).  In it, he alleged defendants exerted "top down" pressure on their nursing facilities to

"recruit residents with high acuity levels (i.e. residents who were extremely dependent upon staff

for their most basic care needs)" while intentionally understaffing the facilities in order to "reap

higher Medicare and Medicaid reimbursements."  First Amend. Compl. ("FAC") ¶¶ 2, 7.

According to relator, defendants thus engaged in a "nationwide false claim scheme . . . to obtain

payment from Medicare and Medicaid for necessary resident care that it claimed to have

provided but, in fact, did not provide." *Id.* ¶ 1.  Relator alleged that as a result, from at least

2008 to the filing of the FAC, defendants knowingly presented or caused to be presented false or

fraudulent claims and certifications through the submission of "false claims for [prospective

payment system] payments for thousands of nursing home residents." *Id.* ¶ 114.

Relator alleged in the FAC defendants defrauded the Medicare and Medicaid

reimbursement systems in four ways: (1) by submitting false RUG scores on forms for

reimbursement; (2) by expressly certifying the accuracy of those forms; (3) by understaffing

SNFs to the extent that they could not meet the needs of residents, in violation of federal and

state regulations, while expressly/impliedly certifying that the SNFs were in compliance with

those regulations; and (4) by using government reimbursement funds to expand defendants'

companies while providing inadequate care to residents and expressly/impliedly certifying that

they were in compliance with regulations that require they used government funds to ensure

residents' needs were adequately met.

Defendants filed a Motion to Dismiss the FAC on August 22, 2019 (Document No. 48). The Court granted in part and denied in part that Motion, ruling, *inter alia*:

1. The Public Disclosure Bar does not apply to relator's claims based on theories of factual falsity for inflated RUG scores and express legal falsity for certification of accuracy of MDS Forms;

2. Relator failed to state a claim under a theory of express/implied legal falsity for compliance with staffing requirements on the ground that he did not adequately allege that compliance with staffing requirements was material to the Government's payment decision;

3. Relator failed to state a claim under a theory of express/implied legal falsity for compliance with regulations on the use of government funds on the ground that the claim was not based on violations of a statute or a regulation regarding the use of government funds; and

4. Relator failed to state claims under the false claims laws of California, Connecticut, and Tennessee on the ground that he did not allege how those states calculate Medicaid reimbursement or that defendants provided false information to those states.

*See United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431 (E.D. Pa. 2020).

### C.  Second Amended Complaint

Relator filed the Second Amended Complaint on July 14, 2020, supplementing his allegations with additional facts related to staffing requirements, restrictions on the use of government funds, Form 1500s, and California, Tennessee, and Connecticut's Medicaid reimbursement systems.

First, relator added the following allegations in support of his claim that staffing

requirements are material to the Government's reimbursement decision:

1.  Two examples of CMS denying prospective payments to SNFs that were "found to
    have significant and pervasive staffing violations of the kind described here," SAC
    ¶ 125-1(c)[4];

2.  Five examples of cases in which the government has prosecuted FCA claims related
    to Medicare, SAC ¶ 124;

3.  The Office of Inspector General of Health and Human Services ("OIG")'s
    Compliance Program Guidance for Nursing Facilities, which states that SNFs can
    face penalties including criminal sanctions, suspension of Medicare payments,
    exclusion from program participation, and execution of a corporate integrity
    agreement for violating regulations, SAC ¶ 125-1(a); and

4.  A report published by OIG titled "Incidents of Potential Abuse and Neglect at Skilled
    Nursing Facilities Were Not Always Reported and Investigated," which states "CMS
    developed the Conditions of Participation (CoPs) that healthcare organizations must
    meet to start and continue participating in Medicare and Medicaid, that these CoPs
    establish health and safety standards, which are the foundation for improving quality
    and protecting the health and safety of beneficiaries," SAC ¶ 125-1(b).

Second, relator added allegations to support the theory of express/implied certification of

compliance with regulations governing the use of government funds.  The SAC changed a

citation to the regulation governing "nursing home allocation and use of government funds."

SAC ¶ 131.  The newly-cited regulation provides, in pertinent part, "A facility must be

---

[4] Due to a typographical error, the SAC has two paragraphs numbered 125.  The Court refers to the first of these two paragraphs as "¶ 125-1" and the second as "¶ 125-2."

administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident." 42 C.F.R. § 483.70.  Relator added allegations that this regulation is material to the Government's reimbursement decision through two examples of situations in which the Government has pursued unjust enrichment causes of action.

Third, relator added allegations that defendants falsely certified the accuracy of CMS-1500 Forms ("Form 1500s").  The FAC did not include an allegation that the submission of Form 1500s involves an express certification that the forms are accurate.  As such, when relator raised this argument in his Response to Defendant's Motion to Dismiss Relator's First Amended Complaint, the Court did not address it.  In the SAC, relator included allegations that the Form 1500s included an express certification of accuracy.

Fourth, relator added facts to support his allegations that defendants submitted false Medicaid claims to California, Tennessee, and Connecticut.  The SAC alleges that California's Medicaid Plan "requires that nursing facilities be reimbursed in part based on resident acuity" and cites to Attachment 4.19 D to California's State Medicaid Plan.  SAC ¶ 43.  It further alleges that SNFs must meet state and federal requirements in order to receive reimbursement.  *Id.* Similarly, the SAC states that Tennessee's Medicaid Plan "requires that all nursing facilities participating in the Medicaid program meet all applicable federal and state requirements for Medicaid reimbursement, and further requires that nursing facilities are reimbursed on the basis of patient acuity" and cites to Attachment 4.19 D to Tennessee's State Medicaid Plan.  *Id.* ¶ 45. Finally, on this issue, the SAC avers that, "[i]n Connecticut, similar to the federal law, Connecticut's Public Health Code requires each nursing home to employ sufficient nursing and nurse aides to provide appropriate care of patients housed in the facility 24-hours per day, seven

days a week, and requires that all nursing homes meet these staffing requirements for Medicaid

reimbursement." *Id.* ¶ 43 (internal quotations omitted).

