IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES,** et al., ex rel., **TIMOTHY SIRLS,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**KINDRED HEALTHCARE, INC.,** et al.,<br><br>  Defendants. | CIVIL ACTION<br><br>NO. 16-0683-KSM |

**M E M O R A N D U M**

**Marston, J.**                                                                                                   **August 20, 2024**

Relator Timothy Sirls brings this *qui tam* action on behalf of the United States under the False Claims Act ("FCA") and on behalf of ten states[1] under analogous state statutes. (*See* Doc. No. 62.) He alleges that Defendant Kindred Healthcare, Inc., and six other Defendant Kindred entit (collectively, "Kindred"),[2] wrongfully accepted Medicare and Medicaid reimbursements for services that Kindred failed to provide to its nursing home residents. (*Id.*) Before the Court is Kindred's third motion to dismiss. (Doc. No. 169; *see also* Doc. No. 48 (motion to dismiss amended complaint); Doc. No. 66 (first motion to dismiss second amended complaint).) For the reasons discussed below, that motion is denied.[3]

---

[1] Those states are: Colorado, Georgia, Indiana, Massachusetts, Montana, Nevada, North Carolina, Virginia, Washington, and Wisconsin. (Doc. No. 62.) Relator previously voluntarily dismissed claims brought on behalf of New Hampshire (*see* Doc. No. 61 at 2), and the Court previously dismissed with prejudice the claims asserted on behalf of California, Connecticut, and Tennessee (Doc. No. 86).

[2] The six other Defendant entities are: Kindred Healthcare Operating, Inc., Kindred Healthcare Services, Inc., Kindred Nursing Centers East, LLC, Kindred Nursing Centers West, LLC, Kindred Nursing Centers South, LLC, Kindred Nursing Centers North, LLC. (Doc. No. 62.)

[3] The Court disposes of this motion on the papers. *See* E.D. Pa. Local R. 7.1(f) ("Any interested party may request oral argument on a motion. The court may dispose of a motion without oral argument.").

I.     BACKGROUND

Because the Court writes only for the parties, we do not recite the facts and procedural history at length in this Memorandum.[4]

A.     Factual Allegations

From April 2014 to July 2014, Relator worked as the Director of Nursing Services at Heritage Manor Healthcare Center in Mayfield, Kentucky.  (Doc. No. 62 at ¶ 7; *id.* at p. 95.) During the relevant period, Heritage was one of 174 nursing facilities operated by Kindred across the country.  (*Id.* at p. 2.)  Relator claims that at each of these facilities, Kindred purposefully recruited residents with high acuity levels (i.e., residents who were extremely dependent on staff for their most basic care needs) so that it could reap higher Medicare and Medicaid reimbursements from the named government entities.  (*Id.* at ¶¶ 2, 6, 7.)  Kindred then purposefully understaffed the facilities so that it could see a higher profit from those reimbursements.  (*Id.*)  Specifically, Relator alleges that Kindred instituted a strict policy of staffing based on census (number of residents) and not on acuity (resident needs).  (*Id.* at ¶¶ 2, 6, 7, 65.)  This understaffing meant it was "humanly and mathematically impossible" for the nursing facilities to deliver the essential care services that Kindred claimed were required by its residents and—more importantly—that it claimed were provided to those residents.  (*Id.* at ¶¶ 2, 5, 6.)

The FCA "punishes the knowing presentation of a fraudulent demand for payment to the United States, and permits a private relator to bring a *qui tam* civil suit in the government's name."  *U.S. ex rel., Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 231 (3d Cir. 2013) (citations

---

[4] A more detailed discussion of the facts and procedural history can be found in the Court's Memoranda deciding Kindred's prior motions to dismiss.  *See United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 438–42 (E.D. Pa. 2020) ("*Kindred I*"); *United States, ex. rel., Sirls v. Kindred Healthcare, Inc.*, 517 F. Supp. 3d 367, 374–78 (E.D. Pa. 2021) ("*Kindred II*").

omitted). Here, Relator's claims are based on Kindred's submission of two forms in connection with its requests for reimbursements. The first is the Minimum Data Set ("MDS") form that each nursing facility completed for each resident. (*See* Doc. No. 62 at ¶ 10.) On each resident's MDS form, in "Section G," the relevant Kindred facility described that resident's ability to perform activities of daily living ("ADL"), including bed mobility, toilet use, and eating, as well as the level of staff assistance required by and provided to the resident in performing these tasks. (*Id.* at ¶ 34 ("In Section G of the MDS, the nursing home provides a specific list of the ADL care each resident needs and a list of the AOL [sic] services the nursing home claimed to have provided to the resident."); *see also id.* at ¶¶ 35–36.) Section G is used to determine the resident's Resource Utilization Group ("RUG") score, which in turn determines the amount of Medicare and/or Medicaid reimbursement that the facility receives for the resident. (*Id.* at ¶¶ 135–41.)

