IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES,** et al., ex rel., **TIMOTHY SIRLS,**<br><br>      Plaintiffs,<br><br>      v.<br><br>**KINDRED HEALTHCARE, INC.,** et al.,<br><br>      Defendants. | CIVIL ACTION<br><br>NO. 16-0683-KSM |

**M E M O R A N D U M**

**Marston, J.**                                                                                                          **October 7, 2024**

Relator Timothy Sirls brings this *qui tam* action on behalf of the United States under the False Claims Act ("FCA") and on behalf of ten states[1] under analogous state statutes. (*See* Doc. No. 62.) He alleges that Defendant Kindred Healthcare, Inc. and six other Defendant Kindred entities (collectively, "Kindred")[2] wrongfully accepted Medicare and Medicaid reimbursements for services that Kindred failed to provide residents at its nursing facilities. (*Id.*)

I.   **BACKGROUND**

Because the Court writes only for the parties, we do not recite the facts and procedural history at length in this Memorandum.[3]

---

[1] Those states are: Colorado, Georgia, Indiana, Massachusetts, Montana, Nevada, North Carolina, Virginia, Washington, and Wisconsin. (Doc. No. 62.) Relator previously voluntarily dismissed claims brought on behalf of New Hampshire (Doc. No. 61 at 2), and the Court previously dismissed with prejudice the claims asserted on behalf of California, Connecticut, and Tennessee (Doc. No. 86).

[2] The six other Defendant entities are: Kindred Healthcare Operating, Inc., Kindred Healthcare Services, Inc., Kindred Nursing Centers East, LLC, Kindred Nursing Centers West, LLC, Kindred Nursing Centers South, LLC, Kindred Nursing Centers North, LLC. (Doc. No. 62.)

[3] A more detailed discussion of the facts and procedural history can be found in the Court's Memoranda deciding Kindred's motions to dismiss. *See U.S. ex rel. Sirls v. Kindred Healthcare, Inc.*,

1

A.	**Factual Allegations**

From April to July 2014, Relator worked as the Director of Nursing Services at Heritage Manor Healthcare Center in Mayfield, Kentucky.  (Doc. No. 62 at ¶ 7; *id.* at p. 95.)  During the relevant period, Heritage was one of 174 nursing facilities operated by Kindred across the country.  (*Id.* at p. 2.)  Relator claims that at each of these facilities, Kindred purposefully recruited residents with high acuity levels (i.e., residents who were extremely dependent on staff for their most basic care needs) so that it could reap higher Medicare and Medicaid reimbursements from the named government entities.  (*Id.* at ¶¶ 2, 6, 7.)  Kindred then purposefully understaffed the facilities so that it could see a higher profit from those reimbursements.  (*Id.*)  Specifically, Relator alleges that Kindred instituted a strict policy of staffing based on census (number of residents) and not on acuity (resident needs).  (*Id.* at ¶¶ 2, 6, 7, 65.)  This understaffing meant it was "humanly and mathematically impossible" for the nursing facilities to deliver the essential care services that Kindred claimed were needed by its residents and—more importantly—that it claimed were provided to those residents.  (*Id.* at ¶¶ 2, 5, 6.)

The FCA "punishes the knowing presentation of a fraudulent demand for payment to the United States, and permits a private relator to bring a *qui tam* civil suit in the government's name."  *U.S. ex rel., Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 231 (3d Cir. 2013) (citations omitted).  Here, Relator has three sets of remaining claims:  (1) claims based on the alleged factual falsity of claims submitted under the FCA and analogous state laws, (2) claims based on the alleged express false certifications of accuracy in Minimum Data Set forms, and (3) claims

---

469 F. Supp. 3d 431, 438–42 (E.D. Pa. 2020) ("*Kindred I*"); *U.S. ex rel. Sirls v. Kindred Healthcare, Inc.*, 517 F. Supp. 3d 367, 374–78 (E.D. Pa. 2021) ("*Kindred II*").

based on the alleged express false certifications of accuracy in Form CMS 1500s. *Kindred II*, 517 F. Supp. 3d at 391. This motion involves the first set of claims.