Defendants filed a Motion to Dismiss Second Amended Complaint on August 25, 2020.

(Document No. 66).  Relator filed his Response on October 6, 2020 (Document No. 68), and

defendants filed a Reply on October 27, 2020 (Document No. 72).  The United States filed a

Statement of Interest under 31 U.S.C. § 3730(d) on December 15, 2020 (Document No. 77).  The

Motion is thus ripe for decision.

## III.   LEGAL STANDARDS

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint

for "lack of jurisdiction over the subject matter" of a case.  The plaintiff has the burden of

establishing subject matter jurisdiction.  *See Carpet Group Int'l v. Oriental Rug Imp. Ass'n*, 227

F.3d 62, 69 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891

(3d Cir. 1977)).  "Without jurisdiction the court cannot proceed at all in any case." *Steel Co. v.

Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted).

In evaluating a Rule 12(b)(1) motion, the Court must first determine whether the motion

"presents a 'facial' attack or a 'factual' attack." *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312,

320 (3d Cir. 2018).  A facial attack "considers a claim on its face and asserts that it is insufficient

to invoke the subject matter jurisdiction of the court." *Id.*  When ruling on a facial attack, the

Court "considers only the complaint, viewing it in the light most favorable to the plaintiff." *Id.*

By contrast, a factual attack is an argument that challenges the "factual allegations underlying

the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise

presenting competing facts.'" *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).  When

ruling on a factual attack, the Court weighs the evidence and must satisfy itself as to the existence of its power to hear the case. *Id.* To the extent that defendants' Motion to Dismiss seeks dismissal of relator's claims based on the FCA's public disclosure bar, the Motion presents a factual challenge because defendants argue additional facts—namely, public disclosures— establish that the Court lacks jurisdiction over the claims pursuant to 31 U.S.C. § 3730(e)(4).

## B. Rule 12(b)(6)

The purpose of a 12(b)(6) motion to dismiss is to test the legal sufficiency of the complaint. *Liou v. Le Reve Rittenhouse Spa, LLC*, No. CV 18-5279, 2019 WL 1405846, at *2 (E.D. Pa. Mar. 28, 2019) (DuBois, J.). To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In assessing the plausibility of a plaintiff's claims, a district court first identifies those allegations that constitute nothing more than mere "legal conclusions" or "naked assertion[s]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 564 (2007). Such allegations are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The Court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief. *Id.* at 680. "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of

public record, orders, [and] items appearing in the record of the case.'"  *Buck*, 452 F.3d at 260

(quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed.

2004)).

### C.  Rule 9(b)

FCA relators are required to satisfy Rule 9(b)'s heightened pleading standard.  The Third

Circuit has held that "it is sufficient for a plaintiff to allege 'particular details of a scheme to

submit false claims paired with reliable indicia that lead to a strong inference that claims were

actually submitted.'"  *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014)

(quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).  A

relator is not required to show "the exact content of the false claims in question" to survive a

motion to dismiss, *id.*, but must allege "all of the essential factual background that would

accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and

how of the events at issue,"  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812

F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d

198, 217 (3d Cir. 2002)).

## IV.   DISCUSSION

### A.  Applicable Law

The FCA imposes liability upon a defendant who (1) "knowingly presents, or causes to

be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes,

uses, or causes to be made or used, a false record or statement material to a false or fraudulent

claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  To plead an FCA violation, a relator must allege three

elements: causation, falsity, and scienter.  *United States ex rel. Jackson v. DePaul Health System*,

No. 15-020, 2020 WL 1875608, at *6 (E.D. Pa. April 15, 2020).  Since the Supreme Court

decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), the Third Circuit has held that a relator must also allege materiality—*i.e.*, that the alleged misrepresentation was material to the Government's payment decision.  *See United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 317-18 (3d Cir. 2019) ("[M]ateriality is an element of all FCA claims").

### B.  Staffing Requirements

Relator alleges defendants defrauded the Government through the Medicaid and Medicare systems by intentionally understaffing its SNFs to the extent they could not provide the necessary level of care, as required by federal regulations, while falsely certifying that they were in compliance with those regulations.  In the Memorandum Addressing Defendants' First Motion to Dismiss, the Court held that relator had properly pled the causation and falsity elements of this theory.  *Kindred Healthcare,* 469 F. Supp. 3d at 444-48.  However, the Court also ruled that relator failed to allege that compliance with staffing requirements was material to the government's payment decision.  *Id.*  In the SAC, relator added allegations as to materiality.

#### i.    Materiality

Defendants argue that relator has still not adequately alleged that compliance with the staffing requirements was material to the Government's payment decision.  Defs.' Mot. 12-17.  In *Escobar*, the Supreme Court affirmed that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Escobar*, 136 S. Ct. at 2002.[5]  The Supreme Court further held that a "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or

---

[5] The Supreme Court made clear that the materiality inquiry is "demanding" but not "too fact intensive" for courts to apply at the dismissal stage.  *Escobar*, 136 S. Ct. at 2003, 2004 n.6.

contractual requirement as a condition of payment." *Escobar*, 136 S. Ct. at 2003. While such a label is "relevant," it is not dispositive. *Id.* On this issue, the Supreme Court rejected the argument that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004.