Relator argues that from February 2008 to the filing of the Second Amended Complaint on July 14, 2020, Kindred knowingly submitted false MDS forms (in that the facilities could not, and did not, provide the services that they claimed were required in each residents' Section G), and therefore, submitted false claims for reimbursement. (*See* Doc. No. 62 at ¶ 7.c. ("Kindred's systemic, non-acuity-based staffing practices resulted in dependent residents routinely not receiving the essential ADL care that Defendants certified such residents required and were provided and which directly resulted in resident neglect and harm."); *id.* at ¶ 7.e (same); *id.* at ¶ 8 ("Relator has direct knowledge that Kindred understaffed each of the subject nursing homes and quantified the extent to which it deprived residents of the basic ADL care that was required and that Kindred claimed was provided."); *id.* at ¶ 136 ("Accordingly, insomuch as these MDS ADLs are used to classify each resident into different case-mix categories called RUGs, Kindred's

3

coding of residents' needs and services provided directly influenced the amount of its Medicare and most Medicaid payments."); *cf.* at ¶ 37 (alleging that in each MDS form, Kindred certified the accuracy of the submission).)

Second, Relator claims that Kindred submitted false Form CMS-1500s ("Form 1500s"), which are the standard claim forms used by providers to bill for services. (*Id.* at ¶ 10 & n.7.) In a Form 1500, the nursing facility must certify, as a condition for payment of Medicare and/or Medicaid funds, that the services provided to a resident were "medically necessary and personally furnished" by either the provider or an employee under the provider's supervision. (*Id.*) As with the MDS forms, Relator claims that Kindred knowingly submitted false Form 1500s because it was impossible for Kindred to provide the services that it claimed were needed and provided. (*Id.*)

### B.     Procedural History

Relator filed this action on February 11, 2016, and it was assigned to the Honorable Jan E. Dubois. (Doc. No. 1.) On April 3, 2019, the government entities declined to intervene in the case (Doc. No. 15), and the Court ordered that the Complaint be unsealed and served on Kindred (Doc. No. 16). After two rounds of motion practice, the only remaining claims in this case are claims "based on the theories of factual falsity and express false certification of accuracy in MDS forms and Form 1500s" in Counts I, II, IV, V, VIII through XXI, and XXIV through XXIX. (Doc. No. 86 at ¶ 4.)

On April 30, 2021, the action was reassigned to the undersigned. (Doc. No. 114.) One month later, the Court ordered the parties to begin fact discovery. (Doc. No. 118.) For more than two years the parties have diligently engaged in discovery with the assistance of a special discovery master, the Honorable (Ret.) Thomas J. Rueter. (Doc. Nos. 119–20.) Now, as discovery draws to a close, Kindred files its third motion to dismiss, which seeks dismissal of

Relator's pre-2010 claims for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Doc. No. 169.) Specifically, Kindred argues that this Court lacks jurisdiction under the FCA's public disclosure bar because the bases for Relator's claims were previously asserted in a separate civil action. (*Id.*) Relator opposes that motion. (Doc. No. 175.)

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) "governs jurisdictional challenges to a complaint." *Williams v. Litton Loan Servicing*, Civil Action No. 16-5301 (ES) (JAD), 2018 WL 6600097, at *5 (D.N.J. Dec. 17, 2018). "The Court can adjudicate a dispute only if it has subject-matter jurisdiction to hear the asserted claims." *Id.* (quotation marks omitted). "A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000). Typically challenges to the Court's jurisdiction under the FCA's pre-2010 public disclosure bar are considered factual. *See U.S. ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 234 (3d Cir. 2013) ("Zizic concedes that the District Court correctly concluded that [the defendants] launched a factual, rather than facial, jurisdictional attack . . . by challenging the actual failure of his claims to comport with the jurisdictional prerequisites contained in 31 U.S.C. § 3730(e)(4)."); *see also U.S. ex rel. Atkinson v. Pa. Shipbuilding*, 473 F.3d 506, 512 (3d Cir. 2007) (same).[5]

When the defendant raises a factual attack, as Kindred does in this case, the "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Int'l Ass'n of Machinists & Aerospace Workers v. N.W. Airlines, Inc.*, 673 F.2d 700, 711 (3d Cir.