Relator's factual falsity claims relate to the Minimum Data Set ("MDS") forms that Kindred's nursing facilities completed for each resident in their care. (*See* Doc. No. 62 at ¶ 10.) On each resident's MDS form, in "Section G," the relevant Kindred facility described that resident's ability to perform activities of daily living ("ADL"), including bed mobility, toilet use, and eating, as well as the level of staff assistance required by and provided to the resident in performing these tasks. (*Id.* at ¶ 34 ("In Section G of the MDS, the nursing home provides a specific list of the ADL care each resident needs and a list of the AOL [sic] services the nursing home claimed to have provided to the resident."); *see also id.* at ¶¶ 35–36.) Section G is used to determine the resident's Resource Utilization Group ("RUG") score, which in turn affects the amount of Medicare and/or Medicaid reimbursement that the facility receives. (*Id.* at ¶¶ 135–41.)

Relator argues that from February 2008 to the present, Kindred knowingly submitted false MDS forms (in that the facilities could not and did not provide the ADL services that they claimed were needed and provided), and therefore, submitted claims for reimbursement that were factually false. (*See* Doc. No. 62 at ¶ 7.c. ("Kindred's systemic, non-acuity-based staffing practices resulted in dependent residents routinely not receiving the essential ADL care that Defendants certified such residents required and were provided and which directly resulted in resident neglect and harm."); *id.* at ¶ 7.e (same); *id.* at ¶ 8 ("Relator has direct knowledge that Kindred understaffed each of the subject nursing homes and quantified the extent to which it deprived residents of the basic ADL care that was required and that Kindred claimed was provided."); *id.* at ¶ 136 ("Accordingly, insomuch as these MDS ADLs are used to classify each

resident into different case-mix categories called RUGs, Kindred's coding of residents' needs and services provided directly influenced the amount of its Medicare and most Medicaid payments.").)

### B. Procedural History

Relator filed this *qui tam* action on February 11, 2016, and it was assigned to the Honorable Jan E. Dubois. (Doc. No. 1.) On April 3, 2019, the government entities declined to intervene in the case (Doc. No. 15), and the Court ordered that the Complaint be unsealed and served on Kindred (Doc. No. 16). In the months that followed, Relator twice amended the Complaint, first on July 22, 2019, and again, on August 14, 2020. (*See* Doc. Nos. 18, 62.) As noted above, after multiple rounds of motion practice, the only claims remaining in the operative Second Amended Complaint are claims "based on the theories of factual falsity and express false certification of accuracy in MDS forms and Form 1500s" in Counts I, II, IV, V, VIII through XXI, and XXIV through XXIX. (Doc. No. 86 at ¶ 4.)

#### 1. Early Discovery

On April 30, 2021, this action was reassigned to the undersigned. (Doc. No. 114.) One month later, the Court ordered the parties to begin fact discovery. (Doc. No. 118.) For more than three years the parties have pursued discovery with the assistance of a special discovery master, the Honorable (Ret.) Thomas J. Rueter. (Doc. Nos. 119–20.) The Special Master has ruled on various discovery disputes between the parties and submitted multiple reports and recommendations ("R&Rs") for the Court's consideration. Of note, the Special Master issued R&Rs in February and May 2024. (*See* Doc. Nos. 179-1, 185-1 (the "February R&R" and "May R&R," respectively).) The February R&R recommended, among other things, that Kindred be required to produce certain limited categories of documents related to its staffing levels. (Doc. No. 179-1 at 7–8.) And the May R&R recommended allowing discovery from January 1, 2008

through March 23, 2010 because Kindred failed to show that the FCA's shorter statute of limitations applied. (*See* Doc. No. 185-1.) Both recommendations were adopted by the Court. (*See* Doc. No. 179 (adopting February R&R in part); Doc. Nos. 193, 194 (adopting May R&R).)

### 2.      **The August R&R**

On August 19, 2024, the Special Master submitted a third R&R addressing multiple discovery disputes raised in two letter requests by Relator. (*See* Doc. No. 192 (the "August R&R").) The August R&R is currently before the Court for consideration.