In *Escobar*, the Supreme Court focused the materiality inquiry on the "effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2003 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). Courts should consider "evidence that the defendant knows that the Government consistently refuses to pay claims . . . based on noncompliance with the particular statutory, regulatory, or contractual requirement." [6] *Escobar*, 136 S. Ct. at 2003. "Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.*

In the SAC, relator added four categories of allegations that compliance with staffing requirements is material to the Government's payment decision.[7] In response, defendants argue that: (1) relator's new allegations are not relevant to this case; (2) relator pleads that federal regulations are "conditions of participation," not "conditions of payment," and conditions of participation are not material; and (3) the Government's decision not to intervene weighs against materiality. The Court considers each argument in turn.

First, the SAC includes, *inter alia*, two examples of CMS denying payments to SNFs "found to have significant and pervasive staffing violations of the kind described here." SAC ¶ 125-1(c). Defendants argue this does not demonstrate materiality because (1) relator has not

---

[6] The Court construes this statement in *Escobar* as requiring allegations, not evidence.
[7] *See* Page 9, *supra*.

alleged what the staffing violations were or that those staffing violations were relevant to CMS'
decision to terminate benefits and (2) because the examples involved the prospective, rather than
retrospective, denial of payments.

The Court disagrees with defendants' first argument.  The SAC alleges compliance with
staffing requirements is material to the Government's payment decision because CMS has denied
"payments to nursing homes that are found to have significant and pervasive staffing violations
of the kind described here" and identifies the two SNFs.  ¶ 125-1(c).  Relator has, therefore,
properly alleged that the Government refuses to pay claims "based on noncompliance with the
particular statutory, regulatory, or contractual requirement."  *Escobar*, 136 S. Ct. at 2003.

The Court also disagrees with defendants' second argument.  The FCA does not draw a
distinction between prospective denial of payments and retroactive recoupment of payments.
"Material" means "having a natural tendency to influence, or be capable of influencing, the
payment or receipt of money or property."  *Escobar*, 136 S. Ct. at 2002.  This definition does not
draw a distinction between prospective and retroactive payments, and defendants cite no
authority to the contrary.  As such, relator has adequately alleged that defendants knew
compliance with the staffing requirements was a material condition of participating in the
Medicare and Medicaid programs.[8]

Second, defendants contend conditions of participation are different than conditions of
payment, and the fact that the federal regulations identify staffing regulations as conditions of
participation weighs against materiality.  *See* 42 C.F.R. § 483.1(b) ("The provisions of this part
[determine] whether a facility meets the requirements for participation in Medicare and

---

[8] Defendants also aver that relator's other allegations in the SAC are not relevant to establish materiality.  The Court
need not consider these allegations individually in view of the Court's ruling that relator's two examples of CMS'
denial of payments are sufficient.

Medicaid.").  This argument is unconvincing in view of the rejection by the Supreme Court in *Escobar* of the claim that such a designation is dispositive.  *Escobar*, 136 S. Ct. at 2003-04.

Third, defendants cite the Memorandum Addressing Defendants' First Motion to Dismiss to argue the fact that the Government did not intervene in this case weighs against materiality. Defs.' Mot. 17.  The United States filed a Statement of Interest in response to this argument, arguing that the Court should not interpret the Government's decision not to intervene as weighing against materiality.  In it, the United States states that "there are a myriad of reasons why the government may decline to intervene in an FCA action" and that interpreting a decision not to intervene as meaning the falsity was immaterial is "antithetical to the text and purpose of the qui tam provision of the FCA."  Gov't's Statement of Interest 2-3 (internal quotations omitted).  The Court finds the argument of the United States convincing and does not consider the Government's decision not to intervene as weighing against materiality.  *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 144 n.3 (E.D. Pa. 2012) (following the "overwhelming weight of authority" and agreeing with the Government's argument in its Statement of Interest that the "decision not to intervene should not be interpreted as a comment on the merits of [p]laintiff's claims").

        *ii.*    *Scienter*

Defendants do not argue that relator has failed to plead the scienter element of this claim. Relator has adequately pled this element because he alleges that "Kindred knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in [] MDS forms," yet "knowingly and methodically presented, or caused to be presented, false or fraudulent claims for payment."  SAC ¶¶ 10, 126.

###### iii.   Public Disclosure Bar

Defendants argue that relator's theory of express/implied certification of compliance with staffing requirements is precluded by the public disclosure bar.  The FCA's public disclosure bar provides that a *qui tam* suit shall be dismissed "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless "the person bringing the action is an original source of the information."[9]  31 U.S.C. § 3730(e)(4).

The Third Circuit has explained the public disclosure bar in the form of an equation: "X + Y = Z," where "Z represents the allegation of fraud and X and Y represent its essential elements."  *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 236 (3d Cir. 2013).  Specifically, X represents the set of "misrepresented facts," and Y represents the set of "true facts."  *Id.*  "In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed."  *Id.*  "Where the fraud has been publicly disclosed—either because the public documents set out the allegation of fraud itself [Z] or its essential elements [X+Y]—a relator's claim will be barred."  *United States v. Omnicare, Inc.*, 903 F.3d 78, 84 (3d Cir. 2018); *see also United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 519 (3d Cir. 2007) ("To be 'based upon' the publicly revealed allegations or transactions the complaint need only be 'supported by' or 'substantially similar to' the disclosed allegations and transactions.").