---

[5] As Kindred notes, however, the distinction between factual and facial challenges in this instance is largely immaterial because to decide the jurisdictional issue, the Court need look only to the scope of the claims alleged in Relator's Second Amended Complaint and matters of public record. *See Myers v. Caliber Home Loans, Seterus, Inc.*, No. 1:19-cv-596, 2019 WL 4393377, at *3 (M.D. Pa. Sept. 13, 2019) (explaining that on a facial attack "we consider whether Plaintiffs' allegations, attached documents, and referenced proceedings establish the necessary jurisdiction . . . .").

1982). "[T]he plaintiff [has] the burden of proof that jurisdiction does in fact exist." *Id.* (quoting *Mortensen v. First Fed. Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). And in performing this analysis, "the court may consider evidence outside of the pleadings." *Gould Elecs. Inc.*, 220 F.3d at 176; *see also Int'l Ass'n of Machinists*, 673 F.2d at 711 n.16 ("That the district court is free to determine facts relevant to its jurisdiction has long been clear.").

**III.   DISCUSSION**

In its most recent motion to dismiss, Kindred argues that this Court lacks jurisdiction over Relator's FCA claims that arose before March 23, 2010 because those claims are foreclosed by the Act's public disclosure bar. (*See generally* Doc. No. 169.) Kindred points to an FCA case brought against it by a different relator in 2011 in the Eastern District of Kentucky and argues that the allegations of fraud in that case are substantially similar to the Relator's allegations in this case, such that the Court lacks jurisdiction. (Doc. No. 169-1 at 6 (citing *Coontz v. Kindred Nursing Crs. LP*, No. 5:11-cv-83 (E.D. Ky. 2011)).)

The "FCA's public disclosure bar provides that a *qui tam* suit shall be dismissed 'if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed,' unless 'the person bringing the action is an original source of the information.'" *Kindred II*, 517 F. Supp. 3d at 382 (quoting 31 U.S.C. § 3730(e)(4)). Prior to March 23, 2010—when the Act was amended—this bar was framed in jurisdictional terms, and because the 2010 amendment was not retroactive, "claims based on conduct occurring before March 23, 2010 are still governed under the prior jurisdictional version of the statute." *U.S. ex rel. Silver v. Omnicare, Inc.*, 903 F.3d 78, 83 n.5 (3d Cir. 2018); *see also Zizic*, 728 F.3d at 231–32 ("[T]he FCA's public disclosure bar divests a court of subject matter jurisdiction over a *qui tam* suit that is based on allegations or transactions that have been publicly disclosed in certain sources, unless a relator is an original source of that information."). Under the pre-March 23, 2010 version of

6

the FCA, "the public disclosure bar applies if: '(1) there was a [prior] public disclosure; (2) in a civil hearing; (3) of allegations or transactions of fraud; and (4) that the relator's action was based upon." *Zizic*, 728 F.3d at 235 (quoting *U.S. ex rel. Paranach v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005)) (cleaned up); *see also Silver*, 903 F.3d at 93 ("[W]hen a relator claims not to rely on public disclosures, the court must first determine whether the publicly available documents *in fact* disclosed information sufficient to raise the inference of fraud, and second whether the relator's complaint objectively relied upon that disclosed information.").

Here, there is no real dispute that the first two elements of the *Zizic* test are satisfied because the documents filed in *Coontz*, including the complaint in that action, were publicly available on the court's civil docket before Relator filed his initial Complaint in this case. *See Zizic*, 728 F.3d at 235 (holding that a prior civil litigation was a public disclosure for purposes of the FCA's bar); (*see also* Doc. No. 169-7 (order unsealing *Coontz* complaint in March 2012)).