In the first letter request, Relator seeks to compel the production of certain medical records in Kindred's care. (*See* Doc. No. 192 at 2–8.) Although Kindred has produced numerous medical records in this case, it has refused to produce three categories of records: (1) records for claims between January 1, 2008 and March 23, 2010, (2) records for claims between February 11, 2016 and November 30, 2018, and (3) records from any period that are unrelated to the provision of ADL services. (*Id.*) The Special Master recommends that Kindred be compelled to produce the first two categories of records but not the third. (*Id.* at 3–8.) As to the first two categories, the Special Master found that records from January 1, 2008 through November 30, 2018 are relevant to Relator's claims of continuous wrongdoing. (*Id.*) As to the final category, the Special Master found that per "Judge DuBois' February 4, 2021 Memorandum . . . Relator's remaining claims relate solely to the furnishing of ADLs." (*Id.* at 5.) And contrary to Relator's arguments, the allegations in the "Second Amended Complaint do not support Relator's assertion" that he "alleges RUG scores at the relevant facilities were false for reasons unrelated to ADLs." (*Id.* at 6.) The Special Master also notes that Relator's representations throughout the litigation have suggested the scope of his claims are limited to "allegations that Kindred sought reimbursement for the provision of ADL services which Kindred did not provide." (*Id.* at 8.)

Turning to Relator's second letter request, Relator seeks an order compelling Kindred to produce additional documents related to its staffing levels at each facility. (*Id.* at 8.) Although Relator's letter targets specific requests included in Relator's first four requests for production, the parties' dispute is best understood as involving two overarching issues as to the scope of staffing data sought. First, Relator seeks staffing data beyond that which Kindred was previously ordered to produce. In the portion of the February R&R adopted by the Court, the Special Master recommended that Kindred "be ordered to produce to Relator the 'most important' [staffing] documents [he] seeks, namely employee time records/cards and punch cards, including job codes necessary to interpret such time records/cards and punch cards." (Doc. No. 179-1 at 8.) In making this recommendation, the Special Master "struck a balance," recognizing that much of the staffing data sought by Relator was publicly available but also that Relator was entitled to seek "the same information from multiple sources." (*Id.* at 8 n.4.) The February R&R also considered the "prolonged discovery period this case has endured" and the complications necessarily resulting from the fact that "Kindred no longer owns the facilities in question." (Doc. No. 192 at 9.) For all of these reasons, the Special Master recommended allowing targeted discovery of staffing data, and the Court adopted that recommendation. Given this prior recommendation, which was given after reasoned consideration of the issues and which was adopted by the Court without objection, the Special Master's August R&R recommends denying Relator's current request to the extent it would require that "Kindred respond to *all* discovery requests relating to 'staffing.'" (*Id.* at 10 (emphasis added).)

The second overarching dispute related to staffing records involves the time frame for which Kindred must produce the "most important" staffing data required by the February R&R.

Once again, the Special Master recommends that the relevant time frame is January 1, 2008 through November 30, 2018.  (*Id.*)

## II.   DISCUSSION

Both parties object to the August R&R.  (*See* Doc. Nos. 197, 199.)  Relator objects to the Special Master's recommendation that Kindred not be required to produce medical records unrelated to ADL services.  (Doc. No. 197.)  And Kindred objects to the Special Master's recommendation that the relevant time period for discovery includes the period from February 11, 2016 through November 30, 2018.  (Doc. No. 199 at 3.)[4]  The Court considers the challenged portions of the August R&R de novo, *see* Fed. R. Civ. P. 53(f)(3)–(4), and rules on the papers, *see* E.D. Pa. Local R. 7.1(f) ("Any interested party may request oral argument on a motion.  The court may dispose of a motion without oral argument.").

### A.   Relator's Objections

Relator objects to the August R&R to the extent it recommends that the Court find Kindred is required to produce only those medical records that are related to the provision of ADL services.  (Doc. No. 197.)  According to Relator, the Second Amended Complaint includes "allegations [that] make clear that the conduct at issue is not merely the submission of false claims related to ADLs but also **inflated RUG scores**."  (*Id.* at 4.)  In addition, Relator argues that the August R&R "disregards the plain language" of Judge Dubois's rulings on Kindred's motions to dismiss, which "did not limit Relator's claims to only those claims related to the provision of ADLs."  (*Id.*)  Kindred counters that the Special Master correctly viewed the allegations in the Second Amended Complaint and this Court's prior rulings as confirming that

---

[4] Kindred "acknowledges that its argument that it need not produce medical records for claims for services furnished from January 1, 2008 to March 23, 2010 is moot" in light of the Court's recent rulings.  (Doc. No. 199 at 3 (citing Doc. Nos. 193–96).)