Under relator's theory, X represents defendants' compliance with federal staffing regulations that require SNFs to staff their facilities so as to enable them to provide adequate

---

[9] Defendants aver that "[a]ll of the State FCAs at issue here all include a public disclosure bar, and Defendants likewise move under those bars."  Defs.' Mot. 18 n.17.  Cal. Gov't Code § 12652(d)(3)(A); Colo. Rev. Stat. § 25.5-4-306; Conn. Gen. Stat. § 4-282; Ga. Code Ann. § 49-4-168.2; Ga. Code Ann. § 23-3-122; Ind. Code Ann. § 5-11-5.5-7; Ind. Code Ann. § 5-11-5.5-6; Mass. Ann. Laws ch. 12, § 5G; Mont. Code Ann. § 17-8-403; Nev. Rev. Stat. Ann. § 357.100; N.H. Rev. Stat. Ann. § 167:61-e; N.C. Gen. Stat. § 1-611; Tenn. Code Ann. § 4-18-104; Va. Code Ann. § 8.01-216.8; Wash. Rev. Code Ann. § 74.66.080.

care, and Y represents the allegation that defendants' SNFs were understaffing the SNFs. Therefore, Z, the fraud itself, represents defendant's alleged scheme to intentionally understaff its SNFs in violation of federal regulations while certifying that it complied with the regulations.

The requirements of the public disclosure bar were amended on March 23, 2010. The amendment is not retroactive, and so "claims based on conduct occurring before March 23, 2010 are still governed under the prior jurisdictional version of the statute." *Omnicare*, 903 F.3d at 83 n.5. Because the SAC alleges defendants' fraud spans from 2008 to the filing of the FAC, the allegations span both versions of the public disclosure bar. As such, the Court considers both versions.

a. Pre-March 23, 2010 Public Disclosure Bar

Prior to the 2010 amendment, the public disclosure bar was jurisdictional, raised in the form of a motion to dismiss under Rule 12(b)(1). *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013). The particular sources of public disclosures that trigger the pre-March 23, 2010 bar are: (1) "criminal, civil, or administrative hearing"; (2) "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation"; and (3) "the news media." 31 U.S.C. § 3730(e)(4)(A) (2006).

An FCA relator can overcome the pre-March 23, 2010 public disclosure bar by establishing that he is an original source of the information. To do so, a relator must demonstrate that he is an independent and direct source of his allegations. *Zizic*, 728 F.3d at 239. Knowledge is independent if it "does not depend on public disclosures" and direct if "he obtains it without any intervening agency, instrumentality, or influence." *Id.* at 239-40. Relator "bears the burden of demonstrating that he is an original source." *United States ex rel. Judd v. Quest Diagnostics, Inc.*, 638 Fed. App'x 162, 167 (3rd Cir. 2015).

1.   Relator's Allegations

The Court first considers whether the public disclosure bar applies to relator's claims of allegations of conduct occurring prior to the amendment.  In their pending Motion to Dismiss, defendants incorporate by reference their arguments on this issue presented in their Motion to Dismiss the FAC (Document No. 48, filed August 22, 2019) ("First Mot."). [10]

First, defendants contend that the level of staffing at their facilities "relative to resident acuity and case-mix" is "routinely disclosed in federal administrative investigations and reports." First Mot. 25.  Defendants point out that "both staffing and acuity data is reported to the Government, synthesized by CMS, and publicly disclosed on CMS' Nursing Home Compare website."  *Id.* at 26.  Defendants argue that CMS "uses RUG data to allow it compare the 'expected' number of nursing hours for a SNF against the actual hours reported by the SNF" and "[t]he ratio of these two numbers is then multiplied by a national average . . . enabling comparisons between facilities."  *Id.*  Defendants further argue that "any staffing issues" were "disclosed to the government" through the government's annual surveys conducted by CMS in coordination with the state governments.  *Id.* at 27.  Defendants also cite CMS' 2001 report to Congress as publicly disclosing "the philosophy that Relator pushes here"—that "high staffing leads to better care."  *Id.*

Second, defendants contend that relator's Amended Complaint merely "parrots information previously disclosed in civil hearings, in some cases directly quoting from publicly

---

[10] In the Court's Memorandum Addressing Defendants' First Motion to Dismiss, the Court considered the public disclosures defendants presented.  Because the Court held that relator failed to allege materiality of staffing requirements, the Court did not address whether the public disclosure bar applies to this theory of fraud.  However, after reviewing defendant's sources in its analysis of the effect of the public disclosure bar on relator's other claims at issue in defendants' Motion to Dismiss the FAC, the Court observed "the sources cited by defendants broadly disclose staffing issues and defendants' failure to staff based on resident acuity."  *Kindred Healthcare*, 469 F. Supp. 3d at 458.

disclosed materials, including depositions transcripts and affidavits." First Mot. 28. Defendants

cite two actions that trigger the public disclosure bar in this case: *Walsh v. Kindred Healthcare*,

No. 11-00050 (N.D. Cal. 2011); *Sande v. Kindred Healthcare, Inc., et al.*, No. 10-00329 (W.D.

Wa. 2010).[11]   In the Memorandum Addressing Defendants' First Motion to Dismiss, the Court

summarized these cases as follows:

> *Walsh* was a class action that alleged that various Kindred
> entities including Kindred Healthcare, Inc., Kindred Operating, Inc.
> and Kindred Nursing Centers West, L.L.C. had not "provided
> sufficient staffing of nurses at skilled nursing facilities . . . in
> California" in accordance with California's specific staffing
> requirements for nursing facilities. *See Walsh v. Kindred
> Healthcare*, 798 F. Supp. 2d 1073, 1079 (N.D. Cal. 2011). The
> plaintiffs averred that defendants failed to maintain "statutorily-
> mandated nursing staff levels" and, as a result, the plaintiffs
> "suffered several indignities and other harms as a result of
> inadequate nurse staffing." *Id.*
>
> *Sande* was a malpractice action brought against Kindred
> Healthcare, Inc., Kindred Healthcare Operating, Inc., Kindred
> Healthcare Services, Inc., Kindred Nursing Centers West, LLC, and
> certain other entities and employees. *See* [Defs.' Req. Judicial
> Notice for First Mot. (Document No. 49, filed August 22, 2019)] Ex.
> A, First Amended Complaint, *Sande v. Kindred Healthcare, Inc., et
> al.*, No. 2:10-cv-00329-JLR (W.D. Wa. 2010). The *Sande* plaintiff
> also alleged that defendants directed a single facility "to maximize
> revenues by: (a) increasing its occupancy rates/census by targeting
> high acuity, high rate of pay residents even though the needs of such
> residents exceeded the care capabilities of the nursing home's
> employees; and (b) staffing it with dangerously low numbers of
> competent direct care givers." [First Mot.] 36. The *Sande* plaintiff
> similarly alleged that defendants "refused to implement policies,
> procedures and systems to ensure that: (a) the acuity levels and
> needs of residents were consistent with the numbers and
> qualifications of direct caregivers; and (b) needed care and treatment
> was provided in accordance with laws and professional standards."
> *Id.* at 39.

---

[11] Defendants also cite *Duffy v. Kindred Hosps. East, LLC*, No. 03-6655 (E.D. Pa. 2004). As the Court held in the Memorandum on Defendants' First Motion to Dismiss, however, "*Duffy* was initiated in 2003 and therefore predates the particular staffing policy at issue in this case, which relator alleges was implemented in April of 2006." *Kindred Healthcare*, 469 F. Supp. 3d at 456-57/

Third, defendants contend that staffing issues at their facilities "have been disclosed by the news media and online." First Mot. 29. Defendants cite news sources reporting the settlement of the *Walsh* class action mentioned above.[12] *Id.* at 30.

The Court concludes these three sources reveal information that is "substantially similar to" relator's allegations such that they trigger application of the public disclosure bar. *Zizic,* 728 F.3d at 237. The federal administrative investigations and reports broadly disclose the staffing levels at defendants' SNFs and how those levels compare to other SNFs. The plaintiffs in *Walsh* alleged that defendants' staffing levels were so low that they caused residents to suffer indignities and harm. The plaintiff in *Sande* alleged that defendants recruited high-acuity residents but refused to staff based on resident acuity level in order to maximize revenues at the involved SNF. Taken together, these allegations "broadly disclose staffing issues and defendants' failure to staff based on resident acuity." *Kindred Healthcare*, 469 F. Supp. 3d at 458.

Relator's only argument that the public disclosure bar does not apply is that "no person other than Relator has alleged, accused, or even suggested that Defendant defrauded the Government through its staffing policy." Relator's Resp. 22. However, novelty of theory is insufficient to overcome the public disclosure bar when the fraud's essential elements have already been publicly disclosed. *United States v. Omnicare, Inc.*, 903 F.3d 78, 84 (3d Cir. 2018) ("Where the fraud has been publicly disclosed—either because the public documents set out the allegation of fraud itself [Z] or its essential elements [X+Y]—a relator's claim will be barred.").

---

[12] Defendants also cite an anonymous posting on an online forum—AllNurses.com—in which allegations of unsafe staffing ratios were described. The Court held in the Memorandum Addressing Defendants' First Motion to Dismiss that "anonymous posts themselves do not quality as news media." *Kindred Healthcare*, 469 F. Supp. 3d at 457 n.18.

The Court thus concludes the public disclosure bar applies to relator's claim under the theory of express/implied legal falsity for certification of compliance with staffing regulations.

### 2.   Original Source

Relator has not overcome the public disclosure bar by demonstrating that he is an original source of the allegations in the SAC.  Defendants argue that relator has not established that he is an independent and direct source because the SAC does not explain how relator learned of these allegations, but rather he "extensive[ly] reli[es] on depositions and affidavits from prior cases his attorneys have handled."  Defs.' Mot. 19.  In his Response, relator contends that he has independent and direct knowledge of his allegations in Paragraphs 2, 7, 8, 62-64, and 82 of the SAC but that is insufficient to overcome the public disclosure bar.  Relator's Resp. 23-24.  The Court agrees with defendants on this issue.

In the SAC, relator only alleges that his knowledge is "direct and independent." SAC ¶¶ 7, 14, 62, 63; *see also* SAC ¶¶ 8, 18 (alleging relator has "direct knowledge").  He does not explain how he learned this information, through either his involvement in the alleged fraud or through his own investigation.  *Judd*, 638 Fed. App'x at 168 (holding that relator's "bare assertion" he had firsthand knowledge of the defendants' fraudulent scheme was not sufficient to overcome the public disclosure bar because "[t]o establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint") (quoting *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999)).  As such, relator's bare legal conclusion that he is an independent and direct source of his allegations is not afforded a presumption of truth.  *Judd*, 638 Fed. App'x at 168.

The Court concludes that relator fails to establish that he is an original source of the information, and so he cannot overcome the pre-March 23, 2010 public disclosure bar. Defendants' Motion to Dismiss is granted as to relator's claim that defendants defrauded the Medicare system prior to March 23, 2010 by intentionally understaffing its SNFs in violation of federal regulations while expressly/impliedly certifying compliance with those regulations.

### b.  Post-March 23, 2010 Public Disclosure Bar

After the 2010 amendment, the public disclosure bar is raised by motion to dismiss under Rule 12(b)(6), as opposed to Rule 12(b)(1).  The FCA enumerates the particular sources of public disclosures: (1) "Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (2) "congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; and (3) "the news media." [13]  *Id.* § 3730(e)(4)(A)(i)-(iii).