Turning to the third element, "we consider whether the information publicly disclosed in the [*Coontz*] litigation constituted allegations or transactions of fraud." *Zizic*, 728 F.3d at 235. "An allegation of fraud is an explicit accusation of wrongdoing." *Id.* at 235–36. And a "transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." *Id.* at 236. The Third Circuit has "adopted a formula to represent when information publicly disclosed in a specified source qualifies as an allegation or transaction of fraud." *Id.*; *see also Silver*, 903 F.3d at 83 (explaining that courts employ "a formula of sorts" to determine "whether a fraudulent transaction has been publicly disclosed"). That formula is: "$X + Y = Z$," where X represents a "misrepresented fact," Y represents the "true facts," and "Z represents the allegation of fraud." *Zizic*, 728 F.3d at 236. If "either Z (fraud) or both X (misrepresented facts) and Y (true facts) are publicly disclosed by way of a

7

listed source," then the public disclosure bar applies. *Id.* (quoting *Atkinson*, 473 F.3d at 519). Said differently, when "the fraud has been publicly disclosed—either because the public documents set out the allegation of fraud itself [Z] or its essential elements [X + Y]—a relator's claim will be barred so long as it is 'supported by or substantially similar to the public disclosures.'" *Silver*, 903 F.3d at 84 (quoting *Zizic*, 728 F.3d at 237).

Here, again, both parties seem to agree that the *Coontz* litigation publicly disclosed allegations of fraud under this formula. In *Coontz*, the relators alleged that certain Kindred defendants "engaged in a scheme to defraud Medicare and Medicaid by submitting claims for payment that overstate the value of the services they have provided to their nursing home residents, and that request payment for services and products never actually rendered or provided." (Doc. No. 169-4 (*Coontz* Complaint) at ¶ 2.) Specifically, Kindred employees would "fill out [a resident's] MDS form to reflect a lower-than-actual functional capacity and a higher level of required services than was actually required in order to place the resident in a high RUG" and ensure the facility "receive[d] a greater payment rate than they were entitled to receive." (*Id.* at ¶ 52.) Placing these allegations in the Third Circuit's formula, *Coontz* alleged that various Kindred defendants submitted MDL forms to the government which certified that certain services were needed by residents and provided to those residents (the "X-factor") when in fact, those services were neither needed nor provided (the "Y-factor"). *See Silver*, 903 F.3d at 84 ("In this case, the parties agree that the allegedly 'misrepresented' state of facts [X] is that PharMerica was complying with the Anti-Kickback statute, and that the allegedly 'true' state of facts [Y] is that PharMerica was in fact engaging in the fraudulent practice of swapping, which violates the statute.").

That brings us to the fourth element, under which the Court must decide "whether the relator's complaint is based on" the disclosures in *Coontz*. *Zizic*, 728 at 237 (quoting *Atkinson*, 473 F.3d at 519). This is the heart of the parties' dispute. (*See* Doc. No. 178 at 2 (identifying the "only point[ ] in dispute" on this issue as "whether the Relator's claims concerning the submission of ADL services are 'based upon' or 'substantially similar to' the allegations in the *Coontz* complaint"). "To be based on allegations or transactions of fraud, claims need not be actually derived from the public disclosure." *Zizic*, 728 F.3d at 237 (quotation marks omitted). Instead, "claims need only be 'supported by' or 'substantially similar to' public disclosures." *Id.* (quoting *U.S. ex rel. Mistick PBT v. Hous. Auth. of Pittsburgh*, 186 F.3d 376, 385–88 (3d Cir. 1999)). "Substantial similarity exists where there is 'substantial identity' between the publicly disclosed allegations and the allegations in the relator's complaint." *U.S. ex rel. Feldstein v. Organon, Inc.*, 364 F. App'x 738, 741 (3d Cir. 2010) (quoting *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 514 (6th Cir. 2009)).