7

"Relator's surviving claims relate only to Kindred's alleged failure to furnish ADLs."  (Doc. No. 200 at 6.)

### 1. **Legal Standard**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ."  Fed. R. Civ. P. 26(b)(1).  Although the scope of discovery allowed under Rule 26 is broad, *Fort Wash. Resources, Inc. v. Tannen*, 153 F.R.D. 78, 79 (E.D. Pa. 1994), it is not limitless, *Druding v. Care Alternatives*, Civil No. 08-2126(JBS/AMD), 2017 WL 11461795, at *3 (D.N.J. June 21, 2017).  Instead, the "scope of relevant discovery is circumscribed by the complaint and its claims, and it is against these claims that discoverability is determined as to each discovery request." *Castellani v. City of Atlantic City*, 102 F. Supp. 3d 657, 663 (D.N.J. 2015) (citations omitted) (alterations adopted).

The party seeking discovery bears the burden of showing the relevance of the requested information.  *See Morrison v. Phila. Housing Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001) ("A party moving to compel bears the initial burden of showing the relevance of the requested information."); *Brewer v. Berks Cty. Sheriff*, No. 5:13-CV-5763, 2015 WL 13620425, at *2 (E.D. Pa. Oct. 5, 2015) ("The party seeking discovery has the burden of showing that the information sought is relevant to the subject matter of the action and may lead to admissible evidence.").  If the requesting party satisfies its burden, "[t]he burden then shifts to the party resisting discovery to justify withholding it."  *Morrison*, 203 F.R.D. at 196.

**2.     Analysis**

Because the "starting point for ascertaining whether or not discovery may be had on a topic is the complaint and the defenses," *U.S. ex rel. Simms Powell v. Am. Intercontinental Univ., Inc.*, Civil Case No. 1:08-CV-2277-RWS-LTW, 2013 WL 12114445, at *3 (N.D. Ga. Feb. 22, 2013), the Court begins by analyzing the allegations in the Second Amended Complaint. Relator argues that he is entitled to all medical records for the identified residents and not merely those records related to the provision of ADL services because the allegations in the Second Amended Complaint show "that the conduct at issue is not merely the submission of false claims related to ADLs but also ***inflated RUG scores***." (Doc. No. 197 at 4.) But the only scheme related to RUG scores that is described with any specificity in the Second Amended Complaint involves Kindred's alleged failure to provide needed ADL services. Specifically, Relator alleges that Kindred inflated RUG scores by claiming, in Section G of each resident's MDS form, that the resident needed and was provided ADL services that Kindred could not have provided given its staffing levels. (*Compare* Doc. No. 62 at ¶ 5 (alleging that "Kindred deliberately limited the number of staff members allowed to be on duty in its nursing homes," which "made it impossible for Kindred to *deliver the ADL services* that it claimed to Medicare and Medicaid were provided to residents in an individualized resident document known as a *Minimum Data Set*" (emphases added)), *with id.* at ¶¶ 34–35 ("In Section G of the MDS, the nursing home provides a specific list of the ADL care each resident needs and a list of the AOL [sic] services the nursing home claimed to have provided to the resident."), *and with id.* at ¶ 136 ("[I]nsomuch as these MDS ADLs are used to classify each resident into different case-mix categories called RUGs, Kindred's coding of residents' needs and services provided directly influenced the amount of its Medicare and most Medicaid payments.").[5])[6]