For allegations of conduct after the amendment, an "original source" is defined as an individual who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  31 U.S.C. § 3730(e)(4)(B).  A relator cannot "merely mirror allegations that were already publicly disclosed."  *Omnicare*, 903 F.3d at 92.  Rather, the relator must materially add to the allegations by "contribut[ing] information – distinct from what was publicly disclosed – that adds in a significant way to the essential factual background: the who, what, when, where and how of the events at issue."  *Moore*, 812 F.3d at 306.

---

[13] The Third Circuit has held that one other change in the 2010 amendment—"that the relator's alleged fraud need only be 'substantially the same' as, rather than 'based on,' the publicly disclosed allegations or transactions in order to trigger the public disclosure bar—merely codified the law as it already existed in [the Third] Circuit."  *Omnicare*, 903 F.3d at 83.

1.   Relator's Allegations

The Court first considers whether the public disclosure bar applies to relator's allegations regarding conduct after March 23, 2010.  Because the 2010 amendment limited the use of civil actions as sources to those in which the Government or its agent was a party, the Court cannot consider *Walsh* and *Sande* in this analysis.  *Compare* 31 U.S.C. § 3730(e)(4)(A) (2006) to 31 U.S.C. § 3730(e)(4)(A)(i) (2010).

The Court concludes that the federal administrative investigations and reports and the news reports trigger the public disclosure bar as to this claim.  The news reports explain that residents of defendants' SNFs located in California filed a class action lawsuit alleging defendants failed to comply with state staffing requirements by providing less than 3.2 direct nursing hours per day.  Defs.' Req. Judicial Notice for First Mot. Ex. G.  "The class plaintiffs claimed that as a result of the understaffing, the facilities failed to provide the quality of care they claimed they would provide."  *Id.*  For example, "turnings were infrequent, resulting in pressure sores and other injuries; call lights were often ignored for extended periods of time; assistance was not provided for eating, dressing, and bathing; and proper fluids were not provided when needed."  Defs.' Req. Judicial Notice for First Mot. Ex. H.  The case involved allegations related to at least twenty-one SNFs and ultimately settled for over eight million dollars.  Defs.' Req. Judicial Notice for First Mot. Ex. J.  The federal reports show defendants' staffing levels for SNFs across the United States.  First Mot. 27.

The above facts are "substantially similar" to the facts alleged in support of relator's theory of fraud in this case.  Taken together, they reveal both the "X" and "Y" of this claim.  They reveal defendants' SNFs' staffing levels compared to resident acuity – the data defendants submitted to the Government – as well as allegations that those staffing levels led to inadequate

care.  The Court thus concludes the public disclosure bar applies to relator's claim of fraudulent certification of compliance with staffing regulations post-March 23, 2010.

### 2.   Original Source

As stated *supra*, relator fails establish that he is an independent source of the allegations contained in the SAC because he does not state how he learned the facts contained in the SAC. Accordingly, the Court need not consider whether relator's allegations materially add to the publicly disclosed facts.  Because relator has not established that he is an original source of the allegations, he is unable to overcome the amended public disclosure bar.  Accordingly, the Motion to Dismiss is granted as to relator's claims of false certification of compliance with staffing regulations after March 23, 2010.

### C.  Government Funding

Relator alleges defendants defrauded the Government through the Medicaid and Medicare systems by using reimbursed funds to grow their business while intentionally understaffing their facilities and falsely certifying they were in compliance with regulations that required defendants to use the funding to provide adequate care to its residents.  In the Memorandum Addressing Defendants' First Motion to Dismiss, the Court held that relator had properly pled the causation element of this theory.  *Kindred Healthcare*, 469 F. Supp. 3d at 444. However, the Court ruled in that Memorandum that relator failed to allege defendants' use of government funds was contrary to any regulations or compliance with such regulations was material to the Government's payment decision.  *Id.* at 19-20.  In the SAC, relator added allegations to address the falsity and materiality elements.

Defendants argue in the Motion to Dismiss the SAC that relator's new allegations are insufficient—they fail to adequately allege that regulations restricted the use of Government

24

funds or that any such restrictions were material to the Government's payment decision.  The Court addresses each argument in turn.

                  i.     *Falsity*

In the SAC, relator cites 42 C.F.R. § 483.70, which provides, "A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." SAC ¶ 131.  The regulation then includes a non-exhaustive list of "resources."  42 C.F.R. § 483.70(e)(2).  Defendants argue that, because the regulation does not expressly identify government funds as a "resource," these funds are not considered a "resource" under the regulation.  Defs.' Mot. 22.  Defendants also argue relator is "suggesting that this regulation applies a quantitative limit on any profits."  *Id.*  The Court disagrees with defendants on this issue.

The list of resources included in the regulation states that it is non-exhaustive.  *See* 42 C.F.R. § 483.70(e)(2) ("The facility's resources, *including but not limited to . . . .*") (emphasis added).  Therefore, the fact that government funds is not listed in the regulation is not fatal to relator's theory of fraud.  The Court also finds defendants' argument that relator attempts to plead there is a "quantitative limit on any profits" unconvincing.  Defs.' Mot. 22.  Relator does not make such an allegation.

Accordingly, relator has alleged that, by submitting forms certifying compliance with federal regulations, defendants falsely certified that they used their resources, including

government funds, to maintain the highest level of well-being of each resident, while knowingly providing substandard care.