For example, in *United States ex rel. Feldstein v. Organon, Inc.*, the Third Circuit found substantial similarity where the "central premise of [the relator's] false claims theory [wa]s the allegation that [the defendant] concealed the harmful side effects of Raplon, both before and after its FDA approval," and a prior litigation included "similar allegations of concealment of the harmful side effects of Raplon." *Id.* at 741–42. Although the prior complaint "sounded in negligence, failure to warn, and breach of warranty, and made no reference to Medicare, Medicaid, or false claims," the court found the relator's "identification of one specific legal consequence of the alleged fraud—the possible submission of false claims to Medicare and Medicaid—d[id] not change the substantially similar nature of the underlying allegations of fraud and concealment in each action." *Id.* at 742; *see also U.S. ex rel. Galmines v. Novartis*

9

*Pharms. Corp.*, 88 F. Supp. 3d 447, 450 (E.D. Pa. 2015) (finding new allegations were "substantially similar" to publicly disclosed allegations because "they allege *the same underlying scheme*, but as applied to a new time period" (emphasis added)); *cf. Silver*, 903 F.3d at 89–90 ("When a free-standing allegation of fraud already exists in the public realm, the mere application of experience or deductive skills to such information or the addition of another allegation to the already articulated accusation of fraud does not create a new, non-barred, claim of fraud.").

By contrast, in *United States ex rel. Silver v. Omnicare, Inc.*, the Third Circuit found that a publicly available document did not trigger the public disclosure bar because the documents referenced by the defendant merely "indicate the possibility that" a type of fraudulent scheme known as "swapping" "could be perpetrated in the nursing home industry." 903 F.3d at 86. The relator's "more concrete claim, which set out specific facts suggesting that PharMerica in particular was engaged in swapping, relied upon these general disclosures but could not have been derived from them absent [the relator's] addition of the non-public per-diem information." *Id.* Because the "relator's non-public information permits an inference of fraud that could not have been supported by the public disclosures alone," the court held that the "FCA's public disclosure bar [wa]s not implicated." *Id.*

Kindred reasons that the claims in this case are substantially similar to those in *Coontz* because in *Coontz*, the allegations were, at base, that Kindred "billed Medicare and Medicaid for ADLs that its staff did not actually furnish," and Relator "now seeks to advance the same theory of FCA liability in this case." (Doc. No. 169-1 at 7.) Relator disagrees, arguing that Kindred paints the allegations in *Coontz* and in this case with too broad a stroke. According to Relator, although both cases involve allegations that Kindred falsified MDL forms to receive government

10

reimbursements for services that were never provided, "the gravamen of the false claims [in *Coontz*] was that the *government was duped into paying for services that were not needed*, whereas here the gravamen of Relator's false claims allegations centers on the *government being duped into paying for services that were not provided*." (Doc. No. 175 at 16–17.) The Court agrees with Relator.

In performing the "substantial similarity" inquiry, the court must "take a careful look at the details of each alleged fraud." *Sturgeon v. PharMerica Corp.*, 438 F. Supp. 3d 246, 264 (E.D. Pa. 2020). Indeed, "[s]everal courts have cautioned against conducting the substantial similarity inquiry at too high a level of generality," recognizing that "cast in unduly general terms, any two fraud allegations against the same defendant begin to sound similar." *Id.* at 264 & n.15 (collecting cases); *see also U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935–36 (7th Cir. 2012) ("[B]oosting the level of generality in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound.").

The Seventh Circuit's analysis on this issue is instructive.[6] In *United States ex rel. Goldberg v. Rush University Medical Center*, the court addressed one in a string of cases alleging that the defendant teaching hospitals submitted fraudulent claims for Medicare reimbursement. 680 F.3d at 933. As the court explained, "Medicare pays teaching hospitals for work by residents . . . on a fee-for-service basis," but "only when a teaching physician supervises the residents." *Id.* at 933–34. "During the 1990s, the Department of Health and Human Services concluded that many if not all of the 125 teaching hospitals affiliated with medical schools were

---

[6] Like the Third Circuit, the Seventh Circuit looks to whether an FCA claim is "substantially similar to, and thus based on," a prior disclosure. *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935 (7th Cir. 2012) (quotation marks omitted); *accord Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 (7th Cir. 2013).

billing for unsupervised services that residents performed," and the Department began to audit many of the hospitals and demand reimbursement. *Id.* at 934. In the years that followed, multiple *qui tam* suits were brought against various hospitals on the same basis, and the Seventh Circuit held that such cases were foreclosed by the public disclosure bar because the Department's prior report, audits, and "similar public documents disclose that billing for unsupervised work by residents was an industry-wide practice," such that "an allegation that a particular teaching hospital had billed for residents' unsupervised work was 'based upon' that disclosure.'" *Id.* (quoting *U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726 (7th Cir. 2006)).