9

Relator argues that the Second Amended Complaint left open the possibility of claims apart from the provision of ADL services because nothing in his pleading explicitly "limit[s] his claims to only those related to the provision of ADL services." (Doc. No. 197 at 3.) But it is not enough to show that the allegations in the operative complaint broadly allow the possibility of additional fraudulent activity. Under Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, which applies to FCA actions, Relator was required to plead the alleged fraud with particularity. *See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306–07 (3d Cir. 2016). In other words, it was not sufficient for Relator to allege generally "that the government payors were being billed for services that were not provided," that Kindred "knowingly made . . . false statements, claims, and certifications in its MDS assessments," or that "from at least 2008 to the present, Kindred knowingly presented . . . false or fraudulent claims to Medicare and Medicaid . . . for services that it did not provide." (Doc. No.197 at 3–4 (quoting Doc. No. 62 at ¶¶ 126, 127, 129).) Relator also needed to allege *how* these claims for

---

[5] (*See also* Doc. No. 62 at ¶ 8 (alleging Kindred "submitted claims to the Government *for ADL services* that were mathematically and humanly impossible for it to have provided" (emphasis added)); *id.* at ¶ 62 (same); *id.* at ¶ 88 (same); *id.* at ¶ 106 ("Kindred knew that the levels of staff it mandated and enforced in its facilities made it impossible to provide for *the Section G needs* of residents." (emphasis added)); *id.* at ¶ 110 (same); *id.* at ¶ 9 ("The false claims and statements in this case include tens of thousands of false MDSs and Form CMS-1500s submitted to Medicare and Medicaid. Kindred knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in these MDSs and the Form 1500s, and that the submission of *false resident ADL information* in these MDSs and concomitant false representations in the Form 1500s may subject it to substantial criminal, civil, and administrative penalties." (emphasis added)); *id.* at ¶ 139 (explaining that "to obtain the highest 'late loss' ADL score, highest RUG code, and largest Medicare (and/or Medicaid) reimbursement, a nursing home must claim in Section G of the MDS that the resident was provided the assistance of two staff members for a number of these 'late loss' ADLs").)

[6] In his initial letter to the Special Master, Relator made the slightly different argument that "Kindred must produce all requested medical records relating to **factually false MDS forms**, not just those related to ADL services." (Doc. No. 199-2 at 4.) But again, the Second Amended Complaint alleges that Kindred submitted factually false MDS forms when it claimed in Section G of that form that ADL services were necessary and that they were provided. Relator has not alleged any other way that the MDS forms were factually false, either in the Second Amended Complaint or in his briefing on this discovery dispute.

reimbursement were false.  *See In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (explaining that "Rule 9(b) requires, at a minimum," that a plaintiff claiming fraud support their claims "with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997))); *accord Moore & Co., P.A.*, 812 F.3d at 306–07.  To satisfy this standard in the FCA context, the Third Circuit has held a plaintiff must allege the "*particular details of a scheme* to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (quotation marks omitted) (emphasis added).

Judge DuBois previously ruled that Relator satisfied Rule 9(b)'s requirements to the extent he alleged a scheme related to the false provision of ADL services:

> [R]elator in this case has alleged the causal chain that affected payment from the program. As clearly set forth in the MDS form itself and explained by CMS' manuals for providers, the assistance provided to residents by facility staff *in performing ADLs* is reported in the MDS assessment and directly impacts the residents' Resource Utilization Group classifications and corresponding rate of reimbursement. . . . [T]he amount of reimbursement is determined in part by reference to the level of assistance reported in Section G of the MDS. Relator thus plausibly alleges liability under the FCA when he states that defendants caused their facilities to falsely report the level of support provided to residents *in Section G of their MDS assessments* and thus inflate Resource Utilization Group classifications and corresponding rates of reimbursement.

*Kindred I*, 469 F. Supp. 3d at 446 (citations and quotation marks omitted) (emphases added)); *see also Kindred II*, 517 F. Supp. 3d at 389 (noting that the Court previously "rejected defendants' argument that relator had failed to satisfy Rule 9(b)'s heightened pleading standard for his theories of factual falsity with respect to the RUG scores").)  Nothing in Judge Dubois's

11

prior Memoranda suggests Relator has identified other ways in which Kindred allegedly inflated RUG scores.[7]

Finally, the Court rejects Relator's argument that he is entitled to complete medical records because the parties' discovery to date contemplated the production of medical records without an ADL-related limitation. (Doc. No. 197 at 4–6.) Relator has not meaningfully argued that Kindred waived its current objections by producing some medical records that were unrelated to ADL services. And the Court is not inclined to find as much. Even assuming Kindred did provide complete medical records without objection for some patients, that strategy may have been reasonable during the limited bellwether discovery allowed at the beginning of this action. At that point, providing fulsome medical records for a limited number of patients would have been substantially less burdensome than it is now that the parties are in full discovery and Kindred is tasked with producing records for thousands of patients.