### ii.    Materiality

Defendants argue the SAC does not state that compliance with this regulation, 42 C.F.R. § 483.70, is material to the Government's reimbursement decision.  Defs.' Mot. 22.  The SAC includes two examples of situations in which the Government has pursued unjust enrichment causes of action.  SAC ¶ 125-2.  The first is a case in which the defendants received reimbursement "for services that were not actually rendered, were upcoded, and/or were non-reimbursable medical services and procedures."  *United States ex rel. Borges v. Doctor's Case Medical Center., Inc.*, No. 01-8112-civ, 2007 WL 9702639 (S.D. Fla. Jan. 29, 2007).  The second is a press release from the Department of Justice detailing a case in which the defendant allegedly submitted claims for unnecessary medical services.  SAC ¶ 125-2.  Neither example involves allegations that the defendants failed to provide adequate care to patients, discusses how the defendants spent the government funds, or references 42 C.F.R. § 483.70.  The Court thus concludes that, in relying on these two unjust enrichment cases, relator fails to allege that the misuse of government funds in violation of 42 C.F.R. § 483.70 is material to the Government's reimbursement decisions.  For that reason, defendants' Motion to Dismiss is granted to the extent it seeks dismissal of relator's claims under a theory of express/implied certification of falsity with respect to compliance with the use of government funds. [14]

---

[14] Defendants also argue that the public disclosure bar precludes this claim.  Because relator has not alleged that the government funding regulation is material to the Government's payment decision, the Court need not address this issue.

### D.  Form 1500s

In the SAC, relator added allegations that defendants caused "tens of thousands of false" Form 1500s to be submitted to Medicare and Medicaid.  SAC ¶ 10.  Defendants argue this claim should be dismissed because Form 1500s are submitted by "physicians and other suppliers," not SNFs.  Defendants contend it is, therefore, impossible for them to have submitted "tens of thousands" of false Form 1500s, as they claim relator has alleged.

The Court rejects defendants' Form 1500s argument.  Relator does not allege that defendants themselves submitted false Form 1500s.  Rather, relator alleges that defendants "caused to be presented[] false or fraudulent claims" via the Form 1500s.  SAC ¶ 129.  Taking relator's allegations as true, he has alleged causation and falsity under a theory of express legal falsity for certification of accuracy of Form 1500s.  *See* 31 U.S.C. § 3729(a)(1)(A) (imposing False Claims Act liability if a defendant "knowingly presents, *or causes to be presented*, a false or fraudulent claim for payment or approval") (emphasis added).

Defendants do not argue that relator has failed to plead materiality or scienter with respect to the Form 1500s claim.  The Court concludes relator has adequately pled these two elements.  *See* SAC ¶ 10 ("Kindred knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in . . . the Form 1500s, and that the submission of . . . false representations in the Form 1500s may subject it to substantial criminal civil and administrative penalties.").  Accordingly, defendant's Motion to Dismiss is denied to the extent that it seeks dismissal of the Form 1500s claim.

### E.  MDS Forms and Rule 9(b)

In the Memorandum Addressing Defendants' First Motion to Dismiss, the Court rejected defendants' argument that relator had failed to satisfy Rule 9(b)'s heightened pleading standard

for his theories of factual falsity with respect to the RUG scores and express legal falsity with

respect to the MDS Forms' certification of accuracy.  *Kindred Healthcare*, 469 F. Supp. 3d at

452-53.  In the Motion to Dismiss, defendants attempt to reargue that issue by claiming the

express legal falsity theory is, in fact, a theory of factual falsity.  Defendants then state that Rule

9(b) is not met with respect to this alleged theory of factual falsity or relator's theory of factual

falsity in misreporting RUG scores.  The Court rejects these arguments, as they have already

been addressed and denied in the Court's Memorandum Addressing Defendants' First Motion to

Dismiss.

### F.  State Claims

#### i.    RUG States

Relator alleges that the Medicaid reimbursement systems in Colorado, Georgia, Indiana,

Montana, Nevada, North Carolina, Washington, Wisconsin, Massachusetts, and Virginia mirror

the Medicare reimbursement system by adjusting the *per diem* rate based on the facilities' case-

mix index, which is based, in part, on the RUG scores reported on the MDS Form.  SAC ¶ 137.

Defendants contend that, to the extent the Medicaid programs in these states utilize the same

RUG-based reimbursement methodology as Medicare, relator's Medicaid fraud claims under the

laws of those states (Counts 4, 5, 8-21, and 24-29) fail for the same reason as his FCA claims.

Defs.' Mot. 31.

The Court agrees that its decision as to claims under states' analogous false claims laws

must mirror those under the FCA.  Accordingly, defendants' Motion to Dismiss is granted to the

extent it seeks dismissal of relator's claims of fraud under theories of express/implied

compliance with staffing regulations and express/implied compliance with regulations on the use

of government reimbursement funds and denied to the extent it seeks dismissal of relator's

claims of fraud under theories of factual falsity in RUG scores and express falsity in certifying

accuracy of MDS forms and Form 1500s under the false claims laws of Colorado, Georgia,

Indiana, Montana, Nevada, North Carolina, Washington, Wisconsin, Massachusetts, and

Virginia.

ii.     *California, Tennessee, and Connecticut*

Defendants contend that relator's allegations with respect to the California, Tennessee,

and Connecticut Medicaid reimbursement systems are insufficient to state claims under the false

claims laws of those states because "[r]elator has not pleaded any facts to support that

Defendants' practices in th[ose] particular state[s] violated the state Medicaid program's

reimbursement rules."  Defs.' Mot. 31.  In the SAC, relator alleges that these states'

reimbursement systems "contain certain requirements that render them functionally equivalent to

the other states at issue since reimbursement in each state is premised upon patient acuity and/or

the requirements of adequate staffing."  SAC ¶ 42.  In his Response, however, relator admits that

"RUG scores may not directly impact reimbursement rates" in these states but avers that "these

states nonetheless require a level of care which Kindred uniformly failed to meet."  Relator's

Resp. 31.  The Court agrees with defendants on this issue on the ground that relator has not

alleged that defendants falsified any forms submitted to these states' Medicaid programs.