In *Goldberg* the defendants relied on those prior decisions to argue for dismissal of the relators' claims, and the district court agreed that the claims were foreclosed "because the [government's] audits and report were about bills for unsupervised work by residents, and the allegations of this complaint concern one means for work to be deemed 'unsupervised.'" *Id.* at 935. On appeal, the Seventh Circuit reversed. The court explained that the district court had "inappropriate[ly]" viewed the allegations of fraud at "a very high level of generality." *Id.* Although both the public documents and the relators' complaint alleged that teaching hospitals, like the defendant, were wrongly seeking reimbursement for unsupervised work, the public documents "dealt with bills submitted for services that residents had performed all by their lonesome," whereas the relators in *Goldberg* alleged fraudulent billing for "residents' services that *were* supervised, but inadequately." *Id.* at 934–35 (explaining that the relators alleged that "Rush University Medical Center submitted fee-for-service bills to the Medicare program on account of unsupervised work that the residents had performed in the hospital's operating theaters" where "teaching physicians" were allowed "to supervise multiple operations

simultaneously" allegedly in violation of regulations requiring the teaching physician to be "present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure" (quotation marks omitted)).  Given the differences between the relators' alleged scheme and the fraud discussed in the public documents, the Seventh Circuit held that "the allegations of these relators are not 'substantially similar'" to the prior allegations.  *Id.* at 936; *see also Leveski*, 719 F.3d at 832 (finding that although the relator's case "looks similar to the *Graves* case at first blush"—because the "relators in both cases are former employees of [the defendant]," "held the same job title," and alleged "that [the defendant] violated the incentive compensation provision of the HEA"—the "details of how [the defendant] allegedly violated the HEA are quite different in [the relator's] case than they were in *Graves*.  Unlike the *Graves* relators, who alleged a more rudimentary scheme by [the defendant] to violate the HEA incentive compensation provision, [the relator in this case] alleges a more sophisticated, second-generation method of violating the HEA").

      Here, Kindred's argument is akin to the one raised by the defendants in *Goldberg* and *Leveski*.  And like the Seventh Circuit in those cases, we find that Kindred's argument would have us compare this case and *Coontz* at too high a level of generality.  Notably, although the relators in *Coontz* and Relator in this action both allege that Kindred facilities fraudulently represented in MDL forms that they provided services which were not in fact provided, the underlying scheme in each case is very different.  *See Leveski*, 719 F.3d at 828 ("Certainly the allegations in *Graves* seem very similar to Leveski's allegations on first impression.  But first impressions can be deceiving.  A closer examination reveals four critical differences between the two cases."); *Sturgeon*, 438 F. Supp. 3d at 264 (explaining that the court must "take a careful look at the details of each alleged fraud").

As Relator notes, the *Coontz* relators alleged that Kindred facilities falsely inflated residents' ADL scores to suggest that those residents needed more services than they actually required. (Doc. No. 175 at 16–17.) But here, by contrast, Relator alleges that Kindred accurately recorded residents' ADL scores, but then failed to provide those needed services because it purposefully understaffed its facilities to ensure it maximized profit margins. (*Id.*); *see also Leveski*, 719 F.3d at 830 (finding the public disclosure bar did not apply where the "scheme alleged by [the relator], in contrast" to the allegations made by prior relators, "involves a much more sophisticated—and more difficult to detect—violation of Department of Education requirements"). Given these distinctions, the Court cannot say that Relator could have uncovered the fraud alleged in this case simply by looking to the allegations disclosed in *Coontz*. *See Silver*, 903 F.3d at 89 (emphasizing that the public information alone "would have been insufficient to disclose the actual fraud that [the relator] alleges").

Accordingly, the Court finds under the fourth *Zizic* factor that Relator's claims are not "based on" the allegations disclosed in *Coontz*. And Relator's claims are not foreclosed by the public disclosure bar. *See id.* ("Having concluded that the publicly available information did not disclose the alleged true state of affairs that PharMerica was violating the Anti-Kickback law by engaging in swapping—what, in the terminology of our mathematical representation of the public disclosure analysis, we might title the 'Y-factor'—the public disclosure bar is inapplicable to Silver's claims.").

Because Relator's claims are not based on the *Coontz* allegations, we need not decide whether Relator is an original source of those claims.

## IV.   CONCLUSION

For the reasons discussed above, Kindred's motion to dismiss is denied. An appropriate order follows.