\*   \*   \*

For all of those reasons, the Court overrules Relator's objections to the August R&R and adopts the Special Master's recommendation that discovery of medical records be limited to those records that are related to the provision of ADL services. *See U.S. ex rel. Spay v. CVS Caremark Corp., et al.*, Civil Action No. 09–4672, 2013 WL 4525226, at \*6 (E.D. Pa. Aug. 27, 2013) ("Although Plaintiff was free to plead with requisite Rule 9(b) specificity that the other practices at issue—failure to review for over-utilization, failure to ensure prior authorizations,

---

[7] Even in his current briefing, Relator has not described with specificity any scheme by Kindred to inflate RUG scores unrelated to ADL services. Interestingly, *Kindred* notes that "other services that bear on patient RUG scores and reimbursement" include "therapy services like occupational therapy, physical therapy, and speech-language pathology services." (Doc. No. 200 at 3.) But even assuming that Relator meant to argue that Kindred falsely inflated RUG scores by claiming it provided needed therapy services when it did not, none of the allegations in the Second Amended Complaint support that theory. (*See generally* Doc. No. 62.)

and failure to apply negotiated MAC pricing—were committed on a nationwide basis, he neglected to do so. Both Defendants and this Court thus understood the nationwide claims to be cabined to only three areas. Plaintiff cannot now, in an effort to engage in unbridled discovery, unilaterally expand the scope of his Amended Complaint. As such, the Court restricts the scope of nationwide discovery to Defendants' DUR practices in the areas of gender indications, expired NDCs, and missing/false physician push numbers."); *see also C&S Wholesale Grocers, Inc. v. Gerrity's Super Market, Inc.*, No. 3:22-CV-1331, 2023 WL 5651997, at *2 (W.D. Pa. Aug. 31, 2023) (finding "parties . . . have no entitlement to discovery to develop new claims or defenses that are not already in the pleadings" and can only seek discovery relevant to "existing claims"). The parties should meet and confer about which records are "related to ADL services," and to the extent they are unable to reach agreement, discuss this issue with the Special Master.[8]

### B.    Kindred's Objections

Turning to Kindred's objections, Kindred argues that the Special Master erred by finding that the relevant dates for discovery include the period from February 11, 2016 (the date Relator filed his initial Complaint) through November 30, 2018 (the date Kindred completely divested control of the subject facilities). (Doc. No. 199 at 3.) The August R&R recommends that Kindred be required to produce records from this time period because they are relevant to Relator's allegations that "the conduct at issue is ongoing." (Doc. No. 192 at 4.) Kindred objects to this recommendation, arguing that "Relator has not pled ongoing misconduct with sufficient particularity and therefore is not entitled to discovery post-dating the filing of his Complaint." (Doc. No. 199 at 3.) The Court agrees with Kindred.

---

[8] Relator asks the Court to direct Kindred to "divulge specifically how it has determined which records are 'related to ADL services.'" (Doc. No. 179 at 6 n.3.) The Court agrees that Kindred must provide this information.

13

When Rule 9(b) governs the pleadings, a plaintiff must do more than plead in vague terms that the unlawful conduct is "continuing" before the court will allow discovery into a defendant's practices to the present. *See Spay*, 2013 WL 4525226, at *3 ("The simple inclusion of a cursory allegation that the Defendants' conduct is ongoing—made on information and belief only and without any of the specificity mandated by Federal Rule of Civil Procedure 9(b)—does not automatically entitle Plaintiff to obtain expansive discovery to the present of all of Defendants' practices in order to uncover new false claims."); *see also U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, No. 11 Civ. 0071 (PGG), 2015 WL 13649823, at *3 (S.D.N.Y. Aug. 29, 2015) ("In the context of the FCA, courts in other circuits have repeatedly found that rote allegations of 'ongoing' illegal activity, unaccompanied by allegations of specific instances of wrongdoing, are insufficient to justify discovery beyond the time period during which specific instances of wrongdoing have been alleged."); *cf. Simms Powell*, 2013 WL 12114445, at *5 ("Discovery should not be had prior to the 2005 time period because the Complaint only particularly describes fraud upon SACS as occurring as of 2005, when Defendants allegedly falsely represented to SACS that they were was [sic] making required corrective measures to meet SACS accreditation requirements." (citations omitted)).