California's state Medicaid plan provides for facility-specific reimbursement rates based

on patient acuity and staffing levels at SNFs.  SAC ¶ 43 (citing Cal Welf. & Inst. Code

§ 14126.02).  However, relator does not identify any paperwork or data that California uses to

calculate these metrics or allege that such paperwork was falsified.  The Court thus concludes

that, because relator does not allege that California relied on falsified RUG scores, MDS Forms,

or Form 1500s in determining its reimbursement rates or that defendants falsified audited or

reviewed cost data that California used to calculate its facility-specific reimbursement rates, relator does not adequately allege that defendants submitted false Medicaid claims to California.

Relator alleges that Tennessee's state Medicaid plan reimburses SNFs "on the basis of patient acuity."  SAC ¶ 45.  In support of this allegation in the SAC, relator cites to a publication that details a two-level reimbursement system in which residents are identified as "Level 1" or "Level 2" acuity.  Attachment 4.19 D to Tennessee's State Medicaid Plan at 740, https://www.tn.gov/content/dam/tn/tenncare/documents2/4-19-d.pdf.  However, neither relator nor the sources relator cites identify the paperwork or process for assigning an acuity level for residents.  The Court thus concludes that, because relator does not allege that Tennessee relied on falsified RUG scores, MDS Forms, or Form 1500s in determining its reimbursement rates or that defendants falsified any other forms used by Tennessee to calculate resident acuity level, relator has failed to adequately allege that defendants submitted false Medicaid claims to Tennessee.

The SAC includes no new allegations as to how Connecticut calculates reimbursement rates.  The SAC only alleges that the Connecticut "Medicaid program[] also pay[s] NFs a per diem rate but do[es] not use a case mix index in making adjustments to the per diem rate." SAC ¶ 42.  The SAC does not include any allegations as to how Connecticut calculates its *per diem* rate.  Moreover, relator has not alleged that defendants' conduct fraudulently affected Connecticut's reimbursement decisions.  As such, relator has failed to state a claim under Connecticut's false claims statute.

For all of the foregoing reasons, defendants' Motion to Dismiss is granted to the extent it seeks dismissal of relator's claims of fraud on the Medicaid systems of California, Tennessee, and Connecticut (Counts 3, 6, 7, 22, and 23).

30

iii.       *Other States and Rule 9(b)*

Defendants argue that, in the SAC, relator is "trying to loop in federal FCA causes of action for all 50 states." Defs.' Mot. 30. Specifically, relator alleges:

1. "Medicare and the California, Colorado, Connecticut, Georgia, Indiana, Massachusetts, Montana, Nevada, North Carolina, Tennessee, Vermont, Virginia, Washington, and Wisconsin Medicaid programs, *as well as the other Medicaid programs in the United States*, paid Kindred and other nursing home providers a predetermined daily amount in a per resident, per day basis." ¶ 133 (emphasis added).

2. "California, Colorado, Connecticut, Georgia, Indiana, Massachusetts, Montana Nevada, North Carolina, Tennessee, Vermont, Virginia, Washington, and Wisconsin Medicaid programs, *as well as other Medicaid programs in the United States*, use a similar per diem payment system." ¶ 134 (emphasis added).

Defendants argue Rule 9(b) requires dismissal of any federal FCA causes of action for Medicaid claims or any state causes of action for non-plaintiff states.  It is unclear from the SAC whether plaintiff is actually asserting causes of action for all fifty states.  If so, the Court agrees with defendants on this issue.

As a preliminary matter, the SAC does not identify claims by any states other than the named states.  Further, just as relator failed to state a claim on behalf of California, Connecticut, and Tennessee—the three named states that do not use RUG-based reimbursement systems— relator fails to state a claim by any of these other states because he does not allege how these states calculate their Medicaid reimbursement payments. Accordingly, to the extent relator attempts to include a federal FCA cause of action or state cause of actions for unnamed states, the Motion to Dismiss is granted.

## V.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' Motion to Dismiss.  The Motion is granted to the extent it seeks dismissal of relator's claims of fraud under the FCA and the analogous false claims laws of Colorado, Georgia, Indiana, Montana, Nevada, North Carolina, Washington, Wisconsin, Massachusetts, and Virginia under express/implied theories of legal falsity in certifying compliance with staffing regulations and regulations governing the use of government reimbursement funds.  The Motion is also granted to the extent it seeks dismissal of relator's claims under the false claims laws of California, Tennessee, and Connecticut.  Further, to the extent relator attempts to state federal FCA or state false claims laws claims on behalf of unnamed states, the Motion is granted.  The Motion is denied to the extent it seeks dismissal of relator's claims of fraud under theories of false certification of accuracy of Form 1500s, false certification of accuracy of MDS Forms, and falsification of RUG scores.  All of the above dismissals of relator's claims are with prejudice on the ground that, because relator has filed two amended complaints, the Court concludes that further amendment would be futile. *See Buoniconti v. City of Philadelphia*, No. 15-cv-3787, 2016 WL 723527, at *12 (E.D. Pa. Dec. 13, 2016).

Relator's remaining claims are as follows: (1) claims based on the alleged express false certifications of accuracy in MDS forms and Form 1500s and (2) claims based on the alleged factual falsity of claims submitted under the FCA and analogous laws of Colorado, Georgia, Indiana, Montana, Massachusetts, Nevada, North Carolina, Virginia, Washington, and Wisconsin in Counts One, Two, Four, Five, Eight through Twenty-One, and Twenty-Four through Twenty-Nine.

An appropriate order follows.