Relator looks to distinguish *Spay* and *Bilotta*, arguing that those cases differ from this one because they involved complaints with defined date ranges, which the relators looked to expand in discovery, whereas here, Relator alleges a sweeping scheme by Kindred without any conclusive time periods.[9] (Doc. No. 204 at 4–6.) But Relator's argument ignores that in both

---

[9] Relator also once again argues that Kindred's objection is inconsistent with its prior position to "produce[ ] more than a dozen residents' medical records related to Medicare claims and treatment which occurred after February 11, 2016, in the bellwether discovery phase." (Doc. No. 204 at 2.) The Court rejects this argument for the same reasons we rejected it in connection with Relator's request for medical records unrelated to the provision of ADL services.

14

cases the courts were primarily concerned with the lack of any specific allegations related to continuing conduct. For example, when the court in *Spay* declined the relator's request to allow discovery "from 2006 to the present," it explained that the "most important[ ]" reason for its decision was the fact that the "Amended Complaint's allegations of continuing misconduct are superficial at best." 2013 WL 4525226, at *2. The court found that "cursory allegations" of continuous conduct were "unquestionably insufficient to open the door to broad and burdensome discovery into Defendant's nationwide practices over the course of more than seven years." *Id.* Similarly, the court in *Bilotta* emphasized that the relator's operative complaint "contain[ed] no specific allegations of illegal conduct after November 2011," and it rejected the idea that "rote allegations of 'ongoing' illegal activity" were sufficient to "justify discovery beyond the time period during which specific instances of wrongdoing have been alleged." 2015 WL 13649823, at *3.

Like the relators in *Spay* and *Bilotta*, Relator here has provided only "cursory" and "superficial" allegations of ongoing illegal conduct. As Relator concedes, the Second Amended Complaint "alleges the starting point for the alleged conduct by Kindred as 'at least 2008,' but does not reference a precise endpoint for that conduct, instead alleging conduct ongoing through 'the present.'" (Doc. No. 204 at 4.) Given the lack of any specific allegations as to when the unlawful conduct ended, the Court cannot find that Relator has shown discovery through November 30, 2018 is relevant to his claims.[10] Instead, the Court sets an upper temporal limit on discovery of February 11, 2016, the date Relator filed his initial Complaint. *See Druding*, 2017 WL 11461795, at *5 ("[G]iven that the complaint places no temporal construction on when

---

[10] Because Relator has failed to show that discovery from this period is relevant, the Court need not address whether Kindred has shown that the requested discovery is unduly burdensome. *See Morrison*, 203 F.R.D. at 196.

Defendant's alleged fraudulent conduct allegedly ended, the upper temporal limit for discovery in this action should be no later than April 29, 2008" when the relators "filed their initial complaint against Defendant."); *see also U.S. ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005) (finding the "proper temporal range for discovery is February 1997 *through the date of the original complaint*" in a case where the relator alleged that the defendant "submitted false claims from at least the time of [his] hiring into the undefined future" (emphasis added)).

Given the vague nature of Relator's allegations, the heightened pleading requirements of Rule 9(b), and the persuasive rulings of other courts to consider this issue, the Court finds that Relator's allegations are insufficient to show he is entitled to discovery on claims that may have accrued after the filing of the initial complaint in this action. Accordingly, the upper temporal limit on discovery is February 11, 2016, and the Court declines to adopt the portion of the August R&R that recommends holding otherwise.

### III.  CONCLUSION

For the reasons discussed above, Relator's objections are overruled, and Kindred's objections are sustained. The relevant period for discovery is January 1, 2008 to February 11, 2016. The remainder of the August R&R is approved and adopted.